UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JOHN DOE[1] ("Plaintiff"),

                Plaintiff,

    v.

HOBART AND WILLIAM SMITH COLLEGES,
WILLIAM BOERNER, TAMARA CHASE, and
KELLEY HODGE

                Defendants.

_____

**DECISION AND ORDER**

6:20-CV-06338 EAW

## INTRODUCTION

Plaintiff John Doe[1] ("Plaintiff") was expelled from defendant Hobart and William Smith Colleges ("HWS") in April 2020, after having been found responsible for sexually assaulting a female classmate, Jane Roe ("Roe")[2]. (Dkt. 16). He brings this lawsuit against HWS, William Boerner ("Boerner"), the Title IX Coordinator and Assistant Vice President of HWS, Tamara Chase ("Chase"), an investigator contracted by HWS to investigate Roe's claims against Plaintiff, and Kelley Hodge ("Hodge"), an attorney who served as the adjudicator for Roe's claims against Plaintiff. (*Id*).

Currently pending before the Court are three motions to dismiss, filed by Chase (Dkt. 20), HWS and Boerner (Dkt. 21), and Hodge (Dkt. 22), respectively. For the reasons

---

[1]     The Court previously entered a Decision and Order granting Plaintiff permission to proceed under a pseudonym. (Dkt. 36).

[2]     Roe and the other HWS students referenced in Plaintiff's pleadings are referred to pseudonymously.

set forth below, the Court grants in part and denies in part Chase's motion to dismiss, grants in part and denies in part HWS' and Boerner's motion to dismiss, and grants Hodge's motion to dismiss.

**FACTUAL BACKGROUND**

The following facts are taken from Plaintiff's amended complaint and, as is required at this stage of the proceedings, are presumed to be true.

## I.  Background Information Regarding Sexual Assaults on College Campuses and Investigation Into and Public Criticism of HWS

On April 4, 2011, the United States Department of Education's Office for Civil Rights (the "OCR") issued a "Dear Colleague Letter" to colleges and universities in order to explain its interpretation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.* ("Title IX"), and the regulations associated therewith.  (Dkt. 16 at ¶ 19). The Dear Colleague Letter "advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX" and required colleges and universities receiving federal funding to "take immediate action to eliminate the harassment, prevent its recurrence, and address its effects." (*Id*.).  Despite the fact that the Dear Colleague Letter purported to be a guidance document, the Department of Education treated it "as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus."  (*Id*. at ¶ 20).  The Dear Colleague Letter, "while not completely ignoring due process concerns, suggested that schools should focus more on victim advocacy."  (*Id*. at ¶ 21).

On April 19, 2014, the OCR "issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence*." (*Id*. at ¶ 22). This document was "aimed at addressing educational institutions' sexual misconduct policies[.]" (*Id*. at ¶ 23). Also in April 2014, "the White House issued a report titled *Not Alone*, which included a warning that if the OCR finds a school in violation of Title IX, the school risks losing federal funds." (*Id*. at ¶ 24 (internal quotation marks omitted)).

In May 2014, the Department of Education included HWS on a list of colleges "under investigation for possibly violating federal rules aimed at preventing sexual harassment." (*Id*. at ¶ 29). The investigation into HWS was related to a complaint made against it in 2014 on behalf of a female student who claimed to have been sexually assaulted by three members of the school's football team. (*Id*. at ¶¶ 30-31). HWS was subject to extensive criticism in the national media regarding its handling of the female student's claim. (*Id*. at ¶¶ 32-36). Plaintiff claims that HWS made policy revisions as a result of this backlash, which have "focus[ed] on victim advocacy, in order to avoid any further bad media attention, the likes of which caused the school considerable reputational harm in 2014 and the years that followed." (*Id*. at ¶ 43). Plaintiff further asserts, relying in part on a 2018 article in HWS' school newspaper entitled *Four Years Later: The Herald Investigates Sexual Misconduct Response at HWS*, that HWS "is still acutely aware of the potential for another massive public media bashing should it fail to find a male student responsible for an alleged sexual assault – particularly when the allegations involve alcohol

and a female student alleging she was incapacitated, as did the woman at the center of the 2014 controversy." (*Id*. at ¶¶ 45-49).

A second OCR investigation into HWS was opened in 2015. (*Id*. at ¶ 50). Both investigations continued for years, and were finally resolved on September 28, 2018. (*Id*.).

In 2018, the Department of Education rescinded the Dear Colleague Letter and issued proposed new Title IX regulations. (*Id*. at ¶¶ 52-53). HWS "signed onto a public objection to the proposed new regulations, arguing in large part that the imposition of uniform standards of fairness and due process in Title IX adjudications would create too heavy a burden on schools." (*Id*. at ¶ 54).

## II.    <u>Encounter between Plaintiff and Jane Roe</u>

The encounter between Plaintiff and Jane Roe that gave rise to the disciplinary proceedings at issue in this lawsuit occurred between the late night of October 20, 2018, and the morning of October 21, 2018. Shortly before the encounter, Plaintiff had connected with Roe's roommate, Sally Smith ("Smith") on a dating application called Tinder. (*Id*. at ¶ 64). Plaintiff thereafter began chatting with Smith on another application known as Snapchat. (*Id* at ¶ 67). Plaintiff's username on Snapchat is his first and last name. (*Id*. at ¶ 68).

Just before midnight on October 20, 2018, Plaintiff was in his dorm room chatting with Smith on Snapchat. (*Id*. at ¶ 70). Smith invited Plaintiff to her dorm room, but Plaintiff told her that he wanted to be alone with her and complained that her roommate would be present if he came to her room. (*Id*. at ¶¶ 70-71). Smith told Plaintiff that she would "get rid of her roommate so that they could be alone" and insisted that he come to

her dorm room. (*Id*. at ¶ 71). Smith told Plaintiff that she would let him into the dorm. (*Id*.).

Plaintiff walked to Smith's dorm and sent her a message on Snapchat advising her of his arrival and asking her to let him in. (*Id*. at ¶ 72). However, before Smith arrived, someone else let Plaintiff into the dorm. (*Id*.). Plaintiff messaged Smith that someone else had let him into the building but that he was still waiting for her because he did not know which room was hers. (*Id*. at ¶ 73). Plaintiff and Smith exchanged a few more messages, and Smith eventually met Plaintiff in the lobby of her dorm and took him into her room, where her roommate, Roe, was present. (*Id*. at ¶¶ 73-75).

"After a few moments, Smith then walked out of her dorm room, leaving Plaintiff there with her roommate, without explanation." (*Id*. at ¶ 76). Plaintiff asked Roe, "what was that about?" and Roe advised Plaintiff that she and Smith had had a "big night." (*Id*. at ¶¶ 77, 79). Roe and Plaintiff then had an approximately ten-minute conversation about her home country and family background and Plaintiff's travels outside the United States. (*Id* at ¶¶ 80-81). Roe then moved across the bed on which she was laying and kissed Plaintiff. (*Id*. at ¶ 82). Plaintiff and Roe kissed on the bed and touched each other over their clothes. (*Id*. at ¶ 83). Roe then lowered Plaintiff's pants, with Plaintiff's assistance, and performed oral sex on him. (*Id*. at ¶ 84). Plaintiff asked Roe if she wanted to have sex and advised her that he did not have a condom with him. (*Id*. at ¶ 85). Roe got out of bed and retrieved a condom from her drawers, which she handed to Plaintiff. (*Id*. at ¶ 85). Plaintiff placed the condom on his penis and had consensual vaginal intercourse with Roe for "a few minutes" before ending the sexual encounter. (*Id*. at ¶¶ 86-87). "Plaintiff and

Roe then bid each other goodbye and Plaintiff returned to his dorm at approximately 1:00 a.m. on October 21, 2018." (*Id.* at ¶ 88).

Video taken approximately twenty minutes after Plaintiff left Smith's and Roe's dorm room shows Smith, Roe, and another female friend leaving their dorm to meet with a fourth friend, Anna. (*Id.* at ¶ 89). In the video, Roe "is clearly walking on her own, in steady gate, fully oriented to time, place, and activity, and joking about having to go 'save' a friend." (*Id.* at ¶¶ 90-91). After Roe and Smith met up with Anna, "Smith contacted a different male student, and went home with him. Smith did not return to her and Roe's dorm room until the next morning, after 5:00 a.m." (*Id.* at ¶ 92-93). Plaintiff never reached out to either Smith or Roe again after the encounter, which he regarded "as a random hookup, a fairly common interaction on College campuses." (*Id.* at ¶ 96).

III. **Complaint by Roe and HWS Investigation**

Nearly a year after the encounter described above, Roe, accompanied by Smith, filed a complaint against Plaintiff with HWS's Title IX office. (*Id.* at ¶ 97). Roe and Smith reported that they had been out drinking on the night of October 20, 2018, and that they were "very drunk" when they returned to their shared room. (*Id.* at ¶ 98). Roe and Smith further reported that Plaintiff had been "pursuing" Smith and that on October 20, 2018, he was "trying to come over" even though Smith "was telling him no." (*Id.* at ¶ 99). Smith claimed that she had left her room to go to the bathroom, leaving Roe "face down on her bed, blackout [drunk]." (*Id.* at ¶ 100). According to Smith, when she returned from the bathroom, she found Plaintiff in her room with Roe, and she yelled at him, causing him to leave the room. (*Id.*). Roe alleged that she "came to" and discovered Plaintiff's "hands all

over her and he was then shoving it in her butt." (*Id*. at ¶ 101). Roe reported that she did not know Plaintiff's name at the time of the incident, but that she saw him on campus in the spring of 2019 and pointed him out to a friend, who provided his name. (*Id*. at ¶ 102). Roe also noted that she had failed a class during the spring 2019 semester and required academic accommodations. (*Id*. at ¶ 103).

Plaintiff received a Notice of Investigation (the "Notice") on September 20, 2019, advising him that Roe had filed a complaint alleging that on October 21, 2018, he "sexually assaulted her while she was face down and blacked out on her bed." (*Id*. at ¶¶ 103-104). The Notice did not set forth the specific sexual acts of which Plaintiff was accused. (*Id*. at ¶ 105).

HWS hired CSC Investigations ("CSC"), an outside investigative firm, to conduct the Title IX investigation in Roe's complaint. (*Id*. at ¶ 106). CSC's investigators are trained in a "trauma-informed" approach to sexual misconduct investigations, which Plaintiff claims is "linked . . . to the protection of girls and women." (*Id*. at ¶¶ 108-109 (internal quotation marks omitted)). Plaintiff additionally claims that the trauma-informed approach prohibits an investigator from "(i) ask[ing] a complainant basic questions, such as clarifying inconsistencies in her story or filling in gaps; (ii) observ[ing] the complainant's demeanor as part of a credibility assessment; or (iii) tr[ying] to drill down on the details and establish a timeline of the night." (*Id*. at ¶ 110 (internal quotation marks omitted)). Further, "investigators and adjudicators are taught in trauma-informed trainings that inconsistencies in a complainant's story are a direct result of the trauma. Similarly,

they are trained to view those inconsistencies as a natural byproduct of assault as opposed to an indicator that the complainant's story may lack credibility." (*Id*. at ¶ 112).

Chase, a CSC employee, conduct the investigation into Roe's complaint. (*Id*. at ¶ 118). Chase first interviewed Roe, then Smith, and then Plaintiff. (*Id*. at ¶ 119). Chase also interviewed three other HWS students. (*Id*. at ¶ 120). Plaintiff alleges that Chase audio-recorded all of these interviews but subsequently destroyed the recordings "as a matter of course." (*Id*. at ¶ 121). After completing her initial round of interviews, Chase conducted follow-up interviews with Roe and Smith, "informing them of new information that arose in the other interviews and giving them an opportunity to amend or correct their claims in light of the new information." (*Id*. at ¶ 122). However, Chase never invited Plaintiff for a follow-up interview. (*Id*.).

Chase issued her final investigative report on February 7, 2020. (*Id*. at ¶ 123). The final investigative support contained summaries of Chase's interviews with the parties and witnesses in which Chase "deliberately excluded or subtly altered information from Roe and Smith's story that was inconsistent with the evidence/witnesses or damaged their credibility." (*Id*. at ¶ 124). "The summaries of the interviews from Roe and Smith also contained no acknowledgment or analysis of the fact that they both made statements in their interviews that contradicted each other as well as their initial claims when first filing the Title IX report." (*Id*. at ¶ 126). Further, "the final investigative report made no mention of the relevance of the video evidence showing Roe awake, alert, fully oriented towards time, place, and context—and smiling and laughing—just twenty to thirty minutes after the alleged assault." (*Id*. at ¶ 134). "In sum, the entirety of the report was clearly written in

such a way to bolster Roe's claims and to completely obfuscate any evidence that might tend to weaken her credibility or support Plaintiff's version of events." (*Id*. at ¶ 139).

IV. **Adjudicatory Hearing, Outcome, and Appeal**

HWS conducted an adjudicatory hearing regarding Roe's claims against Plaintiff on March 9, 2020. (*Id*. at ¶ 141). Hodge, an attorney and former prosecutor, served as the sole adjudicator. (*Id*. at ¶ 142). "Hodge was provided a copy of the Final Investigative Report, as well as the interviews, photos, and videos submitted during the investigation." (*Id*. at ¶ 143). "Boerner, Plaintiff and his counsel, Roe and her attorney, [HWS']s attorney, and [HWS]'s Deputy Title IX Coordinator, Katie Stiffler" were present for the hearing. (*Id*. at ¶ 144). Chase did not appear at the hearing. Further, although Hodge called Anna as a witness, Anna did not appear, and no reason for her failure to appear was provided to the parties. (*Id*. at ¶ 145). The "young women to whom Roe had alleged she made her first 'outcry' about the incident to in the Spring or Summer of 2019" also did not appear, again without explanation. (*Id*. at ¶ 146).

During the hearing, "Hodge declined to ask probing questions directly relevant to Roe and Smith's claim that Roe was passed out, blacked out, immobile and completely incapacitated when she and Plaintiff had intercourse." (*Id*. at ¶ 147). "At the hearing, Jane Roe continued to tell demonstrable lies and inconsistencies." (*Id*. at ¶ 149). Further, at several points during the hearing, "Roe's attorney was feeding her the answers to direct questions about the facts of the events at hand. The recording of the hearing subsequently reviewed by Plaintiff clearly caught Roe's attorney whispering to her substantive responses to Hodge's questions, which Roe then parrots back as if her own." (*Id*. at ¶ 151). "In

contrast to the deferential treatment given to Roe and Smith. . ., when it was time to pose questions to Plaintiff, Adjudicator Hodge was confrontational and essentially conducted a cross-examination aimed at trying to damage Plaintiff's credibility and prosecute him, rather than conduct an impartial and dispassionate inquiry." (*Id*. at ¶ 159). Hodge further "asked Plaintiff patently inappropriate and pointed questions that implied a presumption of guilt and a need to explain and prove his innocence." (*Id*. at ¶ 160).

Hodge issued an outcome letter (the "Outcome Letter") as to Plaintiff's case on March 16, 2020. (*Id*. at ¶ 171). In the Outcome Letter, Hodge found Plaintiff responsible for sexually assaulting Roe and recommended a sanction of expulsion. (*Id*.). Plaintiff alleges numerous issues with the Outcome Letter, including that (1) it "skipped over any analysis of the factors that constitute incapacity under the relevant [HWS] policy, instead categorically concluding that Roe was intoxicated—based on her own report of her alcohol consumption that evening, which was not corroborated by any witness and did not take into account her professed high alcohol tolerance—and then skipping straight from intoxication to presumed incapacitation"; (2) "[i]n finding that Roe was intoxicated, Hodge . . . relied on investigative interview summaries of witnesses who did not attend the hearing, and therefore, Hodge had no basis to evaluate their credibility and Plaintiff had no opportunity to cross-examine them"; (3) "[f]or her factual conclusions, Hodge largely copy/pasted the most damaging, inflammatory version of the allegations from Roe and Smith's investigation interview reports, completely ignoring every inconsistency in their claims and much of their testimony at the hearing"; and (4) "Hodge . . . made clear in her Outcome Letter that her decision was based on her gender-based presumption that a woman would

never consent to casual or anonymous sex, and therefore Plaintiff's version of events was simply not believable." (*Id*. at ¶¶ 176-179). Plaintiff also takes issue with Hodge's rationale for recommending expulsion—namely, that it was "necessary to address the continued affects that the incident had on Jane Roe." (*Id*. at ¶ 185). Plaintiff notes that by the time the Outcome Letter was issued, HWS "had moved all courses to remote/online formatting due to the COVID-19 crisis" and there was accordingly "no way that Roe would ever have to see Plaintiff on campus again, as it was Plaintiff's final semester and he had already left campus and did not share any courses with Roe." (*Id*.).

On March 25, 2020, Plaintiff submitted an appeal from the finding of responsibility and the sanction of expulsion. (*Id*. at ¶ 187). Roe submitted a response to Plaintiff's appeal on April 1, 2020, in which she included a note purportedly written by Anna. (*Id*. at ¶ 190). The note was neither sworn nor notarized and "purported to provide an innocuous excuse for Anna's failure to appear at the hearing and made several inflammatory statements about the trauma of assault and her full support for Jane Roe." (*Id*. at ¶ 192).

Boerner, "who was in charge of vetting the student submissions to the appeal panel, did not make any initial determination that this document was improper and should not be submitted[.]" (*Id*. at ¶ 194). Instead, Plaintiff's counsel "had to write to Boerner asking him to remove this information, as it is not permitted under the policies, and to convene a new appeals panel who had not been tainted by viewing the inappropriate documents." (*Id*. at ¶ 195). Boerner agreed to "redact the improper information, but would not convene a new panel, as the appeals panel had allegedly not accessed the documents yet." (*Id*. at ¶ 196). Plaintiff's counsel then advised Boerner that "the improper documents were still

available, in full, unredacted, in the online appeal folder," to which HWS responded that "the appeals panel did not have access to that online folder and were not provided copies of the note." (*Id*. at ¶¶ 197-198).

HWS denied Plaintiff's appeal on April 11, 2020, thereby finalizing his expulsion. (*Id*. at ¶ 199). HWS issued a two-page appeal outcome letter in which it "disregarded most of Plaintiff's arguments about adjudicator bias and failure to account for evidence as 'not within the scope of an appeal,' and wrote off the rest of Plaintiff's concerns with minimal explanation." (*Id*.).

## **PROCEDURAL HISTORY**

Plaintiff filed the instant action on May 22, 2020, and contemporaneously therewith filed a motion to proceed under a pseudonym. (Dkt. 1; Dkt. 2). Plaintiff filed an amended complaint on August 26, 2020, which is the operative pleading. (Dkt. 16). Plaintiff's amended complaint sets forth five causes of action: (1) a violation of Title IX by HWS; (2) breach of contract by HWS, Chase, and Hodge; (3) promissory estoppel by HWS; (4) negligence by Boerner, Chase, and Hodge; and (5) negligence on the basis of respondeat superior against HWS. (*Id*.).

The instant motions to dismiss the amended complaint were filed on September 28, 2020. (Dkt. 20; Dkt. 21; Dkt. 22). Plaintiff's responses were filed on November 16, 2020 (Dkt. 25; Dkt. 26; Dkt. 27), and Defendants' replies were filed on December 3, 2020. (Dkt. 29; Dkt. 30; Dkt. 31).

The Court granted Plaintiff's request to proceed pseudonymously on March 19, 2021. (Dkt. 36).

**DISCUSSION**

I. **Legal Standard**

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). A court should consider the motion by "accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016). To withstand dismissal, a claimant must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted). "To state a plausible claim, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Nielsen*

*v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).

## II.     **Chase's Motion to Dismiss**

The Court turns first to Chase's motion to dismiss.  As noted above, Plaintiff has asserted claims for breach of contract and negligence by Chase.  For the reasons set forth below, the Court denies Chase's motion with respect to Plaintiff's breach of contract claim but grants it with respect to Plaintiff's negligence claim.

### A.     **Breach of Contract**

Plaintiff does not allege that there exists a contract between himself and Chase. Instead, he alleges that Chase entered into a contract with HWS and that he is a third-party beneficiary of that contract.  (*See* Dkt. 16 at ¶¶ 275-276).

In seeking dismissal of the breach of contract claim, Chase has submitted to the Court a copy of an "Investigative Services Agreement" purportedly between HWS and CSC.  (Dkt. 20-3).  However, the copy of the Investigate Services Agreement provided to the Court is incomplete and only partially executed.  (*Id.*).  Further, the authenticity of the copy of the Investigative Services Agreement submitted to the Court has not been established by an individual with personal knowledge; instead, it has been attached to the attorney affidavit of Chase's counsel, with no explanation of how it was obtained or how its accuracy was verified.  (*See* Dkt. 20-1 at ¶ 3).

 "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the

complaint." *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010). Further, "[w]here a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." *Id.* (quotations omitted). "[A] contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls" is generally deemed integral to the complaint, and accordingly may typically be considered on a motion to dismiss. *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006). However, "even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document" before the Court can take such document into account on a Rule 12(b)(6) motion. *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

Here, it is not clear on the record that no dispute exists regarding the authenticity or accuracy of the copy of the Investigative Services Agreement submitted by Chase. To the contrary, Plaintiff expressly states that he is not conceding authenticity. (Dkt. 25 at 12 n.3). Under these circumstances, the Court cannot consider the copy of the Investigative Services Agreement submitted by Chase in deciding her motion to dismiss. *See Azzolini v. Marriott Int'l, Inc.*, 417 F. Supp. 2d 243, 246 (S.D.N.Y. 2005) ("[W]here plaintiff relies on a document of disputed authenticity, as is the case here, the court may not consider it on a motion to dismiss.").

Because the Court cannot consider the copy of the Investigative Services Agreement submitted by Chase, her request for dismissal of Plaintiff's breach of contract claim, which relies entirely on the language of said Investigative Services Agreement, must be denied.

- 15 -

**B.**    <u>Negligence</u>

The Court turns next to Plaintiff's negligence claim against Chase. The parties are in agreement that New York law governs this claim. (*See* Dkt. 20-5 at 13; Dkt. 25 at 14).

"The elements of a negligence claim under New York law are: (i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach." *Pasternack v. Lab'y Corp. of Am. Holdings*, 807 F.3d 14, 19 (2d Cir. 2015) (quotation omitted). "It is axiomatic that there can be no claim for negligence in the absence of a duty of care, running to the injured party," and "[t]he existence and scope of a duty is an issue of law for the court to determine." *Kennedy-McInnis v. Biomedical Tissue Servs., Ltd.*, 178 F. Supp. 3d 97, 102 (W.D.N.Y. 2016).

Here, Chase argues that she had no duty of care to Plaintiff. (*See* Dkt. 20-5 at 14-21). In opposition, Plaintiff contends that Chase had a duty of care to Plaintiff arising from her performance of her contractual obligations to HWS. (*See* Dkt. 25 at 14).

Under New York law, "a contractual obligation, standing alone, will generally not give rise to tort liability in favor of a third party." *Espinal v. Melville Snow Contractors, Inc.*, 98 N.Y.2d 136, 138 (2002). However, "under some circumstances, a party who enters into a contract thereby assumes a duty of care to certain persons outside the contract[.]" *Id.* at 139. In particular, "a party who enters into a contract to render services may be said to have assumed a duty of care—and thus be potentially liable in tort—to third persons" where (1) the contracting party, "in failing to exercise reasonable care in the performance of his duties, launches a force or instrument of harm"; (2) "the plaintiff detrimentally relies on the continued performance of the contracting party's duties"; or (3) "the contracting

party has entirely displaced the other party's duty" to the plaintiff. *Id*. at 140 (quotation and alteration omitted).

The Court agrees with Chase the none of the three exceptions to the general New York rule regarding duty of care and contractual obligations applies here. "New York courts analyzing the first *Espinal* exception have interpreted the phrase 'launching a force or instrument of harm' to mean "negligently creating or exacerbating a dangerous condition." *Nguyen v. Morrison Healthcare*, 412 F. Supp. 3d 196, 202 (E.D.N.Y. 2018) (quotation and alterations omitted). Here, Plaintiff argues that Chase "created an unreasonable risk of a wrongful finding through her biased and improper investigation and report[.]" (Dkt. 25 at 15).

The Second Circuit's decision in *In re Lake George Tort Claims*, 461 F. App'x 39 (2d Cir. 2012) is instructive. There, the plaintiffs claimed that the defendant had launched a force or instrument of harm by building a canopy that was unsafe for a forty-eight-passenger boat. *Id*. at 41. The Second Circuit found that the relevant question was whether the canopy constructed by the defendant created a danger that the previously existing canopy did not. *Id*. Since the plaintiffs could not demonstrate that this was the case, their negligence claims could not survive. *Id*.

By analogy, the question in this case is whether Plaintiff has plausibly alleged that Chase's investigation into Roe's complaint increased the risk that Plaintiff would be wrongfully found responsible for sexual assault. As set forth in *In re Lake George*, the relevant point of comparison is not to some hypothetical, more fulsome investigation, but to the state of affairs *before* Chase undertook her contractual obligation. Before Chase

began her investigation, the statements made by Roe and Smith were the only information HWS had available to it regarding Roe's complaint. Plaintiff cannot plausibly contend that Chase's investigation, during which he was afforded an opportunity to tell his side of the story, somehow left him in a worse position than he would have been given no investigation whatsoever.

It is not sufficient that Plaintiff alleges Chase performed a deficient investigation and failed to uncover and/or include in her Investigative Report highly relevant evidence. *See Nguyen*, 412 F. Supp. 3d at 2013 ("[A]n alleged omission or inaction is insufficient to find that a defendant launched an instrument of harm where inaction is at most a refusal to become an instrument for good. (quotation omitted)); *see also Church ex rel. Smith v. Callanan Indus., Inc.*, 99 N.Y.2d 104, 112 (2002) (explaining that the first *Espinal* exception does not allow for imposition of liability where the contracting party merely "fail[ed] to make conditions safer for the injured party" and finding no duty where the defendant failed to perform its contractual duty to install additional guiderails, thus resulting in car accident, because the defendant's conduct did not "create[] or increase[] the risk of the [car's] divergence from the roadway beyond the risk which existed even before [the defendant] entered into any contractual undertaking"). In other words, even assuming that a better, more complete, less biased investigation by Chase would have *decreased* the likelihood of an erroneous resolution of Roe's claims, that does not mean that her subpar investigation (again, compared to no investigation taking place at all) *increased* the likelihood of such error.

The second *Espinal* exception also does not allow Plaintiff to state a negligence claim against Chase. Plaintiff argues that "as a respondent going through the disciplinary process, [he] essentially had to rely on Chase's performance, as he relied on [HWS]'s promises to its students concerning the disciplinary process through the issuance of its Policies, which Chase expressly agreed to abide by." (Dkt. 25 at 15). However, the second *Espinal* exception "only applies when performance of contractual obligations has induced detrimental reliance on continued performance and the defendant's failure to perform those obligations positively or actively works an injury upon the plaintiff." *DeAngelis v. Am. Airlines, Inc.*, No. 06-CV-1967 (NGG), 2010 WL 1292349, at *4 (E.D.N.Y. Mar. 31, 2010) (quotations omitted). Here, Plaintiff has not alleged that Chase performed her contractual obligations in such a fashion that he was detrimentally induced to rely on her continued performance. To the contrary, he affirmatively alleges that Chase failed to comply with her contractual obligations throughout the entire process, and that he relied on her because he had no other choice.

Finally, Plaintiff has offered no argument that the third *Espinal* exception applies here, nor does the Court discern any basis for such a finding in Plaintiff's allegations. Accordingly, Plaintiff has not plausibly alleged that Chase's performance of her contractual obligations created a duty of care to Plaintiff sufficient to support a negligence claim.

The Court notes that, although Plaintiff does not make such an argument in opposition to Chase's motion to dismiss, in the amended complaint, he seems to indicate that New York Education Law Article 129-B ("Article 129-B"), which is commonly known

as the "Enough is Enough Law," imposed a statutory duty of care on Chase. (*See* Dkt. 16 at ¶¶ 293-294). Article 129-B was enacted in 2015 and was intended "to require all colleges and universities in the State of New York to implement uniform prevention and response policies and procedures relating to sexual assault, domestic violence, dating violence and stalking." *Doe v. Syracuse Univ.*, No. 5:18-CV-377, 2019 WL 2021026, at *8 (N.D.N.Y. May 8, 2019). The provisions of Article 129-B impose obligations on colleges and universities; they do not, by their own terms, impose obligations on individuals. The Court finds no basis for finding that Article 129-B imposed a duty of care on Chase.

For all these reasons, the Court finds that Chase is entitled to dismissal of Plaintiff's negligence claim against her.

## III.   Hodge's Motion to Dismiss

Plaintiff has also asserted a breach of contract claim and a negligence claim against Hodge. However, in his response to Hodge's motion to dismiss, Plaintiff states that he "does not oppose Defendant Hodge's motion to dismiss his breach of contract claims as against her alone." (Dkt. 26 at 5 n.1). Accordingly, the Court grants that portion of Hodge's motion directed to the breach of contract claim, and limits its further analysis to the viability of the negligence claim.

### A.   Choice of Law

As a threshold matter, the parties dispute whether New York or Pennsylvania law governs Plaintiff's negligence claim against Hodge. Specifically, Hodge contends that Pennsylvania law applies, because the contract between HWS and her former employer

pursuant to which she performed her duties as adjudicator (referred to hereinafter as the "Fee Agreement") provides that it shall be "governed by Pennsylvania law." (Dkt. 22-3 at ¶ 13)[3].

Here, the Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) to hear Plaintiff's state law claims. "A federal court entertaining state law claims under its supplemental jurisdiction applies the choice of law principles of the state in which it sits." *Bass v. World Wrestling Fed'n Ent., Inc.*, 129 F. Supp. 2d 491, 503 (E.D.N.Y. 2001). "Under New York law, in order for a choice-of-law provision to apply to claims for tort arising incident to the contract, the express language of the provision must be sufficiently broad as to encompass the entire relationship between the contracting parties." *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) (quotation omitted).

---

[3]     Unlike the contract submitted by Chase, Plaintiff has not contested the authenticity of the copy of the Fee Agreement submitted by Hodge, which is fully executed and has been authenticated by Hodge as a "true and accurate copy." (Dkt. 22-1 at ¶ 3; Dkt. 22-2). Accordingly, the Court may consider this document in resolving Hodge's motion to dismiss.

        The Court notes that Hodge is not a party to the Fee Agreement, but rather signed it as an agent of her former employer. However, under New York law, a nonparty to a contract can enforce the kind of contractual clause at issue here where "[t]he relationship between the nonparty and the [contracting party] . . . is sufficiently close so that enforcement of the clause is foreseeable by virtue of the relationship between them." *Bernstein v. Wysoki*, 77 A.D.3d 241, 251 (2d Dep't 2010). This requirement is satisfied where an employee seeks to enforce a clause in an agreement entered into by its employer. *Id.* at 253 (finding in medical malpractice case that camp physician could enforce forum selection clause in contract entered into by his employer); *see also Siroy v. Jobson Healthcare Info. LLC*, 51 Misc. 3d 1225(A), at *3 (N.Y. Sup. Ct., N.Y. Cty. 2016) (collecting cases in which New York courts have held that "the non-signatory employee was sufficiently close to the employer who did sign the contract and was foreseeable").

Here, the choice-of-law provision at issue provides as follows: "This fee agreement is governed by Pennsylvania law, and any disputes arising under, or concerning its enforcement or interpretation, shall be exclusively resolved in the federal or state courts in the Commonwealth of Pennsylvania." (Dkt. 22-2 at 3). The Court agrees with Hodge that this language is sufficiently broad to encompass Plaintiff's negligence claim, which is premised on Hodge's alleged failures in performing her contractual duties. The choice-of-law provision here is extremely similar to the choice-of-law provision in *Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304 (2d Cir. 1994), which the Second Circuit found was "sufficiently broad to cover tort claims as well as contract claims[.]" *Id*. at 309 (interpreting choice-of-law clause that provided as follows: "This note shall be governed by, and interpreted under, the laws of the State of New York applicable to contracts made and to be performed therein without giving effect to the principles of conflict of laws. The parties hereto consent to the exclusive jurisdiction of the courts of the State of New York to resolve any controversy or claim arising out of or relating to this contract or breach thereof.").

Further, under New York law, a choice-of-law clause also binds "parties claiming third-party beneficiary status," so long as the choice-of-law provision is not otherwise unenforceable. *See Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 417 (S.D.N.Y. 2010). Plaintiff, while not disavowing his claim to be a third-party beneficiary, contends that Hodge is judicially estopped from taking the position that the Fee Agreement is enforceable against him as a third-party beneficiary because she has argued to the contrary

in seeking dismissal of his breach of contract claim. (Dkt. 26 at 16-17). Plaintiff is incorrect.

> As the Supreme Court has explained:
>
> Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him. This rule, known as judicial estoppel, generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.

*New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quotations, citations, and alteration omitted). "[T]he circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle." *Id.* However, "in evaluating whether to apply the doctrine of judicial estoppel, courts generally look for the existence of three factors: (1) that a party's new position is 'clearly inconsistent' with its earlier position, (2) that the party seeking to assert this new position previously persuaded a court to accept its earlier position, and (3) that the party 'would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'" *Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 619 (2d Cir. 2012) (quoting *New Hampshire*, 532 U.S. at 750-51). The Second Circuit "further limit[s] judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity is certain." *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010). "This latter requirement means that judicial estoppel may only apply where the earlier tribunal accepted the accuracy of the litigant's statements." *In re Adelphia Recovery Tr.*, 634 F.3d 678, 696 (2d Cir. 2011).

Here, judicial estoppel does not apply, because Hodge never persuaded this Court (or any other) to accept her contention that Plaintiff is not a third-party beneficiary to the Fee Agreement. Hodge is thus free to argue, in connection with seeking dismissal of the negligence claim, that Plaintiff is a third-party beneficiary as to whom the choice-of-law clause is enforceable. Since Plaintiff also takes the position that he is a third-party beneficiary of the Fee Agreement, the Court accepts that contention for purposes of the instant motion.

### B.     Viability of Negligence Claim Against Hodge

Having resolved the threshold choice-of-law issue, the Court agrees with Hodge that, under Pennsylvania law, Plaintiff has not asserted a viable negligence claim against her. Pennsylvania recognizes the "gist of the action doctrine," pursuant to which a tort claim "based on the party's actions undertaken in the course of carrying out a contractual agreement, is barred when the gist or gravamen of the cause of action stated in the complaint, although sounding in tort, is, in actuality, a claim against the party for breach of its contractual obligations." *Earl v. NVR, Inc.*, 990 F.3d 310, 315 (3d Cir. 2021). The Pennsylvania Supreme Court has explained that the gist of the action doctrine applies where "the duty breached is one created by the parties by the terms of their contract." *Bruno v. Erie Ins. Co.*, 630 Pa. 79, 91 (2014).

Here, Plaintiff's negligence claims against Hodge (and Chase) are affirmatively premised on his contention that "[b]y accepting their contracts and performing their tasks for Hobart, Defendants Chase and Hodge affirmatively accepted a duty of care to conduct the proceedings in a non-negligent manner." (Dkt. 16 at ¶ 295). Plaintiff has offered no

- 24 -

argument that the Pennsylvania gist of the action doctrine allows for assertion of such a claim, nor could he successfully do so. The Court accordingly agrees with Hodge that Plaintiff's negligence claim against her must be dismissed.

## IV.  HWS's and Boerner's Motion to Dismiss

HWS and Boerner have filed a joint motion to dismiss all the claims against them. As set forth above, the amended complaint alleges claims for violation of Title IX, breach of contract, promissory estoppel, and negligence based on respondeat superior against HWS. The sole cause of action asserted against Boerner is one for negligence.

### A.  Negligence Claims

The Court agrees with Boerner that Plaintiff has not asserted a viable negligence claim against him. Plaintiff contends that "a duty may be owed when an individual administrator is in charge of overseeing the disciplinary process, witnesses violations of the standard of care (as set forth by Article 129-B of the Education Law), and despite having the power to prevent harm to a student, further contributes to that harm by upholding the flawed process." (Dkt. 27 at 30). However, this contention is wholly inconsistent with well-established case law holding that "there is no cause of action in the State of New York sounding in negligent prosecution or investigation." *Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 484 (S.D.N.Y. 2015) (citation and alteration omitted); *see also Noakes v. Syracuse Univ.*, 369 F. Supp. 3d 397, 421 (N.D.N.Y. 2019); *Doe v. Syracuse Univ.*, 341 F. Supp. 3d 125, 142 (N.D.N.Y. 2018); *Rolph v. Hobart & William Smith Colleges*, 271 F. Supp. 3d 386, 409 (W.D.N.Y. 2017). While Plaintiff suggests that these cases are somehow limited to negligence claims against institutions, rather than individual

administrators (*see* Dkt. 27 at 30), he offers no substantive basis for drawing such a distinction and fails to make any plausible argument that New York law imposes a greater duty in this regard on an individual as opposed to the institution for which he works. Plaintiff's negligence claim against Boerner must be dismissed.

Further, because the Court has dismissed the negligence claims against all the individual defendants, it must dismiss Plaintiff's derivative, respondeat superior-based negligence claim against HWS. *See Bain v. Town of Hempstead*, No. CV 17-6554 (AKT), 2021 WL 413552, at *11 (E.D.N.Y. Feb. 5, 2021) ("Plaintiff's respondeat superior claim is derivative of his negligence claim, which has already been dismissed by the Court. In the absence of an underlying tortious wrongdoing, a respondeat superior claim cannot survive.").

### B.      Title IX Claim Against HWS

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX, "which is enforceable through an implied private right of action, was enacted to supplement the Civil Rights Act of 1964's bans on racial discrimination in the workplace and in universities." *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016). "Because Title IX prohibits (under covered circumstances) subjecting a person to discrimination on account of sex, it is understood to 'bar[ ] the imposition of university discipline where gender is a motivating factor in the decision to discipline.'" *Id.* (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)).

Cases attacking university disciplinary proceedings on the ground of gender bias "fall generally within two categories." *Yusuf*, 35 F.3d at 715. The first category is an "erroneous outcome" theory, under which "the claim is that the plaintiff was innocent and wrongly found to have committed an offense." *Id.* The second category is a "selective enforcement" theory. *Id.* A selective enforcement claim "asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Id.*

Here, Plaintiff has asserted his Title IX claim on an erroneous outcome theory. A plaintiff bringing an erroneous outcome challenge must allege (1) "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding"; and (2) "a causal connection between the flawed outcome and gender bias." *Yusuf*, 35 F.3d at 715. "Such allegations might include, *inter alia*, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id.*

In *Columbia University*, the Second Circuit addressed the standard for judging the sufficiency of a complaint alleging discrimination under Title IX. 831 F.3d at 53-56. The *Columbia University* court explained that employment discrimination cases brought pursuant to Title VII of the Civil Rights Act of 1964 provide the proper framework for analyzing Title IX claims. *Id.* at 55-56; *see also Yusuf*, 35 F.3d at 714-15 ("Allegations of a causal connection in the case of university disciplinary cases can be of the kind that are found in the familiar setting of Title VII cases."). Accordingly,

> a complaint under Title IX, alleging that the plaintiff was subjected to discrimination on account of sex in the imposition of university discipline, is sufficient with respect to the element of discriminatory intent, like a complaint under Title VII, if it pleads specific facts that support a minimal plausible inference of such discrimination.

*Columbia Univ.*, 831 F.3d at 55-56. Further, "the inference of discriminatory intent supported by the pleaded facts [need not] be the most plausible explanation of the defendant's conduct. It is sufficient if the inference of discriminatory intent is plausible." *Id.* at 57.

Applying this pleading standard in *Columbia University*, the Second Circuit vacated a district court's dismissal of a complaint that alleged that Columbia University had violated Title IX by acting with gender bias in investigating and suspending a male student for an alleged sexual assault. *Id.* at 48. The Second Circuit reasoned that the complaint pleaded "sufficient specific facts giving at least the necessary minimal support to a plausible inference of sex discrimination to survive a Rule 12(b)(6) motion to dismiss. . . ." *Id.* at 56. The allegations that supported that inference included the following: (1) the investigator and hearing panel did not seek out all witnesses that the plaintiff had identified as sources of information favorable to him; (2) the investigator and panel failed to comply with Columbia University's procedures designed to protect accused students; (3) the investigator, the panel, and the reviewing dean reached conclusions that were erroneous and contrary to the weight of the evidence; (4) during the period before the disciplinary hearing, both the student body and public media heavily criticized Columbia University and accused it of not taking seriously complaints of female students alleging sexual assault by male students; and (5) Columbia University was aware of and sensitive to those

criticisms. *Id.* at 56-57. Although the allegations concerning the procedural defects alone supported an inference of bias, the allegations concerning the public criticism gave "ample plausible support to a bias with respect to sex." *Id.* at 57. The Second Circuit reasoned that, "[a]gainst this factual background, it is entirely plausible that [Columbia] University's decision-makers and its investigator were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual assault." *Id.* In other words, *Columbia University* "stands for the general principle that where a university (1) takes an adverse action against a student or employee, (2) in response to allegations of sexual misconduct, (3) following a clearly irregular investigative or adjudicative process, (4) amid criticism for reacting inadequately to allegations of sexual misconduct by members of one sex, these circumstances provide the requisite support for a *prima facie* case of sex discrimination." *Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019)

HWS attempts to distinguish this case from *Columbia University* by arguing that the public criticism of HWS's handling of sexual misconduct complaints is too temporally distant from the adjudication of Roe's claim against Plaintiff to support an inference of gender bias. (*See* Dkt. 21-1 at 13 (arguing for dismissal of Title IX claim because "none of the alleged criticism was contemporaneous")). However, HWS's argument ignores Plaintiff's allegations that (1) the public criticism of HWS's handling of sexual misconduct complaints continued into at least 2018 and (2) the OCR investigations of HWS were not resolved until September 28, 2018, less than a year before the investigation into Roe's complaint against Plaintiff began.

In *Menaker*, the Second Circuit expressly found a *prima facie* case of gender discrimination plausibly alleged because the plaintiff had set forth facts "that suggest at least *some* pressure on Hofstra to react more forcefully to allegations of male sexual misconduct (*e.g.,* the "Dear Colleague" Letter, a Department of Education investigation, and student criticism)." 935 F.3d at 34 (emphasis in original). More particularly, Hofstra had been identified by the national press in May 2015 "as one of several universities under investigation by the Department of Education for possible mishandling of sexual misconduct claims." *Id*. at 27. "At the same time, Hofstra also faced internal criticism for its assertedly inadequate response to male sexual misconduct on campus." *Id*. The complaint in Hofstra was made over one year later, in "late July 2016." *Id*.

HWS tries to distinguish *Menaker* from the instant case by noting that the Department of Education's investigation into Hofstra was ongoing, and by citing facts asserted in the underlying district court action but not mentioned or relied upon by the Second Circuit. (Dkt. 21-1 at 14)[4]. These arguments are not persuasive. It is plausible that a college that had just recently resolved two separate, years-long investigations by the Department of Education would be eager to avoid a third. Moreover, this Court will not assume that the Second Circuit's *Menaker* decision was motivated by facts not cited in the opinion. The allegations here are sufficiently similar to those in *Menaker* that the Court is

---

[4]    HWS also urges the Court to consider facts outside the pleadings in assessing the plausibility of Plaintiff's claim of gender discrimination, including news articles about the "the onslaught of Title IX lawsuits like this one," and allegations made by a different plaintiff, represented by the same counsel as Plaintiff here, in a different lawsuit. (Dkt. 21-1 at 15-16). The Court cannot do so on a motion to dismiss.

constrained to find that a *prima facie* case of gender discrimination has been plausibly alleged. Because HWS has not challenged any other aspect of Plaintiff's Title IX claim, it will be allowed to proceed.

C.     **Breach of Contract Claim Against HWS**

The Court turns next to Plaintiff's claim against HWS for breach of contract. HWS argues that Plaintiff has not plausibly alleged that it breached any "concrete and specific contractual provision and thereby caused him damages." (Dkt. 21-1 at 17). The Court disagrees, for the reasons that follow.

As HWS concedes in its moving papers, "Plaintiff is generally correct that New York law recognizes that the relationship between a student and a college is contractual in nature." (Dkt. 21-1 at 18 (quotation omitted)). As the Second Circuit has explained:

> Under New York law, an implied contract is formed when a university accepts a student for enrollment: if the student complies with the terms prescribed by the university and completes the required courses, the university must award him a degree. The terms of the implied contract are contained in the university's bulletins, circulars and regulations made available to the student. Implicit in the contract is the requirement that the institution act in good faith in its dealing with its students. At the same time, the student must fulfill his end of the bargain by satisfying the university's academic requirements and complying with its procedures.

*Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011) (citations and internal quotation marks omitted). A student asserting a breach of contract claim must identify the specific terms of the implied contract that were allegedly violated by the college (such as an internal rule, regulation, or code), and failure to do so is fatal to the claim. *Id.* (citing *Jones*, 92 A.D.3d at 999). "Not all terms in a student handbook are enforceable contractual obligations, however, and courts will only enforce terms that are

'specific and concrete.'" *Knelman v. Middlebury Coll.*, 898 F. Supp. 2d 697, 709 (D. Vt. 2012) (citation omitted), *aff'd*, 570 F. App'x 66 (2d Cir. 2014). "[G]eneral statements of policy" or "broad pronouncements of [a] University's compliance with existing anti-discrimination laws, promising equitable treatment of all students" cannot provide the basis for a breach of contract claim. *Ward v. N.Y. Univ.*, No. 99 CIV. 8733(RCC), 2000 WL 1448641, at *4 (S.D.N.Y. Sept. 28, 2000).

In his opposition to HWS's motion to dismiss, Plaintiff discusses the following specific contractual provisions that he contends HWS breached in this case: (1) a provision requiring the investigator to "gather other relevant and available evidence and information, including, without limitation, electronic or other records of communications between the parties or witnesses (via voice-mail, text message, email and social media sites), photographs (including those stored on computers and smartphones), and medical records (subject to the consent of the applicable party)"; (2) a provision requiring adjudicators to be trained "at least annually" on several specific topics, including "evaluation of consent and incapacitation" and "the application of the preponderance of the evidence standard"; and (3) a provision stating that while a party's advisor may "provide support and advice . . . at any meeting and/or proceeding," advisors "may not speak on behalf of the parties of otherwise participate in, or in any manner disrupt, such meetings and/or proceedings." (Dkt. 27 at ¶ 31). The Court agrees with Plaintiff that these contractual provisions are specifically specific and concrete to form the basis for a breach of contract claim.

HWS's arguments to the contrary are not persuasive. As to the first provision discussed by Plaintiff, HWS argues that it requires the investigator only to gather

"whatever information he or she believes to be relevant." (Dkt. 29 at 6). The Court disagrees. The provision at issue specifically lists particular kinds of evidence that are included within the category "relevant and available evidence and information," and one of those kinds of evidence is "electronic or other records of communications between the parties or witnesses." Plaintiff further alleges that Chase did not gather text messages falling within this category. HWS's contention that Plaintiff "does not claim that he ever brought the text messages to the Investigator's attention, or to the attention of the Adjudicator or Appeal Panel, for that matter" (Dkt. 29 at 6) is a red herring; Plaintiff was not required to set forth in his pleadings his own actions with respect to the text messages at issue and, at this stage of the proceedings, the Court must draw all inferences in his favor.

As to the second provision discussed by Plaintiff, HWS contends that Plaintiff's allegation that the necessary training was not provided is "conclusory" because it was made "on information and belief." (*Id*. at 7). However, "'[p]leading on the basis of information and belief is generally appropriate' where information is particularly within a defendant's 'knowledge and control.'" *Tenecora v. Ba-Kal Rest. Corp.*, No. 2:18-CV-7311 DRH AKT, 2021 WL 424364, at *5 (E.D.N.Y. Feb. 8, 2021) (quoting *Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008)). Here, there is no question that is particularly within HWS's knowledge what training it provided its adjudicators, and it is plausible that the training was not provided. Indeed, in its moving papers, HWS seems to suggest that Hodge's general training as an "experienced attorney[] who practice[s] regularly in this field" (Dkt. 21-1 at 24) was sufficient to satisfy this provision, which arguably implies that Hodge did

not receive the specific annual training set forth in HWS's policies. The Court does not find Plaintiff's allegation too conclusory to survive a motion to dismiss.

As to the third provision discussed by Plaintiff, HWS argues that feeding a client answers, as Plaintiff alleges Roe's advisor did, merely constitutes permissible "support and advice." (Dkt. 29 at 7-8). The Court disagrees. Providing a client with an answer to a question from an adjudicator that the client then repeats verbatim goes well beyond "support and advice" and could plausibly constitute prohibited participation in the proceeding.

Finally, the Court rejects HWS's argument that it should dismiss Plaintiff's assertion that HWS violated the implied covenant of good faith and fair dealing because "a student cannot maintain a breach of contract claim against a university based solely on the implied covenant of good faith." (Dkt. 21-1 at 25 (quoting *Rolph*, 271 F. Supp. 3d at 406)). Plaintiff's breach of contract claim is not based *solely* on the implied covenant; as discussed above, he has also asserted particular concrete breaches.

For all these reasons, the Court denies HWS's request for dismissal of Plaintiff's breach of contract claim against it.

### D.    Promissory Estoppel Claim Against HWS

HWS moves to dismiss Plaintiff's promissory estoppel claim because Plaintiff alleges an enforceable contract between himself and HWS. (Dkt. 21-1 at 26). Plaintiff argues in opposition that he is free to assert a promissory estoppel claim in the alternative to his breach of contract claim. (Dkt. 27 at 29).

"In New York, promissory estoppel has three elements: a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of the reliance." *Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 44 (2d Cir. 1995) (internal quotation marks omitted). "A plaintiff may utilize the doctrine of promissory estoppel in two situations: (1) to enforce a 'promise in the absence of bargained for consideration'; and (2) 'to provide relief to a party where the contract is rendered unenforceable by operation of the Statute of Frauds.'" *Kant v. Columbia Univ.*, No. 08 Civ. 7476(PGG), 2010 WL 807442, at *4 (S.D.N.Y. Mar. 9, 2010) (quoting *Merex A.G. v. Fairchild Weston Sys.*, 29 F.3d 821, 824 (2d Cir. 1994)). "Where an enforceable contract exists, the doctrine of promissory estoppel is inapplicable and a plaintiff cannot recover under this theory." *Id.*

Plaintiff's promissory estoppel claim fails as a matter of law because there is an enforceable contract between him and HWS. *See Papelino*, 633 F.3d at 93 ("Under New York law, an implied contract is formed when a university accepts a student for enrollment. . . . The terms of the implied contract are contained in the university's bulletins, circulars and regulations made available to the student."). Further, while Plaintiff is correct that Federal Rule of Civil Procedure 8(d) generally allows claims to be pled in the alternative, where "a breach of contract claim and a promissory estoppel claim are pled in the alternative, if the court finds that a contract exists, the promissory estoppel claim must fall." *M&B Properties 3 Bushey Lane VT, LLC v. CWCapital Asset Mgmt. LLC*, No. 2:18-CV-4187 PKC RER, 2019 WL 4805149, at *6 (E.D.N.Y. Sept. 30, 2019) (quotation omitted).

The Court having found the existence of an enforceable contract in this case, there is no further basis for Plaintiff to assert a promissory estoppel claim.

## V.     Request for Leave to Amend

In his opposition papers as to each of the pending motions to dismiss, Plaintiff requests that he "be given an opportunity to amend his pleadings" to the extent that any of his claims are dismissed.  (Dkt. 25 at 11; *see also* Dkt. 26 at 10 and n.3; Dkt. 27 at 11 and n.2).  Plaintiff's request "is not a proper motion for leave to amend, and fails to comply with the Local Rules of Civil Procedure with respect to the process for seeking to amend a pleading."  *Wi3, Inc. v. Actiontec Elecs., Inc.*, 71 F. Supp. 3d 358, 363 (W.D.N.Y. 2014) (explaining that, among other things, this District's Local Rules require the party seeking to amend a pleading to "identify the proposed amendments through the use of a word processing red-line function or other similar markings" (quotations omitted)).   While Plaintiff contends that he "believes the [amended complaint], as is, is sufficient, and it is therefore impossible for Plaintiff to identify, at this time, what theoretical deficiencies he would remedy on an amended pleading" (Dkt. 26 at 10 n.3), this argument lacks merit.  To the extent Plaintiff is in possession of any further information addressing the deficiencies identified by Defendants, he could have submitted a proposed second amended complaint setting forth such additional facts.  The Court therefore exercises its discretion to deny this "cursory or boilerplate request[] . . ., made solely in a memorandum in opposition to a motion to dismiss."  *Malin v. XL Capital, Ltd.*, 312 F. App'x 400, 402 (2d Cir. 2009).

However, the Court will grant Plaintiff's alternative request that he be afforded an opportunity to file a procedurally proper motion for leave to amend.  (*See id.*).  Any such

motion must be filed within 30 days of entry of this Decision and Order, as set forth more particularly below.

**CONCLUSION**

For the foregoing reasons, the Court resolves the pending motions as follows: (1) the Court denies Chase's motion to dismiss (Dkt. 20) as to Plaintiff's breach of contract claim, but grants it as to Plaintiff's negligence claim; (2) the Court grants Boerner's and HWS's motion to dismiss (Dkt. 21) as to Plaintiff's negligence claims against Boerner and HWS and as to Plaintiff's promissory estoppel claim against HWS and denies it as to Plaintiff's Title IX and breach of contract claims against HWS; and (3) the Court grants Hodge's motion to dismiss (Dkt. 22) in its entirety. The Clerk of Court is directed to terminate Hodge and Boerner as defendants in this matter.

The Court's dismissal of the claims set forth above is without prejudice to Plaintiff's ability to file a motion for leave to amend within 30 days of entry of this Decision and Order, consistent with his obligations under Federal Rule of Civil Procedure 11. In the event Plaintiff files such a motion, the Court will set a briefing schedule and any obligation on the part of the remaining Defendants to answer the amended complaint will be stayed. However, in the event that no motion for leave to amend is filed, the remaining Defendants shall answer the amended complaint within 45 days of the date of this Decision and Order. If Plaintiff fails to file a motion for leave to amend, the claims identified above shall be dismissed with prejudice.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:  June 25, 2021
        Rochester, New York