**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
**ROCHESTER DIVISION**

----------------------------------------------------------------------X

| | | |
|---|---|---|
| JOHN DOE,[1] | : | |
| | : | **Civil Action No:  6:20-CV-06338** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| | : | **SECOND AMENDED** |
| -against- | : | **COMPLAINT** |
| | : | |
| | : | |
| **HOBART AND WILLIAM SMITH COLLEGES;** | : | |
| **TAMARA CHASE; and CSC** | : | |
| **INVESTIGATIONS, LLC,** | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

----------------------------------------------------------------------X

Plaintiff John Doe[1] ("Plaintiff" or "Doe"), by and through his attorneys, Nesenoff &

Miltenberg, LLP, as and for his Second Amended Complaint against Defendants Hobart and

William Smith Colleges ("Hobart, "HWS", or "the College"), Tamara Chase ("Chase"), and CSC

Investigations, LLC ("CSC" or "CSC Investigations"), (collectively, "Defendants"), respectfully

alleges as follows:

**THE NATURE OF THIS ACTION**

1.      Plaintiff John Doe, a senior at Hobart and William Smith Colleges slated to

graduate in May 2020, brings this Complaint to remedy the devastating impacts of an improper,

biased, and negligent investigation and adjudication by Defendants of certain false allegations

---

[1] Plaintiff previously filed a motion to proceed by pseudonym.

made against Plaintiff by a fellow Hobart student, Jane Roe,[2] which resulted in Plaintiff's expulsion from Hobart at the conclusion of his senior year, precluding him from receiving his degree.

2.    In September 2019, Plaintiff was notified by Hobart that he was under investigation for an alleged sexual assault, relating to a brief, consensual encounter he had with Jane Roe nearly *a full year* prior, in October of 2018.

3.    Throughout the investigation and adjudication of Roe's claims, Jane Roe revealed herself as entirely non-credible: she told materially inconsistent stories, her claims were directly contradicted by video and text evidence, her claims were inconsistent with those of her own witnesses, and her claims were utterly unbelievable.

4.    Notwithstanding the complete dearth of evidence supporting Roe's claims—in fact, notwithstanding the plethora of evidence *directly contradicting* Roe's claims—Hobart, through the engagement of biased and/or improperly trained individuals, employed a sham process intended to give the appearance of fairness but which was, in truth, a mere formality, wherein Plaintiff was presumed guilty from the start and was ultimately going to be found responsible regardless of the actual facts or evidence in the case.

5.    Hobart's handling of the allegations against Plaintiff violated the contractual obligations promised by Hobart to students, including Plaintiff, pursuant to Hobart's published policies and procedures, were arbitrary and capricious, and violated the implied obligations of good faith and fair dealing inherent in all contracts.  Moreover, Hobart's findings and decisions

---

[2] Jane Roe is a pseudonym.

exhibit clear evidence of gender bias that infected the proceedings, resulting in an erroneous outcome.

6.      Plaintiff has completed the academic requirements of his undergraduate degree, towards which he has been working diligently for the last four years. Hobart's improper decision has and will cause Plaintiff serious and lasting harm, including, but not limited to: (i) deprivation of the timely issuance of his undergraduate degree, functionally forfeiting four years' worth of tuition paid to Hobart; (ii) severe reputational harm and stigma, by way of a *permanent* notation on his transcript indicating he was "expelled after a finding of responsibility for a code of conduct violation;" (iii) lost employment opportunities, specifically, the opportunity to begin full-time employment in July 2020, pursuant to a previously-accepted (and highly competitive) job offer, which is expressly contingent upon Plaintiff's timely attainment of his undergraduate degree; and (iv) Plaintiff will forever have to explain to any school, job, or program that he applies to, that he was expelled from Hobart after a finding of sexual misconduct, thereby severely limiting his future education and career opportunities.

7.      For the foregoing reasons, to be explained in further detail below, Plaintiff seeks injunctive and monetary relief under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), as well as breach of contract, negligence, and related state law claims.

## THE PARTIES

8.      Plaintiff John Doe is a natural person and citizen of the State of Massachusetts.

9.      Defendant Hobart and William Smith Colleges is a private institution of higher education with an undergraduate enrollment of approximately 2,100 students, located in Geneva, New York, 14456.

10.     Defendant Tamara Chase is an investigator and registered agent for CSC Investigations, LLC.  On information and belief, Chase is a citizen of Vermont.  Chase was contracted by Hobart to conduct the investigation of Roe's claims against Plaintiff.

11.     Defendant CSC Investigations, LLC, is a Vermont Limited Liability Company with a primary business address of 271 South Union Street, Burlington, VT 05401, and registered agent for service of process as Tamara Chase, 6 Mill Street, Middlebury, VT 05753.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the case arises under the laws of the United States, specifically, under Title IX of the Education Amendments of 1972, as well as diversity jurisdiction pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000.  This Court has also supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, as the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

13.     This Court has personal jurisdiction over Defendant Hobart on the grounds that it is conducting business and principally located within the State of New York.

14.     This Court has personal jurisdiction over Defendants Chase and CSC Investigations on the grounds that they contracted to provide services to a New York school, their actions which form the basis for this Complaint took place in New York, and such actions occurred in the course of their business.

15.     Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because Hobart is considered to reside in this judicial district and a substantial part of the acts or omissions giving rise to this action occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.     BACKGROUND.

#### A.     Hobart Faces Pressure to Respond Aggressively to Complaints of Sexual Misconduct Allegedly Committed by Male Students against Female Students.

16.     On April 4, 2011, the Office of Civil Rights ("OCR") of the U.S. Department of Education ("DOE") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "Dear Colleague Letter" (the " DCL").    The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq*. and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence, and address its effects."  DCL at 4.

17.     Despite its purported purpose as a mere guidance letter, the Department of Education treated the DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus.

18.     The DCL, while not completely ignoring due process concerns, suggested that schools should focus more on victim advocacy.

19.     On April 19, 2014, the OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* (the "2014 Q&A").

5

20.    Like the DCL, the 2014 Q&A was aimed at addressing educational institutions'
sexual misconduct policies, including the procedures schools "must" have in place "to prevent
sexual violence and resolve complaints" and the elements that "should be included in a school's
procedures for responding to complaints of sexual violence."

21.    In the same month that the OCR issued its 2014 Q&A on Title IX, the White House
issued a report titled *Not Alone*, which included a warning that if the OCR finds a school in
violation of Title IX, the "school risks losing federal funds." *See* White House Task Force to
Protect    Students    from    Sexual    Assault,    *Not    Alone*    (Apr.    2014),    available    at
https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf.    The report further
advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX,
and could therefore initiate investigation, compliance review, and/or litigation against schools
suspected of violating Title IX.

22.    In June 2014, then-Assistant Secretary of Education Catherine Lhamon testified
before the United States Senate, warning that if the OCR could not secure voluntary compliance
with the DCL from a college or university, it could elect to initiate an administrative action to
terminate federal funds or refer the case to the Department of Justice.  *See* Testimony of Catherine
E. Lhamon, Assistant Secretary Office For Civil Rights, U.S. Department Of Education (June 26,
2014),    https://www2.ed.gov/about/offices/list/ocr/correspondence/testimony/20140626-sexual-
violence.pdf.

23.    To support its enforcement of the DCL, the OCR hired hundreds of additional
investigators.  To date, OCR has conducted *over five hundred* investigations of colleges for the
potential mishandling of complaints of sexual misconduct. *See Title IX: Tracking Sexual Assault*

*Investigations*, Chronicle of Higher Education, https://projects.chronicle.com/titleix/ (last visited April 2, 2020).

24.     The DCL and OCR put considerable pressure on universities to treat all those accused of sexual misconduct with a presumption of guilt. The Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate." *Presumed Guilty: College men accused of rape say the scales are tipped against them,* Chronicle of Higher Education, September 1, 2014.  In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent."

25.     Indeed, a 2014 white paper issued by the Association of Title IX Administrators (ATIXA), titled, *Equity is such a Lonely Word*, functionally directed colleges to tilt their investigations in favor of women:

> [C]ampuses for so many years considered only (or primarily) the rights and situation of the accused. Thus, equity ends up feeling like a shift to victim's rights, even though it is not. Ultimately, the pendulum should shift to the middle, rather than to either party, but **because victims have been historically been accorded 3/5 of the rights of an accused individual (or less), and victims are typically women, equity may require institutions to recalibrate the pendulum** to right the historical imbalance.
>
> (emphasis added)

26.     In May 2014, the Department of Education released a list of colleges — 55 in all, including Hobart — under investigation for possibly violating federal rules aimed at preventing sexual harassment.

27.     Hobart found itself under investigation after a complaint was lodged against it with OCR in 2014, for allegedly mishandling an allegation of sexual assault.

28.     The OCR complaint, which eventually sparked nationwide media attention and considerable campus activism, was filed on behalf of a female student who alleged that she was sexually assaulted by three male members of Hobart's football team.  The male students were found not responsible under Hobart's complaint resolution process, resulting in a massive, very public backlash against Hobart.  Much of this backlash and criticism was specifically addressed towards Hobart's failure to protect women on its campus.

29.     On February 4, 2014, The Huffington Post published a piece titled, *It's not Rape, if it's a Freshman: An Open Letter to Parents*.  (https://www.huffpost.com/entry/its-not-rape-if-its-a-fre_b_4726473).  The letter was written by the mother of the female student at the center of the Hobart "gang rape" case, expressing her outrage at Hobart's findings and imploring others to consider, "What happens to a woman without these resources, without a mother with whom she is close, or without a family with the means to fight back?"

30.     The New York Times subsequently published a front-page article on the case.  *See* Walt Bogdanich, *Reporting Rape, and Wishing She Hadn't*, New York Times, July 12, 2014, (http://www.nytimes.com/2014/07/13/us/how-one-college-handled-a-                sexual-assault-complaint.html).

31.     In a follow-up group of "letters to the editor" subsequently published in the New York Times, addressing the July 12 article, nearly all of the comments expressed shock, outrage, and concern over the safety of women on Hobart's campus.

32.     Other articles followed, both in the New York Times and other widely disseminated media publications, including an article titled, *Rape at College, Then Rape by College*, essentially comparing Hobart's processing of the female student's allegations as a rape unto itself:

> Two weeks after the fall term started, an unknown number of male students, apparently including members of the undefeated football team at Hobart and William Smith Colleges (Hobart), raped an 18-year-old freshman girl who'd had too much to drink. Hobart's response was to re-rape the child bureaucratically by ignoring evidence and finding the alleged rapists not guilty.

33.     According to an article in the Finger Lakes Times, a sexual assault advocacy group called UltraViolet, after catching wind of the Hobart "gang rape" controversy, began issuing targeted ads on the internet stating, "Applying to Hobart & William Smith? You should know about its rape problem." Jim Miller, *"Rape problem" ads target HWS, 9 other schools*, The Finger Lakes Times (Feb. 3, 2015).

34.     UltraViolet describes itself as

> a community of one million people that drives feminist cultural and political change. Through people power and strategic advocacy, we work to improve the lives of women and girls of all identities and backgrounds, and all people impacted by sexism, by dismantling discrimination and creating a cost for sexism.
>
> We fight attacks against women and work toward a proactive vision of what equality looks like for women. We demand accountability from individuals, the media, and institutions that perpetuate sexist narratives or seek to limit the rights, safety, and economic security of women.
>
> (https://weareultraviolet.org/about-us/)

35.     A representative of UltraViolet commented for the FLT article,

> With epidemic rape on campuses across America, it's time to make
> colleges compete to be the best at addressing this issue. . . . One in
> five women will be sexually assaulted before graduating. Students
> and parents deserve to know which schools are addressing the issue,
> and which are sweeping the survivors of rape under the rug.

36.     The attention on Hobart's apparent "rape problem" also sparked campus protests and activism harshly condemning Hobart's handling of allegations of sexual misconduct.

37.     This considerable, extremely negative national attention and student criticism placed heavy pressure on Hobart to vigorously prosecute and punish male students accused of sexual misconduct moving forward.

38.     Indeed, in response to this attention, Hobart's then-chair of the Board of Trustees stated, in a letter to the New York Times, "Could we have handled some things differently in this case? Of course. However, it remains my opinion as a *feminist, mother, daughter, sister* and leader that Hobart and William Smith handled this case properly." (https://www.nytimes.com/2014/07/16/opinion/the-rape-case-hobart-and-william-smith-and-readers-respond.html). It is clear that the Chairwoman's comments about being a feminist, mother, daughter, and sister are intended to address the specific issue of whether Hobart properly protects *women* on its campus.

39.     The chairwomen also made clear that Hobart would respond directly to this backlash by changing its policies: "That is why Hobart and William Smith Colleges pledge to build a new model of governance for this issue. Our attention and focus have never been higher."

40.     On information and belief, Hobart's policy revisions and relevant employee training since then has continued, to this date, to focus on victim advocacy, in order to avoid any further bad media attention, the likes of which caused the school considerable reputational harm in 2014 and the years that followed.

41.     Indeed, despite the passage of time since the Hobart "gang rape" scandal, Hobart's student body remains vigilant in holding Hobart to the new standards it promised to impose following the scandal.

42.     In 2018, Hobart's school newspaper, The Herald, published a multi-part investigative piece titled, *Four Years Later: The Herald Investigates Sexual Misconduct Response at HWS*. (https://hwsherald.com/2018/04/06/four-years-later-the-herald-investigates-sexual-misconduct-response-at-hws/).

43.     The main article opened with a direct reference to the 2014 "gang rape" scandal and OCR investigation, and Hobart's promise to improve the campus climate and response to claims of sexual misconduct.   In discussing the eight separate articles that comprised the investigative piece, *The Herald* stated: "These pieces paint a picture of a campus community that does not promote a culture of respect or advocate for discussions around these issues like there was in 2014."

44.     Once again, the conversation focused primarily on the effect of Hobart's sexual misconduct policies and processes on women (albeit, a more diverse group of women): "We should note that this is not a problem that only pertains to white, heterosexual, female-identifying persons on campus. The Human Rights Campaign notes that '46% of bisexual women have been raped compared to 17% heterosexual and 13% lesbian.'"

45.     Indeed, one of the included articles, titled, *Troubling Statistics of Campus Sexual Assaults*, focused almost exclusively on rape statistics for women and how female Hobart students described feeling unsafe/insecure about reporting sexual misconduct.

46.     Accordingly, Hobart is still acutely aware of the potential for another massive public media bashing should it fail to find a male student responsible for an alleged sexual assault

– particularly when the allegations involve alcohol and a female student alleging she was incapacitated, as did the woman at the center of the 2014 controversy.

47.     On information and belief, a second OCR investigation into Hobart's handling of sexual misconduct complaints was opened in 2015.  On information and belief, that investigation, too, involved a female complainant who had consumed alcohol prior to the alleged assault. Both investigations went on for years, with final resolution only coming about on September 28, 2018 – just under a year before Hobart began investigating Plaintiff.

**B.   OCR's About-Face, and Hobart's Resistance to New Regulations.**

48.     On September 22, 2017, the OCR rescinded the DCL and the 2014 Q&A and put in place new interim guidance (the "2017 Q&A). *See* Dep't of Ed*., Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

49.     As Secretary of Education, Betsy DeVos, noted, the rescission of the DCL was largely motivated by "[t]he truth . . . that the system established by the prior administration has failed too many students," specifically because "[t]he notion that a school must diminish due process rights to better serve the 'victim' only creates more victims."  Press Release, Secretary DeVos Prepared Remarks on Title IX Enforcement (Sept. 7, 2017), *available at* https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

50.     At the same time, the DOE issued proposed new Title IX regulations, a large portion of which were intended to restore the promise of due process that the DOE recognized had been diminished by the 2011 DCL.

51.     In January 2018, Hobart signed onto a public objection to the proposed new regulations, arguing in large part that the imposition of uniform standards of fairness and due process in Title IX adjudications would create too heavy a burden on schools.

52.     On information and belief, Hobart implements its sexual misconduct policies in a manner intended to protect women specifically, and endeavors to find male accused students responsible and punish them harshly, in order to avoid any further institutional harm resulting from bad media attention and/or a possible loss of federal funds pursuant to an OCR investigation.

53.     For example, a Title IX "update" issued by Hobart in 2018 references considerable training programs and activities specifically focusing on and directed towards men.  By way of example:

a.     "Annually, the Office of Title IX Programs & Compliance provides additional training specific to all campus athletes, student leaders and fraternity officers with an emphasis on their leadership role in preventing sexual misconduct as well as understanding consent, sexual assault and relationship violence,"  and "More than 60 new fraternity members and approximately 600 student athletes were also trained in bystander intervention using Intervene." It is notable that these efforts revolve around *fraternities* and does not mention Hobart's sorority receiving such training.

b.     "Beginning April 16, Chi Phi Fraternity will host a White Ribbon Campaign week. The Campaign engages *boys and men* in programming to end gender-based violence."

c.     "On Thursday, April 19, Chi Phi will hold a **Healthy Masculinity Panel** in the Geneva Room at 7 p.m., for a conversation with a panel of faculty, staff and students about promoting healthy masculinity and using positions of power to prevent sexual violence."

13

    d.   "The Title IX office has collaborated with Alpha Phi Alpha fraternity and Sigma Chi fraternity, hosting screenings and discussions of the documentary ***My Masculinity Helps***, engaging men in conversation around violence prevention and discussing ways in which men can work to prevent sexual violence and support those who are impacted by it."  According to the website for this documentary, "The documentary was conceived as a tool to: engage men and boys in the deconstruction and reconstruction of gender roles, masculinity, and power; educate men and boys about rape culture and their roles and responsibilities in the prevention of rape and sexual assault; and facilitate the training of men and boys as educators, advocates, and activists for the prevention of sexual violence."

54.    On information and belief, Hobart's institutional self-interest in avoiding further bad press and student outrage, particularly in the case of a female complainant claiming intoxication, resulted in an inherent gender bias which directly affected Plaintiff's case.

## II.    <u>THE CHRONOLOGY OF EVENTS.</u>

### A.  <u>John Doe, Jane Roe, and Sally Smith</u>

55.    Plaintiff matriculated to Hobart in Fall 2016, with an expected graduation date of May 2020.  As a rising senior, Plaintiff was able to secure full-time employment with a well-known financial institution to begin in the Summer of 2020, with a starting salary of approximately $62,400 and a $10,000 signing bonus.

56.    On information and belief, Jane Roe is a sophomore at Hobart, with an expected graduation date of May 2022.  On information and belief, Roe has a history of behavioral and

mental health issues, alcohol use/abuse, and at one point was in danger of not completing high school or attending college.

57.     On information and belief, Jane Roe grew up and attended most of her high school education abroad, where the legal drinking age is sixteen years old.  On information and belief, Jane Roe was well experienced with alcohol by the time she began attending Hobart in Fall 2018.

58.     In Fall of 2018, Jane Roe was a freshman, living with a roommate, Sally Smith,[3] in the campus dorms.  According to Roe's friends, Roe and Smith frequently drank large amounts of alcohol during the first few weeks of the Fall 2018 semester.  According to Roe herself, she was "usually good at handling her alcohol," and she and her friends typically drank a "good amount" of alcohol "because they can all drink."

59.     According to Roe and Smith, they quickly became close after moving into their shared dorm room, and at all times relevant herein, considered each other best friends.  Indeed, the two even pushed together the twin beds in their dorm room and essentially shared a bed.

60.     Prior to the evening that would later become the center of a sexual assault allegation, Plaintiff had never met Jane Roe, did not share any classes with her, and had no idea who she was.  They were not connected on any social media platform.

**B.  <u>October 20-21, 2018.</u>**

61.     In approximately the third week of October 2018, Plaintiff connected with Sally Smith on a dating/hook-up app called Tinder.

62.     On information and belief, Tinder primarily works by showing the user photographs of other users who are geographically nearby.  Users can then, based on the photos

---

[3] Sally Smith is a Pseudonym.

of people nearby, "swipe" left or right to either approve the person in the picture or reject them.  If two people swipe each other's photo with approval, then can then connect to begin chatting and, ideally, meet up.

63.     On information and belief, the primary draw of Tinder over other "dating" sites is that, by connecting users primarily by picture and location, it can swiftly facilitate casual sexual encounters.

64.     After Plaintiff connected with Smith on Tinder, they exchanged Snapchat information and began chatting on that application as well.

65.     Plaintiff's username on Snapchat is his real first and last name.

66.     Snapchat is a social media application that primarily focuses on non-permanent communications.  In other words, users' "stories" disappear automatically after twenty-four hours, and all chat messages automatically disappear after the user leaves the chat, unless they specifically take certain actions to save the messages.  In addition, users must save each message individually; if all messages are not saved, when the person re-opens the chat window, it will only show the saved messages, with no indication that there were other, now-deleted messages in between.

67.     On the night of October 20, 2018, just before midnight, Plaintiff was in his dorm room.  Plaintiff and Sally Smith were chatting on Snapchat.  Smith said to Plaintiff, "come here", meaning come to her dorm room.

68.     Plaintiff indicated he wanted to be alone with Smith, and if he went to her room, her roommate would be there.  Smith insisted that she would get rid of her roommate so they could be alone, and insisted Plaintiff come over.  Plaintiff asked if Smith would let him into the building, and she said yes.

16

69.     Plaintiff walked over to Smith's dorm, messaged her on Snapchat to let her know he was there, and asked for her to come let him in.  Before Smith got there, someone else let him into the dorm.

70.     Plaintiff then notified Smith that someone else let him in, but he was still waiting for her to come get him (as he did not know what room was hers).  Smith responded, "ok coming." Smith then messaged Plaintiff saying she could not get up, but did not provide an explanation. Plaintiff responded, playfully, "well you better," since he had just walked over at Smith's own request.

71.     Smith then came to the lobby of the dorm, where Plaintiff was waiting for her.  She led Plaintiff down a hallway and into her room.

72.     When Plaintiff entered Smith's dorm room, her roommate, Jane Roe, was there, sitting on the bed.  Smith then went and lay down on the bed near Roe.  Plaintiff stood near the bed.

73.     After a few moments, Smith then walked out of her dorm room, leaving Plaintiff there with her roommate, without explanation.

74.     Plaintiff turned to the roommate, Jane Roe, and said something like "what was that about?"

75.     Plaintiff was confused, since Smith had insistently invited him over and told him they would be alone, and now she left him in her room with Roe with no explanation.

76.     Jane Roe responded to Plaintiff's question, saying something like, they had a "big night".

77.     When Jane responded, Plaintiff noticed she spoke with an accent.  This then sparked a conversation between the two of them about her home country, Plaintiff's travels outside the U.S., and Roe's family background.

78.     Plaintiff and Jane Roe then chatted for about ten minutes.

79.     After about ten minutes, Roe moved across the bed, closer to Plaintiff, and kissed him.

80.     Plaintiff and Roe then began kissing on the bed, and touching each other over their clothes.

81.     Roe then reached toward Plaintiff's pants, which had an elastic waistband with a drawstring, and began undoing them.  Plaintiff helped to pull his pants down, without removing them, and Roe then performed oral sex on Plaintiff.

82.     After a few minutes, Plaintiff asked Roe if she wanted to have sex, and stated that he did not have a condom on him.  Roe then got out of bed, rummaged through her drawers, retrieved a Trojan brand condom, and handed it to Plaintiff.

83.     Plaintiff placed the condom on his penis.  He was on his knees on the bed.  Roe got back on the bed and bent over in front of Plaintiff.  Plaintiff and Roe then had consensual vaginal sex.

84.     After a few minutes, Plaintiff lost his erection.  He withdrew from Roe, removed the condom, and threw it out.  He pulled his pants back up and this was essentially the end of the encounter.

85.     Plaintiff and Roe then bid each other goodbye and Plaintiff returned to his dorm at approximately 1:00 am on October 21, 2018.

86.     Based upon video evidence, approximately twenty minutes after Plaintiff left, Roe, Smith, and another friend went out from their dorm to meet up with another friend, Anna.[4]

87.     On the video, the girls can first be seen getting ready, in good spirits and a festive mood.  They then walk out of Smith and Roe's room into the dorm hallway.  Smith is speaking into the camera and saying "we're going to save [Anna]!"  Jane, walking behind Smith in the video, then leans into the camera, with wide eyes and a big smile, and says, "save, from the rape!"  The girls can be heard laughing and joking around as the video cuts out.

88.     In the video, Jane is clearly walking on her own, in steady gate, fully oriented to time, place, and activity, and joking about having to go "save" a friend.

89.     On information and belief, Roe and Smith then walked over to another dorm and met up with their friend Anna.

90.     After meeting up with Anna, Smith contacted a different male student, and went home with him.  Smith did not return to her and Roe's dorm room until the next morning, after 5:00 am.

91.     On information and belief, Roe and Anna then walked back to their shared dorm together.

92.     Plaintiff never heard from Smith again after that evening.  Having had sex with her roommate, he also never reached out to her again.

93.     Plaintiff never reached out to Roe after that evening; in fact, he did not even know her name.  Plaintiff took it as a random hookup, a fairly common interaction on College campuses.

C.  **The Title IX Report**

_____

[4] Anna is a pseudonym.

94.     Almost *a year* after Plaintiff and Roe's brief, consensual hook-up, Jane Roe, accompanied by her roommate and best friend Sally Smith, filed a complaint with Hobart's Title IX office.

95.     Roe and Smith told Hobart's Title IX office that on the night of October 20, 2018, they had gone out drinking and were "very drunk' when they returned to their shared room.

96.     Roe and Smith told Hobart's Title IX Fellow, Regina Gesicki, that Plaintiff had been "pursuing" Smith, and that on the night of the incident, he was "trying to come over" and Smith "was telling him no."

97.     Smith told Gesicki that she left her room to go to the bathroom, and that Roe was "face down on her bed, blackout" at the time.  Smith alleged that when she came back from the bathroom, she found Plaintiff in her room with Roe.  Smith stated that she yelled at Plaintiff and he left the room.

98.     Roe alleged that she "came to" to Plaintiff's "hands all over her and he was then shoving it in her butt."

99.     Roe alleged that she did not know Plaintiff's name at the time, but that in the Spring of 2019 she saw him on campus, and pointed him out to a friend, saying "that's the guy."  Roe alleged that her friend responded, "oh, that's [John Doe]", and this was the first time Roe learned Plaintiff's name.

100.    On information and belief, in conjunction with Roe's complaint, she noted that she had failed one course during the Spring 2019 semester, and needed academic accommodations.

D.  **The Title IX Investigation**

20

101.     On September 20, 2019, Plaintiff received a Notice of Investigation.  This was the first time since his encounter with Roe that he heard anything about the incident being non-consensual.

102.     The Notice of Investigation stated, vaguely, that "the Complainant stated that on October 21, 2018, you entered her room in [Complainant's dorm] and sexually assaulted her while she was face down and blacked out on her bed."  The Notice did not allege what specific acts Plaintiff was accused of, as "sexual assault" is widely defined in Hobart's relevant policies.

103.     Hobart employed an outside investigative firm, Defendant CSC Investigations, LLC, to conduct the Title IX investigation into Roe's allegations against Plaintiff.

104.     CSC Investigations is a three-person private investigative firm that conducts Title IX investigations for, among other things, educational institutions.   One of CSC's three investigators (all female) was specifically named in a previous lawsuit against a College for her biased, improper, and deficient investigation, and specifically for slanting her findings against the male respondent.

105.     According to CSC Investigations' website, its investigators are trained in a "trauma-informed" approach, as well as "the role that alcohol and drugs may play in incidents of alleged misconduct."

106.     The OCR has expressly linked the trauma-informed approach to the protection of "girls and women." *See* Federal Partners Committee on Women and Trauma, *Trauma-Informed Approaches: Federal Activities and Initiatives* (Sept. 2013) at 17.

107.     According to the trauma-informed approach, a Title IX investigator who: (i) asks a complainant basic questions, such as clarifying inconsistencies in her story or filling in gaps; (ii) observes the complainant's demeanor as part of a credibility assessment; or (iii) tries to "drill down

on the details and establish a timeline of the night" is considered an "utter[] fail[ure]." *The 7 Deadly Sins of Title IX Investigations* at 2-3, The 2016 ATIXA Whitepaper, *available at* https://atixa.org/wordpress/wp-content/uploads/2012/01/7-Deadly-Sins_Short_with-Teaser_Reduced-Size.pdf.

108. The trauma-informed approach teaches investigators that "the brain responds to trauma by releasing chemicals into the body" that "can't be controlled" and "impact[] individuals' response to a perceived trauma in the moment, and may corrupt recall of the event." *Id.* at 3. Further, the trauma-informed approach teaches investigators that "a triggering event (such as your interview) can reactivate this response." Accordingly, Title IX investigators employing a trauma-informed approach are instructed to: (i) ignore any inconsistencies or gaps in complainants' stories; and (ii) ask the complainant how she feels, rather than what happened. *Id.* at 4.

109. Thus, investigators and adjudicators are taught in trauma-informed trainings that inconsistencies in a complainant's story are a direct result of the trauma. Similarly, they are trained to view those inconsistencies as a natural byproduct of assault as opposed to an indicator that the complainant's story may lack credibility.

110. One of the major problems with the trauma-informed approach – aside from its blatant goal to specifically protect female complainants – is that it lacks scientific support. *See* Emily Yoffe, *The Bad Science Behind Campus Response to Sexual Assault*, The Atlantic (Sept. 8, 2017).

111. Indeed, ATIXA subsequently recognized the absolute damage that the "trauma-informed" approach has caused by improperly influencing investigations, issuing a revised position statement in August 2019 to try to reign in the false information it had previously used to

train thousands of Title IX investigators in prior years.  *See* ATIXA Position Statement: Trauma-Informed Training and The Neurobiology Of Trauma (Aug. 16, 2019), *available at* https://cdn.atixa.org/website-media/atixa.org/wp-content/uploads/2019/08/20123741/2019-ATIXA-Trauma-Position-Statement-Final-Version.pdf.

112.    In the revised position statement, ATIXA acknowledged that "application of the knowledge obtained by practitioners in our field has gotten way ahead of the actual science, that the body of knowledge is being misapplied, and that some purveyors of this knowledge are politically motivated to extrapolate well beyond any reasonable empirical conclusions currently supported by the science." *Id.* at 2.

113.    The position statement further advised that "You may choose a training program underwritten by a federal grant, but that does not assure it is free from trauma- influenced political slant." *Id.* at 7.

114.    On information and belief, despite the unscientific and biased slant of the trauma-informed approach, CSC continues to employ and rely upon bunk trauma-informed approaches in conducting their investigations.

115.    CSC Investigator Tamara Chase conducted the investigation into Roe's claims, on behalf of Hobart.

116.    Investigator Chase interviewed Jane Roe on September 30, and interviewed Sally Smith the next day.  She interviewed Plaintiff afterwards.

117.    Aside from Plaintiff, Roe, and Smith, Investigator Chase interviewed three other Hobart students.

118.    On information and belief, Investigator Chase audio-recorded the interviews with all witnesses, but subsequently destroyed the recordings as a matter of course, despite presumably

being aware, as an attorney, that Title IX cases may result in litigation and that such recordings would be highly relevant to any such litigation.

119.   After interviewing the parties and witnesses, investigator Chase conducted follow-up interviews with both Roe and Smith, informing them of new information that arose in the other interviews and giving them an opportunity to amend or correct their claims in light of the new information.  Investigator Chase never invited Plaintiff for a follow-up interview to address what the investigation had uncovered.

120.   Despite only interviewing six people total, Investigator Chase did not issue her final investigative report until February 7, 2020—*four months* after the investigation began.

121.   In the final investigative report, Investigator Chase created "summaries" of her interviews with the parties and witnesses.  Comparing these summaries with the full interview notes, it is clear that investigator Chase deliberately excluded or subtly altered information from Roe and Smith's story that was inconsistent with the evidence/witnesses or damaged their credibility.

122.   For example, Roe, in her first interview, stated that she was absolutely positive that she did not go to a local bar on the night of the incident—not that she could not recall, but that she "kn[ew] for a fact that they did not go [there]".  Evidence then turned up in the investigation concretely disproving this claim.  In the Final Investigative Report, Investigator Chase simply wrote that Roe "has no memory of" going to the bar.

123.   The summaries of the interviews from Roe and Smith also contained no acknowledgment or analysis of the fact that they both made statements in their interviews that contradicted each other as well as their initial claims when first filing the Title IX report.

124.    For example, Roe stated when she first reported to Title IX that she was passed out, "face-down" on her bed when Plaintiff assaulted her, and Smith similarly told Investigator Chase that Roe was "unable to move or speak."  Yet, in her interview with Investigator Chase, Roe alleged that while Plaintiff was penetrating her, she physically tried to kick and fight him and "literally screamed and howled."  In Smith's interview with Investigator Chase, she stated that when she walked in on the alleged assault,[5] Roe was face-down and appeared to be "asleep."  *None* of these inconsistencies are acknowledged in the report.

125.    Similarly, when Roe first reported to the Title IX office, she stated that she did not learn Plaintiff's name until the Spring semester when she saw him on campus, pointed him out to a friend, and the friend said in response, "oh, that's [Plaintiff]."  Yet, in her interview with Investigator Chase, Roe claimed that she saw Plaintiff on campus in December 2018 and pointed him out to a friend, but the friend did not tell her Plaintiff's name until they spotted him again at a bar downtown and Roe asked the friend what his name was.[6]

126.    Additionally, both Roe and Smith initially told the Title IX office that Plaintiff had been "pursuing" Smith and that Plaintiff was trying to come over to their room on the night of the incident but Smith told him no.  The Snapchat messages subsequently produced categorically disprove this claim, showing instead that Smith quite insistently told Plaintiff to come over.  This discrepancy is nowhere in the Final Report.

---

[5]  It is also worth noting that Smith never stated that she saw any specific sex act, but only that she walked in and saw Plaintiff "on" Roe.  Smith also told Investigator Chase that, after Plaintiff left, she asked Roe whether Roe and Plaintiff were hooking up, and Roe responded, "don't be mad at me."

[6] Notably, both of these claims are spurious, as Smith had been Snapchatting with Plaintiff and was fully aware of Plaintiff's full name at the time of the alleged incident, making it highly questionable that Roe would somehow not know this information until months later.

127.    In her first interview with Investigator Chase, Smith stated that when she walked in on Plaintiff and Roe, and chased Plaintiff off, she had a very distinct and specific memory of seeing the button on the fly of Plaintiff's khaki pants.  It was later revealed in the investigation that Plaintiff was wearing "joggers", which had no button.  In her second interview, Smith then switched gears and stated she did not recall what Plaintiff was wearing.  Investigator Chase neither asked Smith about this sudden change in her claim, nor mentioned this false "memory"/changed allegation in the Final Report.

128.    Most critically, Roe stated in her first interview with Investigator Chase that after Smith "saved" her from the assault by chasing Plaintiff out of the room, Roe "stayed where she was and went to sleep without pulling her pants back up."  This claim is completely disproven by the video evidence of Roe laughing, joking, and walking around in a video just twenty minutes after the alleged incident.  The final investigative report makes *no mention* of this patent credibility issue.

a.    Roe also claimed in her second interview with Investigator Chase that after returning from the trip to see their friend Anna, she could not sleep, and stayed up until Smith returned to their room the next morning.  Once again, this inconsistency was completely left out of the Investigative Report.

b.    Roe also submitted a letter that she purportedly wrote in the Summer of 2019, wherein she stated that she and Smith slept in the same bed together on the night of the incident.  Once again, this third version of events/discrepancy by Roe was completely left out of the final report.

129.    In addition, despite receiving numerous videos from the evening which showed Roe to be fully awake, lively, coherent, and capable at approximately 10pm, 11:30pm, and 1am,

Investigator Chase asked Roe *no* probing questions as to how she was allegedly passed out for the duration of her sexual encounter with Plaintiff, which took place at approximately 12:30-12:45am, yet was demonstrably, fully awake and alert both before and after the incident.

130.    In addition, despite being provided with video evidence of Roe shortly after the alleged assault walking to another dorm to "save [Anna]", Investigator Chase did not ask Roe any questions as to how that "mission" came about, why they believed their friend needed rescuing, or whose idea it was.  This is particularly relevant because in Smith's first interview, she actually stated that *Roe* was the one who told Smith that they needed to go see Anna, after receiving a text from Anna.  Such communications clearly (further) undermined Roe's claim that she was incapacitated and completely incoherent during her encounter with Plaintiff, yet Investigator Chase asked *no* follow up questions, did not ask Roe nor Anna to produce those messages, and once again did not mention this discrepancy in her Final Report.

131.    Shockingly, the final investigative report made *no mention* of the relevance of the video evidence showing Roe awake, alert, fully oriented towards time, place, and context—and smiling and laughing—just twenty to thirty minutes after the alleged assault.

132.    In fact, in the section of the report titled, "contested information", in a sub-section titled, "whether [Roe] was/appeared intoxicated," the investigator included only Roe and Smith's claims that Roe was passed out and Plaintiff's claim that she was not.  ***The report did not even mention the video evidence directly relevant to this assessment***. This is particularly notable because the Investigator freely made references to these videos when supporting Roe and Smith's claims about their whereabouts earlier in the evening in a different section of the report.

    a.   Nor did "whether Roe was/appeared intoxicated" section mention the statements of the three witnesses who *all* told the investigator that they did not know what, if, or

how much Roe was drinking that night, and could not recall anything specific about her behavior to support her claim of incapacitation.

133.    Further, the investigative report specifically uses the phrase "intoxicated" as a key element in dispute, even though the relevant Hobart policy expressly states that intoxication alone *does not preclude consent* – instead, the relevant inquiry is *incapacitation*.

134.    Notably, during the investigation, Roe *never actually denied* performing oral sex on Plaintiff or consenting to vaginal intercourse with him—instead, she alleged that she "did not recall" doing these things, but claimed she had a distinct and reliable memory of Plaintiff anally penetrating her without consent.

135.    Roe also provided no reasonable explanation for the fact that Plaintiff knew she had an accent and knew correct information about her family history, in light of her insistence that the two of them never had any sort of conversation.  Instead, Roe simply mused, without any evidence or actual support, that Plaintiff must have seen pictures on her Facebook page showing her country's flag in the background and simply guessed all of the true facts he knew about her family and background.

    a.   Investigator Chase never asked Roe to provide any such alleged Facebook posts/photos or probed as to how Plaintiff could know from a photo that she had an accent or that only her mother was from a foreign country.

136.    In sum, the entirety of the report was clearly written in such a way to bolster Roe's claims and to completely obfuscate any evidence that might tend to weaken her credibility or support Plaintiff's version of events.

137.    On information and belief, this clear slant was influenced by, and evidences, a gender bias in favor of the female complainant and against the male accused.

28

E. **The Title IX Hearing**

138.    On March 9, 2020, Hobart conducted an adjudicatory hearing of Roe's allegations against Plaintiff.

139.    Hobart hired Kelley Hodge, a former prosecutor, to serve as the sole adjudicator in Plaintiff's case.  According to Hodge's biography on her law firm's website, Hodge is an inaugural member of the organization Women of Tomorrow, as well as a member of the Forum for Executive Women.

140.    Hodge was provided a copy of the Final Investigative Report, as well as the interviews, photos, and videos submitted during the investigation.

141.    The participants at the hearing were Bill Boerner (Hobart's Title IX Coordinator), Plaintiff and his counsel, Roe and her attorney, Hobart's attorney, and Hobart's Deputy Title IX Coordinator, Katie Stiffler.  Stiffler had also been present when Roe and Smith first made their report, jointly, to the Title IX office.

142.    Investigator Chase did not appear at the hearing.  Nor did Anna, the young woman whom Roe and Smith went to "save" shortly after Roe was allegedly assaulted—despite being called as a witness by Hodge.  The parties were provided no reason for Anna's failure to appear at the hearing.

143.    Similarly unavailable without explanation was the young women to whom Roe had alleged she made her first "outcry" about the incident to in the Spring or Summer of 2019.

144.    Throughout the hearing, just like during the investigation, Hodge declined to ask probing questions directly relevant to Roe and Smith's claim that Roe was passed out, blacked out, immobile and completely incapacitated when she and Plaintiff had intercourse.

145.     In fact, during the portion of the hearing devoted to questioning Smith, Hodge asked her several questions about her observations while allegedly "saving" Roe from Plaintiff, yet *did not ask a single question* about the immediate aftermath, whether she and Roe spoke, where they went afterwards, whose idea it was to go see their friend Anna, or how Roe appeared during that walk, which happened almost immediately after the alleged assault.[7]

146.     At the hearing, Jane Roe continued to tell demonstrable lies and inconsistencies. For example, Roe stated that she found out who Plaintiff was the day after her encounter with him, because Smith told her.  She also claimed that she did not see Plaintiff's face during their encounter because she was "face-down" in her pillow, and that "the first time I knew what [Plaintiff] actually looked like was a couple months later.  I guess it was familiar because [Smith] showed me his Tinder picture later and then when I saw him I was like oh yeah that's him."  This contradicted numerous of her previous claims, including that she and plaintiff locked eyes during their encounter, and that she did not know Plaintiff's name until December 2018 (or Spring 2019).

147.     Roe also claimed during the hearing that there was "no communication" between she and Plaintiff during their interaction, despite having previously told the Investigator that she was "screaming and howling".

148.     In addition, there were several times during the hearing when Roe's attorney was feeding her the answers to direct questions about the facts of the events at hand. The recording of the hearing subsequently reviewed by Plaintiff clearly caught Roe's attorney whispering to her substantive responses to Hodge's questions, which Roe then parrots back as if her own.

---

[7] Notably, in Smith's interview with Chase, she stated that they were "sobering up" on the walk to see Anna and that they were "not stumbling"—once again seriously undermining Roe's claim that she was immobile and incoherent just before this walk.

149.    When it was Plaintiff's opportunity to submit questions for the adjudicator to ask Roe, he asked about the video of Roe, Smith, and a friend walking around, speaking into the camera, and saying they were going to "save [Anna]".  Specifically, he asked whether Roe did in fact walk to go meet Anna at another dorm shortly after they had sex.  Roe responded, "I was dragged out of my room."  However, the video evidence quite clearly shows no such thing, as it shows all three girls in the room together, with Smith walking out of the room first and Roe walking out afterwards, on her own, in steady gait and full control of her faculties, laughing and joking.

   a.    Further, Roe's claim about being "dragged out" of her room to go see Anna directly contradicted Smith's statement to Investigator Chase that it was *Roe's idea* to go meet up with Anna.

150.    At the hearing, Plaintiff asked Roe about the discrepancy between the video evidence of her walking around after the incident, and Roe's prior statement to the Investigator that she stayed in bed after the interaction with Plaintiff and fell asleep with her pants still down. After initially sticking with her claim that she had a memory of going to sleep with her pants down, Roe's attorney then whispered something to her, after which she stated that she did not understand the question, and then stated that she actually had no memory of going to sleep with her pants down, despite having told that to the Investigator.

151.    Roe's attorney could be heard coaching her throughout her response, during which she got increasingly defensive about her inconsistencies.  Later on in the hearing, again after consulting with her attorney, Roe then pivoted once again to claim that she did not even recall

telling the investigator that she went to sleep with her pants still down after the incident and was not sure she ever said that.[8]

152.     Plaintiff also asked Roe whether his name was "readily available" to her on the day after the incident.  Despite the text evidence showing that Roe's roommate knew Plaintiff's full name on the night of the incident, and the other testimony making clear that Roe knew that the person who allegedly assaulted her was the same person that Smith was chatting with on Tinder and Snapchat, Roe responded that Plaintiff's name was not readily available to her on the day after the incident.  She provided no explanation for this demonstrably false answer.

153.     Plaintiff also asked Roe about her claim that Plaintiff simply walked into her room out of nowhere, after Smith had left the room, and that the three of them were never in the room together, despite testimony to the contrary by both Smith and Plaintiff.  Roe insisted the three of them were never in the room together.

154.     Plaintiff also asked Roe about a letter she had allegedly written to her family over the summer discussing the incident, which Roe had submitted in support of her claims.  Plaintiff pointed out that, in the letter, written in the Summer of 2019, Roe told her family that immediately after the alleged assault, Smith got into bed with Roe and they slept in the bed together that night. This was completely contradicted by the access card records, as well as Smith's own testimony that after the girls *both* left their dorm room after the incident, Smith left to hook up with another guy and did not return to the room until the next morning.  Without any explanation, Roe flatly denied that her claim in the letter about sleeping with Smith that night was a lie.

---

[8] The parties were given an opportunity during the investigation to review their interview summaries and submit corrections.  Roe did not submit any corrections.

155.    Throughout the hearing, any time Roe was confronted with a discrepancy in her claims, including her version of the events before and after the incident, she asserted that she was "blackout" and could not remember the details, or she asserted that "facts" she had previously reported—which were then proven to be false—were not actual memories, but simply things she assumed to have happened.  In essence, the hearing testimony made it abundantly clear that Roe claimed numerous times to have specific and clear memories of events that were later disproven or contradictory to her own other statements.

156.    In contrast to the deferential treatment given to Roe and Smith in spite of their endless inconsistencies, when it was time to pose questions to Plaintiff, Adjudicator Hodge was confrontational and essentially conducted a cross-examination aimed at trying to damage Plaintiff's credibility and prosecute him, rather than conduct an impartial and dispassionate inquiry.

157.    In that regard, Adjudicator Hodge asked Plaintiff patently inappropriate and pointed questions that implied a presumption of guilt and a need to explain and prove his innocence.

158.    For example, Adjudicator Hodge repeatedly asked Plaintiff whether he contacted Roe or Smith after the night he had sex with Roe, and when he stated that he did not, she pressed him repeatedly for an explanation.  Hodge did not pose similar questions to Smith or Roe.

159.    This is especially bizarre because, if the events of the evening went as Plaintiff consistently described—he had casual sex with the roommate of the girl he had been talking to—it is completely reasonable that he would not seek to continue chatting with Smith after he slept with her roommate.  Yet, if the events went as Roe claimed—that Plaintiff anally raped Roe while

she was unconscious, and Smith walked in, and chased him out of the room—it is virtually inconceivable that neither woman would say anything to Plaintiff after the fact.

160.    Likewise, when Adjudicator Hodge asked Plaintiff about his interaction with Roe, Plaintiff described that he asked Roe whether she wanted to have sex, and she responded by standing up, retrieving a condom, and handing it to Plaintiff.  Adjudicator Hodge then badgered Plaintiff by asking him repeatedly whether Roe *verbally* responded to his question, clearly seeking to elicit a response that would later be used to argue Roe did not verbally consent to intercourse.

161.    Adjudicator Hodge also asked Plaintiff pointed questions implying that there was no conceivable explanation for Plaintiff having sex with Smith's roommate when he had initially gone to their room to see Smith.

162.    Adjudicator Hodge also asked Plaintiff inappropriate character questions submitted by Jane Roe, such as "did you think it was okay to have sex with someone you had never spoken to previously?"

163.    Hodge never asked Roe this question, nor her feelings or previous experiences, if any, with casual sex.  This is despite Smith having told the investigator that Roe "wanted to hook up" with guys during the Fall 2018 semester and that Roe liked to go out every weekend *even after* the night of the alleged assault.

164.    Similarly, Adjudicator Hodge did not interrogate or cross-examine Smith, despite clear issues with Smith's credibility.

165.    For example, Smith stated to Investigator Hodge that she had *no* intention of engaging in any physical/sexual activity with Plaintiff on the night she invited him over. Adjudicator Hodge asked *no* follow-up questions as to Smith's highly spurious claim that she had

"no" intentions with a boy she met on a hook-up site, invited over after midnight, and specifically told she would get rid of her roommate so they could be alone.

166.    Likewise, Adjudicator Hodge did not ask either female student to explain their claim that Plaintiff simply walked into their room without having been let in by either of them. She did not ask Roe or Smith whether they had previously told Plaintiff what room they were in— indeed, the messages from that evening show that they did not—making Roe and Smith's claim completely implausible and yet totally untested by Adjudicator Hodge.

167.    As an experienced prosecutor, it is not plausible that Adjudicator Hodge simply "missed" countless opportunities to seek clarification from Roe and her roommate about obvious and material discrepancies in virtually every aspect of their story.  This is evidenced by Hodge's careful attention to detail and dogged questioning when it came to any conceivable issue with Plaintiff's version of events.  The only plausible explanation is that Plaintiff was presumed guilty from the start and Hodge was carefully avoiding any action that might damage the female complainant's and female witness's credibility.

**F.   The Outcome**

168.    On March 16, 2020, Adjudicator Hodge issued the Outcome Letter for Plaintiff's case ("the Outcome Letter").   Hodge found Plaintiff responsible for sexual assault, and recommended a sanction of expulsion.

169.    In the Outcome Letter, Adjudicator Hodge argued that Roe did not "verbally" consent to intercourse, ignoring the obvious implicit consent in her actions of getting up, searching for and finding a condom, handing it to Plaintiff, and getting back on the bed while positioning herself for intercourse.

170.    Adjudicator Hodge also made false conclusions about Plaintiff's credibility, for example, stating that Plaintiff was not accurate when describing the clothing that Smith wore when she let him into their dorm room on the night in question, because the photos from earlier in the evening showed her wearing other clothes.  In reality, the video filmed after Plaintiff left their room shows Smith wearing a top consistent with what Plaintiff described, and does not show her clothing below her shoulders.

171.    While going out of her way to find any way to discredit Plaintiff on such minor matters as what type of top Smith was wearing,[9] Hodge's Outcome letter shockingly contained *no* substantive analysis of Roe's or Smith's voluminous, demonstrable lies and changes of narrative. Incredibly, the Outcome Letter ***did not even mention the*** *video evidence showing categorically that Roe was awake, lively, walking on her own, speaking without any slurring, wide-eyed, smiling, and fully oriented to her surroundings and context*, which was time-stamped *at most* a half hour after she and Plaintiff had intercourse.

172.    Similarly, Adjudicator Hodge made no mention of the discrepancy between Roe's claim during the investigation that she had to ask Smith what had happened the next day, and a video clip that was produced during the investigation, which was date-stamped October 21, 2018 at 7:03pm (the night after the incident), which briefly shows Roe explaining to Smith how she and Plaintiff had sex, *and then Smith laughs*.  The brief, 16-second video cuts out with Smith laughing.

173.    Moreover, the Outcome Letter skipped over any analysis of the factors that constitute incapacity under the relevant Hobart policy, instead categorically concluding that Roe

---

[9] As noted above, Smith had claimed to the investigator that she had a very distinct and specific memory of Plaintiff's clothing that evening, which then turned out to be untrue. Yet, Hodge made no reference to Smith's clothing discrepancy in assessing *her* credibility.

was intoxicated—based on her own report of her alcohol consumption that evening, which was not corroborated by any witness and did not take into account her professed high alcohol tolerance—and then skipping straight from intoxication to presumed incapacitation.

174.    In finding that Roe was intoxicated, Hodge also relied on investigative interview summaries of witnesses who *did not* attend the hearing, and therefore, Hodge had no basis to evaluate their credibility and Plaintiff had no opportunity to cross-examine them (and even still, those interviews did not actually corroborate Roe's claims).

175.    For her factual conclusions, Hodge largely copy/pasted the most damaging, inflammatory version of the allegations from Roe and Smith's investigation interview reports, completely ignoring every inconsistency in their claims and much of their testimony at the hearing (in which they were caught telling numerous lies and then claimed they simply had no memory of numerous, material aspects of the evening).

176.    Hodge also made clear in her Outcome Letter that her decision was based on her gender-based presumption that a woman would *never* consent to casual or anonymous sex, and therefore Plaintiff's version of events was simply not believable.

177.    Specifically, Hodge stated in her concluding paragraph:

> I find that it is not plausible that the Complainant, appearing "totally fine" would knowingly engage in sexual intercourse, orally and then vaginally, with a person she has never met before, after having a 10-12 minute conversation with that person, never asking for or knowing your name and never giving hers and having no communication with you afterwards.

178.    Hodge did not base this conclusion on any factual basis or evidence presented at the hearing; it was a pure, personal judgment by Adjudicator Hodge that no sober woman would ever consent to anonymous sex.

179.    Further, it is clear from Hodge's conclusion that she not only believes that, *literally* no woman in her right mind would consent to anonymous sex, but that it is actually *more* reasonable to assume that a young man, having been invited into a dorm room by a fellow student who knows his full first and last name and has his picture, would suddenly and violently anally rape a stranger, knowing full well that doing so would make him immediately subject to identification and criminal charges.

180.    In sum, Hodge's conclusions fly in the face of all logic and reason, utterly ignore the actual evidence presented in the case, fail to apply the proper policy definitions, and were in all ways tailored as a prosecution against Plaintiff, and not a fair, impartial decision.

181.    In addition to her erroneous and gender-based findings, Adjudicator Hodge imposed an unduly harsh sanction of expulsion.

182.    Specifically, Adjudicator Hodge stated that expulsion was necessary to address the continued affects that the incident had on Jane Roe.  However, at the time this decision was issued, Hobart had moved all courses to remote/online formatting due to the COVID-19 crisis.  As such, there was no way that Roe would ever have to see Plaintiff on campus again, as it was Plaintiff's final semester and he had already left campus and did not share any courses with Roe.

183.    As such, there is simply no justifiable reason to expel Plaintiff at the end of his senior year, completely destroying his last four years of hard work, along with his entire future.

G.  **Plaintiff's Appeal**

184.    Pursuant to Hobart's policies, Plaintiff submitted an appeal from the decision finding him responsible, and the sanction of expulsion, on March 25, 2020.

185.    In the appeal, Plaintiff addressed: (i) numerous violations of Hobart's sexual misconduct policies on the part of Hobart's Title IX investigators and adjudicator; (ii) clear abuse

38

of discretion on the part of the adjudicator; (iii) Hobart's failure to follow the appropriate policies in determining Plaintiff's sanction, and (iv) that the sanction was grossly disproportionate to the facts of the case.

186.    The appeal presented a detailed analysis of the evidence in the case, the relevant policy provisions, and the specific and undeniable failures by Hobart and its agents/employees to follow the policies and apply the appropriate standard of proof in an impartial manner.

187.    On April 1, 2020, Jane Roe submitted a response to Plaintiff's appeal.  In addition to her response, which was primarily just a complaint that Plaintiff had "no remorse" and was "victim-shaming" by defending himself, Jane Roe submitted a "note" written by the witness, Anna, who had failed to appear at the hearing.

188.    Anna was one of two students other than Smith—neither of whom appeared at the hearing—who interacted with Roe in the immediate aftermath of her sexual encounter with Plaintiff.

189.    The "note", which was not sworn or notarized, was clearly drafted by or in close consultation with Jane Roe and her attorney.  The letter purported to provide an innocuous excuse for Anna's failure to appear at the hearing and made several inflammatory statements about the trauma of assault and her full support for Jane Roe.

190.    Jane Roe also referred to the note and summarized its contents in her response to the appeal.

191.    Boerner, who was in charge of vetting the student submissions to the appeal panel, did not make any initial determination that this document was improper and should not be submitted to the Appeal Panel.

192.     Instead, upon discovering that this completely inappropriate, blatantly manufactured "evidence" had seemingly been passed along to the appeals panel, Plaintiff's advisor had to write to Boerner asking him to remove this information, as it is not permitted under the policies, and to convene a new appeals panel who had not been tainted by viewing the inappropriate documents.

193.     On Friday, April 3, 2020, Katie Stiffler responded on behalf of Boerner, stating that Boerner would redact the improper information, but would not convene a new panel, as the appeals panel had allegedly not accessed the documents yet.

194.     Within an hour, Plaintiff's advisor responded to note that, contrary to Boerner and Stiffler's assertions, the improper documents were still available, in full, unredacted, in the online appeal folder.

195.     Three days later, Hobart responded, stating that the appeals panel did not have access to that online folder and were not provided copies of the "note." However, Plaintiff was not provided a copy of the purportedly redacted version of complainant's response, which had referenced and summarized the "note."

196.     On Saturday, April 11, 2020 Hobart denied Plaintiff's appeal, finalizing his expulsion ("Appeal Outcome Letter"). In the two-page Appeal Outcome Letter, the Appeals Panel disregarded most of Plaintiff's arguments about adjudicator bias and failure to account for evidence as "not within the scope of an appeal," and wrote off the rest of Plaintiff's concerns with minimal explanation.

197.     In a separate letter prefacing the Appeal Outcome Letter, Boerner advised that Hobart was cutting of all access to the investigative report, evidence, and hearing materials. Indeed, Plaintiff now has no access to much of the relevant evidence in this case.

198.    Plaintiff has therefore exhausted his administrative remedies and this lawsuit represents the last and only option for him to right the wrongs occasioned by Defendants' misconduct and clear his name.

III.    **AGREEMENTS, REPRESENTATIONS, COVENANTS AND WARRANTIES BETWEEN PLAINTIFF AND HOBART COLLEGE.**

199.    Upon Plaintiff's acceptance to Hobart, Hobart provided him with the Handbook for Community Standards ("the Handbook"), which contains Hobart's various policies on general student conduct, discipline, and students' rights and responsibilities, as well as the Sexual Misconduct Policy and Procedures (the "Policy" or "SMP"), which set forth prohibited actions and definitions, as well as the process for investigating and adjudicating sexual misconduct claims.

200.    On information and belief, the Policy was last substantially revised in 2016, in large part in response to the severe backlash Hobart faced in 2014.  Indeed, on Hobart's official website, the page that sets forth the Sexual Misconduct Policy is headed, "JUNE 2016."  *See* https://www.hws.edu/studentlife/smp/.

201.    On information and belief, the Policy is reissued every year.

202.    The Handbook and the Policy comprise express and implied promises from Hobart to its students, including Plaintiff John Doe, with regard to how it will address and adjudicate complaints of sexual misconduct.

203.    Throughout the investigation and adjudication of the Title IX complaints involving Plaintiff, Hobart breached its obligations and promises under the Policy.

204.    The 2019-2020 Policy contains a student "Bill of Rights."  Included in this Bill of Rights is the right to: "Participate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard."

      a.    Hobart violated the Policy because the complaint involving Plaintiff was not resolved in a manner that was fair or impartial, but instead, in a way aimed to placate the female complainant and repair Hobart's damaged reputation for failing to protect women, ignoring the relevant evidence.

      b.    Hobart further violated this policy because the right to be heard necessarily includes the right to be heard by an impartial adjudicator, which Adjudicator Hodge clearly was not.

205.    The Policy states that "The Colleges' Procedures provide prompt and equitable responses to all reports of Prohibited Conduct."

      a.    Hobart violated this provision because the resolution of Jane Roe's claim against Plaintiff was neither prompt nor equitable.

206.    The Policy states that "The Colleges apply the preponderance of the evidence standard to determine whether a violation occurred. The preponderance of the evidence means that it is more likely than not that a Policy violation occurred"

      a.    Hobart violated this provision because the evidence in this case overwhelmingly supported Plaintiff's version of events and completely disproved Jane Roe and Smith's version of events, yet Plaintiff was inexplicably found responsible.

207.    The Policy defines Sexual Assault as "having or attempting to have sexual intercourse or sexual contact with another individual without Affirmative Consent."

42

208.    The Policy contains an extensive discussion on affirmative consent, the relevance

of alcohol consumption, and the factors to evaluate incapacitation:

> *Affirmative Consent*
>
> Affirmative Consent is a knowing, voluntary and mutual decision
> among participants to engage in sexual activity. Consent can be
> given by words *or actions*, as long as those words or actions create
> clear permission regarding willingness to engage in the sexual
> activity. Silence or lack of resistance, in and of itself, does not
> demonstrate consent. The definition of consent does not vary based
> upon a participant's sex, gender, sexual orientation, gender identity,
> or gender expression.
>
> Affirmative Consent cannot be obtained through force, including
> physical force, threats, intimidation, or coercion. Threats are words
> or actions that would compel a reasonable person to engage in
> unwanted sexual activity against their will. Intimidation is an
> implied threat that menaces or causes reasonable fear in another
> individual. Coercion is the improper use of pressure to compel
> another individual to initiate or continue sexual activity against that
> individual's will. When a person makes clear a decision not to
> participate in a particular form of Sexual Contact or Sexual
> Intercourse, a decision to stop, or a decision not to go beyond a
> certain sexual interaction, continued pressure can be coercive. In
> evaluating whether coercion existed, the Colleges will consider: (i)
> the frequency of the application of the pressure, (ii) the intensity of
> the pressure, (iii) the degree of isolation of the person being
> pressured, and (iv) the duration of the pressure.
>
> Affirmative Consent cannot be obtained by taking advantage of the
> incapacitation of another individual where the person initiating
> sexual activity knew or reasonably should have known that the other
> was incapacitated. ***Incapacitation is a state where an individual
> cannot make an informed and rational decision to engage in
> sexual activity.*** An individual is incapacitated if the individual lacks
> conscious knowledge of the nature of the act or is physically
> helpless, asleep, unconscious, or otherwise unaware that sexual
> activity is occurring. An individual may be incapacitated as a result
> of the consumption of alcohol or other drugs or due to a temporary
> or permanent physical or mental health condition.
>
> In evaluating Affirmative Consent in cases of alleged incapacitation,
> the Colleges ask two questions: (1) Did the person initiating sexual
> activity know that the other party was incapacitated? And if not, (2)
> should a sober, reasonable person in the same situation have known

that the other party was incapacitated? If the answer to either of these questions is "yes," Affirmative Consent was absent.

Consent is required to be obtained regardless of whether the person initiating the act is under the influence of drugs and/or alcohol.

### 2. Evaluating Affirmative Consent and Incapacitation

An individual who is under the influence of alcohol and/or other drugs may be incapacitated, and therefore unable to consent. ***Consumption of alcohol or other drugs alone is insufficient to establish incapacitation. Incapacitation is a state beyond drunkenness or intoxication***. The impact of alcohol and drugs varies from person to person, and evaluating incapacitation requires an assessment of how the consumption of alcohol and/or other drugs impacts an individual's:

- decision-making ability;
- awareness of consequences;
- ability to make informed judgments; and
- capacity to appreciate the nature and the quality of the act.


Common and obvious warning signs can show that a person may be incapacitated or approaching incapacitation. Although every individual may manifest signs of incapacitation differently, typical signs include slurred or incomprehensible speech, unsteady gait, combativeness, emotional volatility, vomiting, or incontinence. ***A person who is incapacitated may not be able to understand some or all of the following questions: "Do you know where you are?" "Do you know how you got here?" "Do you know what is happening?" "Do you know whom you are with?"***

In general, sexual contact while under the influence of alcohol or other drugs poses a risk to all parties. Alcohol and drugs impair a person's decision-making capacity, ability to communicate clearly, awareness of the consequences, and ability to make informed judgments. Individuals engaging in sexual activity should continually evaluate Consent throughout the encounter. An individual who does not initially appear to be incapacitated may become incapacitated as the effects of alcohol or other drugs increase. If there is any doubt as to the level or extent of the other individual's intoxication or impairment, the prudent course of action is to forgo or cease any sexual contact or activity. Being impaired by alcohol or other drugs is not a defense to a violation of this Policy.

(emphasis added)

44

209.    Hobart violated its provisions on sexual assault and affirmative consent by failing to apply these proper definitions and parameters in the evaluation of Roe's claims against Plaintiff, specifically, by:

   a.   Using "intoxication" as a proxy for "incapacitation", against the express definition in the Policy, during both the investigation and ultimate adjudication of Roe's claims; and

   b.   Failing to apply the proper standards for evaluating incapacitation.

210.    Indeed, the Policy expressly states that an incapacitated person would be unable to understand questions relating to their present state and context.  The video evidence submitted in this case shows unequivocally that Roe was awake, lively, and fully oriented to her surroundings, companions, and intentions, just minutes after the alleged sexual assault took place.  Adjudicator Hodge failed to apply these factors in the Outcome Letter, instead simply concluding that Roe was intoxicated and then concluding without further explanation that Roe was incapacitated.

211.    Likewise, the Policy states that elements of capacity to consent include "decision-making ability", "ability to make informed judgments," and "ability to appreciate the nature and quality of the act."

   a.   According to Smith's testimony to the Investigator, just minutes after Roe's alleged assault by Plaintiff, Roe was in contact with their friend Anna, appreciated the nature of Anna's "situation," and made a decision to gather friends and go to Anna to "save her from . . . rape."  It is abundantly clear, then, that at the very same time period when Roe alleged she was unconscious and incoherent, that she was actually quite capable of carrying on a conversation, making a decision, and appreciating the nature of a questionable sexual situation and its consequences.

b. Further, as explained by Plaintiff *and not contradicted by Roe*, during their sexual encounter, Plaintiff asked Roe whether she wanted to have sex, and she responded by locating her condom stash, retrieving a condom, handing it to Plaintiff, and then positioning herself on the bed for sexual intercourse. All of these actions indicate Roe's clear understanding of her surroundings and context, appreciation of the nature of the act, and an affirmative desire to engage in sexual intercourse with Plaintiff.

212. According to the Policy, "All HWS community members are expected to cooperate fully and provide truthful information in any report or proceeding under this Policy. Providing false or misleading information in bad faith or with a view to personal gain or intentional harm to another in connection with an incident of Prohibited Conduct is prohibited and subject to disciplinary sanctions."

a. Hobart violated this provision because it failed to impose any consequences on Roe or Smith for their patently untrue and fabricated and misleading claims.

213. According to the Policy, "Under the Clery Act, the Colleges are required to issue timely warnings to the HWS community where certain reported crimes (including some forms of Sexual Misconduct) pose a serious or continuing threat to the Colleges' community."

a. In Plaintiff's case, Hobart conducted a "timely warning" assessment when Roe first reported to the Title IX office, but ultimately declined to issue a warning because, given that a year had passed since the alleged incident with absolutely no reported issues with the Plaintiff, he clearly did not pose a danger or threat to the campus community.

b. Yet, Hobart still imposed the most serious sanction available, by expelling Plaintiff.

214.    The Policy states: "Each party has the right to choose and consult with an Advisor of their choice. The Advisor may be any person, including an attorney, who is not otherwise a party or witness involved in the investigation or adjudication. The parties may be accompanied by their respective Advisors at any meeting or proceeding under this Policy and Procedures. While the Advisors may provide support and advice to the parties at any meeting and/or proceeding, they may not speak on behalf of the parties or otherwise participate in, or in any manner disrupt, such meetings and/or proceedings."

   a.   Hobart violated this policy by permitting Roe's attorney to interrupt the hearing proceedings as well as to feed Roe answers to fact questions posed to her by the Adjudicator.

215.    Appendix A to the Policy contains Hobart's "Procedures for Resolving A Sexual Misconduct Complaint Against A Student" (the "Procedures").

216.    According to the Procedures, "Whenever Formal Resolution is commenced, the Title IX Coordinator will designate one or more Investigators from the Colleges and/or an experienced external investigator to conduct a prompt, thorough, fair, and impartial investigation. All Investigators will receive annual training on issues related to Prohibited Conduct and on how to conduct an investigation that is trauma-informed, fair and impartial, provides parties with notice and a meaningful opportunity to be heard, and protects the safety of Complainants and the HWS community while promoting accountability."

   a.   Hobart violated the Procedures because the investigator failed to conduct a thorough, fair, or impartial investigation.   Specifically, the Investigator: deliberately skewed the facts in favor of Roe and against Plaintiff; ignored and misrepresented inconsistencies in Roe's and Smith's claims that would tend to

47

discount their credibility; ignored the relevant video and photo evidence whenever it favored Plaintiff, but freely referred to and relied on it when it supported Roe; failed to request relevant text messages and communications from the night in question, including the communications between Roe and Anna that resulted in the trip to find Anna at another dorm; failed to ask probing questions of Roe and Smith; failed to apply the relevant policy considerations that distinguish between intoxication and incapacitation; failed to provide an explanation for the failure to interview Roe's alleged first "outcry" witness; and took over *four months* to complete the investigation, despite only interviewing six students.

217.    According to the Procedures, "The Title IX Coordinator will notify the Complainant and the Respondent, in writing, of the commencement of an investigation. Such notice will (1) identify the Complainant and the Respondent; (2) specify the date, time (if known), location, and nature of the alleged Prohibited Conduct; (3) identify potential Policy violation(s); (4) identify the Investigator; (5) include information about the Student Bill of Rights; (6) inform the parties of the right to choose and consult with an Advisor, who can accompany the parties to any meeting or hearing under these Policy and Procedures; (7) explain the prohibition against Retaliation; (8) instruct the parties to preserve any potentially relevant evidence in any format; (9) inform the parties how to challenge participation by the Investigator on the basis of bias or a conflict of interest; and (10) provide a copy of the Policy and these Procedures."

     a.   Hobart violated the Procedures because the notice of investigation issued to Plaintiff in this matter failed to identify the "nature of the alleged prohibited conduct," instead simply stating that Plaintiff stood accused of "sexually

48

assault[ing]" Roe.  Further, the investigator was not identified until almost a week

later in a separate email.

218.   The Procedures set forth:

*Presumption of Non-Responsibility and Participation by the Parties*

The investigation is a neutral fact-gathering process. The Respondent is ***presumed to be not responsible***; this presumption may be overcome only where the adjudicator(s) concludes that there is sufficient evidence, by a Preponderance of the Evidence, to support a finding that the Respondent violated the Policy . . . .

(emphasis added)

a.  Hobart violated the Procedures because, based upon the uniform efforts of Investigator Chase and Adjudicator Hodge to completely ignore the blatant evidence discrediting Roe and Smith's claims and to structure the entire process as a prosecution, rather than an investigation, Plaintiff was presumed guilty from the start and was consistently leaned upon to prove his innocence.

b.  Hobart further violated the Procedures because the overwhelming evidence supported Plaintiff's version of events and disproved Roe's allegations, yet Plaintiff was still found responsible.

219.   According to the Procedures: "The investigation typically will be completed within thirty (30) calendar days. This period may be extended to account for a previous attempt, if any, at Informal Resolution, or for other good cause, as described in the section on Timeframe for Completion of Investigation and Adjudication; Extension for Good Cause. Any extension, other than for Informal Resolution, and the reason for the extension, will be shared with the parties in writing."

a. Hobart violated this policy because the investigation took four times as long as the designated time period, and Plaintiff was never informed, in writing or otherwise, of any reason for the delay or extension.[10]

220. According to the Procedures: "The Investigator will notify and seek to interview separately the Complainant, the Respondent, and third-party witnesses, and will **gather other relevant and available evidence and information**, including, without limitation, electronic or other records of communications between the parties or witnesses (via voice-mail, text message, email and social media sites), photographs (including those stored on computers and smartphones), and medical records (subject to the consent of the applicable party)."

a. Hobart violated the Procedures because the Investigator failed to gather (or seemingly, even request) any of the communications between and among Roe, Smith, and their witnesses on the night in question or the morning after, even though it was clear from the videos and pictures submitted that the girls possessed digital records from the time in question.

221. According to the Procedures: "The Title IX Coordinator will review the Final Investigation Report to determine whether, taking all the information in the report **in the light most favorable to the Complainant**, an adjudicator could make a finding that a Policy violation occurred. . . . If the Title IX Coordinator determines that an adjudicator could by a preponderance

---

[10] Plaintiff did request a very brief extension for the scheduling of his interview with Investigator Chase, due to a sudden death in the family of his chosen advisor, a one-week extension to respond to the preliminary investigative report in January 2020, as well as the Plaintiff and Jane Roe jointly requested a brief extension of the hearing date from the end of February to the beginning of March. However, even setting aside these requested extensions, Hobart was well in excess of the scheduled timelines, and never provided a reason for such additional delays.

of the evidence make a finding that a policy violation occurred, a charge will be drafted and the Complainant and Respondent will be informed in writing."

    a.   This provision, in itself, is inimical to the promise that respondents are presumed to be not responsible.  By tipping the scales "in the light most favorable to the complainant," Hobart is violating both the presumption of innocence and distorting the preponderance of the evidence standard.

222.   According to the Procedures: "All persons serving as an adjudicator must be impartial and free from actual bias or conflict of interest. All adjudicators are trained at least annually on non-discrimination; the dynamics of sexual misconduct; the factors relevant to a determination of credibility; the appropriate trauma-informed manner in which to receive and evaluate sensitive information; the manner of deliberation; evaluation of consent and incapacitation; the application of the preponderance of the evidence standard; sanctioning; and the Colleges' Sexual Misconduct Policy and these Procedures."

    a.   On information and belief, Hobart violated this provision because both Adjudicator Hodge and Investigator Chase failed to make an appropriate distinction between intoxication and incapacitation, failed to appreciate the relevant factors for evaluating incapacitation, and failed to properly apply the preponderance of the evidence standard.

223.   According to the Procedures, "An external adjudicator is an individual or panel selected by the Title IX Coordinator or designee who is a neutral person(s) external to the Colleges trained to conduct a Hearing according to the Policy and these Procedures."

a. Hobart violated this provision because Adjudicator Hodge was not neutral, as evidenced by her interrogation and cross-examination of Plaintiff during the hearing, contrasted with the deferential approach to Roe and Smith.

224. According to the Procedures, "Where a student is found responsible for a violation of the Sexual Misconduct Policy, the adjudicator, *in consultation with the Associate Dean of Students or other appropriate administrator* (designated by the Title IX Coordinator prior to the Hearing) will determine the appropriate sanction(s)."

a. Hobart violated this provision because, according to the Outcome Letter issued by Adjudicator Hodge, she alone made the sanction decision, without consultation with the Dean of Students and, to Plaintiff's knowledge, no other administrator was designated by the Title IX Coordinator prior to Plaintiff's hearing.

b. Hobart further violated this provision because Adjudicator Hodge wrote in her Outcome Letter that she was "recommend[ing]" a sanction of expulsion, rather than determining the sanction. Indeed, it is unclear who Adjudicator Hodge believed the recommendation was going to, nor is there any information in the Policy or Procedures as to how such a "recommendation" would be reviewed or by whom.

c. This further indicates that Adjudicator Hodge had not been adequately trained in Hobart's policies, in violation of the policy provision cited above.

225. The Procedures provide that one consideration in determining the appropriate sanction for violation of the SMP is "whether the Respondent has accepted responsibility."

a. This provision unfairly and unduly punishes respondents for defending themselves, which is their right under the Policy, and is therefore a violation of the covenant of good faith and fair dealing.

52

226.    According to the Procedures: "The adjudicator will simultaneously issue a written decision (the "Final Outcome Letter") to both the Complainant and the Respondent, with a copy to the Title IX Coordinator, within seven (7) calendar days following the Hearing. The Final Outcome Letter will set forth the violation(s) of the Policy for which the Respondent was found responsible or not responsible, the rationale; the sanction(s) (if applicable) imposed against the Respondent; and the rationale for any sanction(s) imposed."

    a.    Hobart violated this policy because the Outcome Letter issued by Adjudicator Hodge failed to provide an appropriate rationale for the decision, instead setting forth Hodge's gender-based presumptions and equivalence between intoxication and incapacitation.

227.    According to the Procedures: "The grounds for appeal are: previously unavailable relevant evidence that could significantly impact the Final Outcome; procedural error(s) that had a material impact on the Final Outcome; and the sanction is grossly disproportionate to the conduct committed."

    a.    Hobart violated this provision by denying Plaintiff's appeal despite his presentation of numerous procedural errors that materially impacted the proceedings.

228.    The Procedures on appeals further provide:

> The appeal will be conducted in an impartial manner by an Appeal Panel. In any appeal, the burden of proof lies with the party requesting the appeal, as the original determination and sanction are presumed to have been decided reasonably and appropriately. The appeal is not a new review of the underlying matter. The Appeal Panel will consider an appeal only on the basis of one or more of the three (3) grounds for appeal stated above, and will make a determination based on supporting information provided in the written request for appeal, the written response of both parties, the Final Investigative Report and the written record of the original hearing including the Final Outcome Letter. The Appeal Panel can dismiss the appeal for failing to state a grounds for appeal, affirm

the original findings, or send the case back to the adjudicator for reconsideration.

Absent extenuating circumstances, the Appeal Panel will communicate the result of the appeal to the Complainant and the Respondent within ten (10) calendar days from the date of the submission of all appeal documents by both parties. Appeal decisions are final.

229.   Hobart violated this provision because the Appeals Panel relied on information outside of the record in deciding certain elements of Plaintiff's appeal.  For example, the Appeals Panel claimed that Adjudicator Hodge had indeed conferred with the Dean of Students in determining the sanction, even though *nothing in the record* supported that assertion.

230.   The Procedures state: "Typically, the period from commencement of an investigation through resolution (finding and sanction, if any) will not exceed sixty (60) calendar days. This timeframe may be extended for good cause . . . .  The Title IX Coordinator will notify the parties in writing of any extension of this timeframe and the reason for such extension."

   a.   Hobart violated this provision because the time period from commencement of the investigation through resolution in Plaintiff's case was almost exactly six months— *triple* the time designated—and Plaintiff was never informed in writing of any reason for such delay.

231.   According to the Procedures,

After a finding of responsibility, the Title IX Coordinator will direct the Colleges' Registrar to make a notation on the Respondent's transcript stating the student was "suspended after a finding of responsibility for a code of conduct violation" or "expelled after a finding of responsibility for a code of conduct violation." Notations following an expulsion are permanent.

54

IV.     **N.Y. EDUCATION LAW ARTICLE 129-B**

232.    On July 7, 2015, New York State Governor Andrew Cuomo signed into law Education Law Article 129-B ("Art. 129-B"), commonly known as "Enough is Enough," which became effective on October 5, 2015. *See* N.Y. Educ. L. § 6438 *et seq*.

233.    Art. 129-B applies to "any college or university chartered by the regents or incorporated by special act of the legislature that maintains a campus in New York," including Hobart College.  *See* N.Y. Educ. Law 6439(1).  It mandates that all such institutions, including Hobart, adopt certain rules and procedures in connection with their sexual misconduct policies.

234.    Art. 129-B mandates that each institution file with the State a certificate of compliance with the law, as well as a copy of all written rules and policies adopted in accordance with the statute.  If any institution fails to file a certificate of compliance, it will be ineligible to receive state aid or assistance until such time as it files the certificate.  Art. 129-B also requires the State to conduct random audits to ensure compliance with the provisions of the statute.

235.    Art. 129-B sets forth a standard of care with which colleges, including Hobart, and their agents and representatives, must comply when addressing complaints of sexual assault and disciplinary proceedings related thereto.

236.    In the instant case, Hobart and its agents and employees breached their duty of care to Plaintiff as an enrolled student subject to disciplinary proceedings governed by          Art. 129-B.  As a result of this breach, Plaintiff suffered damages including loss of tuition payments, loss of education, and loss of future educational and career opportunities.

237.    Art. 129-B mandates that all New York State institutions of higher education, including Hobart, "shall ensure" that every student be afforded the following rights:

a.  The right "to have the complaint investigated and adjudicated in an impartial, timely, and thorough manner by individuals who receive annual training in conducting investigations of sexual violence, the effects of trauma, impartiality, the rights of the respondent, including the right to a presumption that the respondent is 'not responsible' until a finding of responsibility is made pursuant to the provisions of this article and the institution's policies and procedures;"

b.  The right "to an investigation and process that is fair, impartial and provides a meaningful opportunity to be heard, and that is not conducted by individuals with a conflict of interest:"

c.  "The right to a process . . . that includes, at a minimum: (i) notice to a respondent describing the date, time, location and factual allegations concerning the violation, a reference to the specific code of conduct provisions alleged to have been violated, and possible sanctions"

d.  "[W]ritten notice of the findings of fact, the decision and the sanction, if any, as well as the rationale for the decision and sanction"; and

e.  "[A] written statement detailing the factual findings supporting the determination and the rationale for the sanction imposed."

*See* N.Y. Educ. L. § 6444.

238.  Defendants violated these rights, as guaranteed by Article 129-B, by: (i) failing to provide Plaintiff, in the Notice of investigation, with the factual allegations concerning the violation, instead simply identifying the policy provision he was alleged to have violated; (ii) failing to conduct a timely, thorough, and impartial investigation into Roe's claims against

Plaintiff; (iii) failing to afford Plaintiff the presumption of innocence; and (iv) failing to provide written notice of findings of fact and rationale for the finding of responsibility.

## V.    **PLAINTIFF'S DAMAGES.**

239.    As a result of Defendants' unlawful, negligent, unfair, gender-biased, and improper conduct, Plaintiff was subjected to a disciplinary process that failed to comport with Hobart's promises to Plaintiff as an enrolled student, the tenets of Title IX, and principles of good faith and fundamental fairness.

240.    As a result of Defendants' unlawful, negligent, unfair, gender-biased, and improper conduct, Plaintiff was improperly expelled from Hobart College just before he was slated to graduate, depriving him the benefits of four years of hard work—and tuition.

241.    As a result of Defendants' unlawful, negligent, unfair, gender-biased, and improper conduct, Plaintiff has been falsely labeled as a perpetrator of sexual assault and his transcript from Hobart will permanently bear a notation stating that he was expelled as a result of violating the code of conduct.

242.    As a result of Defendants' unlawful, negligent, unfair, gender-biased, and improper conduct, Plaintiff's academic/disciplinary file and transcript are now marred by a false and baseless finding of sexual assault and expulsion.

243.    As a result of Defendants' unlawful, negligent, unfair, gender-biased, and improper conduct, Plaintiff will lose the opportunity to begin his previously accepted full-time employment and enter the work force in the Summer of 2020, as he has always planned to do.

244.    As a result of Defendants' unlawful, negligent, unfair, gender-biased, and improper conduct, Plaintiff will have to disclose to future educational institutions, professional programs, licensing authorities, or jobs that he applies to that he was found responsible for committing a

heinous sexual assault, damaging Plaintiff's chances to succeed academically or professionally in the future.

245.    As a result of Defendants' unlawful, negligent, unfair, gender-biased, and improper conduct, Plaintiff's education and career path have been derailed, resulting in considerable economic and consequential harm.

246.    As a result of Defendants' unlawful, negligent, unfair, gender-biased, and improper conduct, Plaintiff was subjected to a gender-biased, fundamentally unfair investigation and adjudication process which destroyed his reputation, precluded him from receiving the diploma he was promised by virtue of his enrollment at Hobart, and has impacted and will permanently impact his education and career prospects and timeline.

247.    As a result of Defendants' unlawful, negligent, unfair, gender-biased, and improper conduct, Plaintiff has suffered and will continue to suffer reputational harm, ridicule, fear, persecution, pecuniary harm, deprivation of his education and damage to his education and career prospects.

248.    Plaintiff's monetary damages include, and are not limited to, $278,803.00 in tuition and fees paid to Hobart over four years, for an undergraduate degree that Hobart now refuses to confer, as well as at least $72,400 in lost salary (for his first year of work alone) at his previously accepted job, which he is now ineligible to begin without his degree.

## AS AND FOR A FIRST CAUSE OF ACTION
**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*.**
**(against Hobart)**

249.     Plaintiff John Doe repeats and realleges each and every allegation above as though fully set forth herein.

250.     Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

251.     On information and belief, Hobart, at all times relevant to this Complaint, received and continues to receive federal funding and is therefore subject to liability under Title IX of the Education Acts of 1972, 20 U.S.C. § 1681(a).

252.     For example, upon information and belief, in 2018-2019, Defendant received approximately $ 2,378,059 in government grants and contracts, in addition to the federal student loan money it received. *See* Hobart and William Smith Colleges Financial Statement May 31, 2019 (https://www.hws.edu/offices/business/images/financial_statements2019.pdf).

253.     Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant Hobart College.

254.     Title IX is enforceable through a private right of action, for monetary damages as well as injunctive relief.

255.     Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline.  *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

256.    The Second Circuit has observed that there are several theories available to a Plaintiff alleging gender bias in violation of Title IX.  One of those theories is known as the "erroneous outcome" theory.

257.    "Plaintiffs who claim that an erroneous outcome was reached must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

258.    Hobart violated Title IX in the instant case because Hobart reached an erroneous finding that Plaintiff was responsible for sexual misconduct, and gender bias was a motivating factor in the wrongful finding.

259.    The outcome was erroneous because, by way of example and not limitation:

a.    Hobart ignored evidence of a clear motive for Roe to lie: that she had sex with a young man whom her roommate/best friend had met through a dating app and expressly asked to come over that night, intending to be alone with him—indeed, this motive is clear when Smith stated to investigator Chase that Roe's first response after Plaintiff left her room was to tell Smith, "don't be mad at me";

b.    Hobart completely ignored the concrete evidence disproving Roe's allegations, to wit, the video filmed just minutes after Roe was allegedly "blackout", "incapacitated," and purportedly unable to move, showing that she was, in fact, entirely coherent, lively, oriented, steady on her feet, and fully in control of her faculties;

c.    Hobart ignored the voluminous lies and inconsistencies told by both Roe and Smith, including whether Smith invited Plaintiff over, whether Smith originally planned

to hook up with Plaintiff, whether Roe was awake and screaming when Plaintiff allegedly assaulted her versus asleep and silent, whether and when Roe and Smith knew Plaintiff's name, whether Roe slept in her room with Smith that night, and whether Roe stayed in her bed and went to sleep with her pants down (again, categorically disproved by the video evidence);

d.  Hobart found Plaintiff to not be credible based largely on either gender stereotypes, or on immaterial alleged "inconsistencies" that were not actually inconsistent, such as Adjudicator Hodge's incorrect statement that Plaintiff did not accurately describe the clothing that Smith wore (yet Smith's actual failure on this very same point was completely ignored and not counted against her);

e.  Hobart failed to properly apply the preponderance of the evidence standard, accepting Roe and Smith's unsupported claims over the objective evidence;

f.  Hobart deliberately refused to question Roe's credibility and presumed her to be credible from the start as a female accuser, despite numerous demonstrable lies and inconsistencies in her claims;

g.  Hobart's adjudicator relied on statements given to the Investigator by witnesses whom she either did not call or who failed to appear at the hearing, precluding any genuine credibility assessment;

h.  Hobart failed to apply the presumption of innocence and presumed Plaintiff guilty from the start as a male accused;

i.  Hobart's investigator distorted and skewed the record in favor of Jane Roe, and failed to gather relevant and potentially exculpatory evidence;

j. Hobart's adjudicator employed archaic and gender-normative stereotypes, presuming males to be sexual aggressors and females to be chaste; specifically, Hobart's chosen adjudicator stated that no woman would ever consent to casual/anonymous sex unless she was incapacitated; and

k. Hobart failed to adequately and genuinely consider Plaintiff's appeal, instead rubber-stamping the decision below.

260.   Particular circumstances suggest that gender bias was a motivating factor behind the flawed proceedings, erroneous findings and/or the decision to impose unduly harsh discipline upon Plaintiff.  These circumstances include, by way of example and not limitation:

a. The federal pressure placed on Hobart by virtue of two, years-long OCR investigations, which put Hobart at risk for losing federal funding, and one of which was specifically initiated because of an allegation that Hobart failed to find three male students responsible for sexually assaulting a younger, intoxicated female student;

b. Years of pressure and criticism from the student body specifically geared towards Hobart's perceived failure to protect "women and girls" from sexual misconduct;

c. The very public, widespread media coverage of Hobart's previous "gang-rape" case and the extremely bad press which resulted from Hobart finding the male respondents not responsible;

d. Hobart's clear sensitivity to such bad press, wherein it directly responded to the gang-rape allegations by revising its policies and procedures;

e.  Hobart's continued effort to repair its tarnished reputation, particularly when it comes to allegations of sexual assault on a freshman girl claiming she was intoxicated;

f.  Hobart's embrace of gender-normative and gender-based stereotypes, wherein it was presumed to be more reasonable that a male would commit a heinous rape than that a female would willingly engage in casual sex;

g.  Hobart's blatant skewing of all facts and claims in favor of Jane Roe and Sally Smith, despite clear evidence of their lack of credibility;

h.  Hobart's disparate treatment of similar circumstances as between Plaintiff, the male respondent, and Smith, the female witness—for example, by claiming that Plaintiff was less credible because he allegedly misremembered Smith's clothing, but not finding Smith any less credible when she alleged with certainty an incorrect fact about Plaintiff's clothing; and similarly, by finding Plaintiff not credible because he initially misremembered who let him into Roe's dorm, but declining to find Roe or Smith less credible when they gave conflicting claims about whether Plaintiff was invited over and how/when he entered their shared room; and

i.  Hobart's presumption that Roe was credible as a female complainant and Plaintiff was not credible as a male respondent, and/or its refusal to test or acknowledge the obvious problems with Roe's credibility;

261.  On information and belief, Hobart's mishandling of Plaintiff's Title IX case was informed by institutional, systemic gender bias, as well as external pressure from the student body and the United States Department of Education, under a threat of rescission of federal funds.

262.    Hobart applied its policies and procedures in a manner that discriminated against John Doe on the basis of his sex and led to an erroneous outcome.

263.    Hobart also imposed an unwarranted and unjustly severe sanction on John Doe, and gender bias was a motivating factor, for the same reasons as described above.

264.    Based on the foregoing, John Doe was subjected to a biased, prejudiced and unfair process in violation of Title IX designed to find him, the male, responsible for sexual assault and be punished severely for it.

265.    This unlawful discrimination in violation of Title IX proximately caused John Doe to sustain substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

266.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Hobart to: (i) reverse the outcome, findings, and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Roe complaint; (iii) remove any record of the finding or Plaintiff's expulsion from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; (v) confer Plaintiff's undergraduate degree (and, as needed do so retroactively to May 2020); and (vi) any and all further actions required to return Plaintiff to the status quo ante.

## AS AND FOR A SECOND CAUSE OF ACTION
### Breach of Contract
### (against Hobart, Chase, and CSC Investigations)

267.    Plaintiff John Doe repeats and realleges each and every allegation above as though fully set forth herein.

268.    At all times relevant hereto, a contractual relationship existed between Hobart and Plaintiff by virtue of Plaintiff's enrollment at Hobart and as defined by and through Hobart's policies and procedures governing the student disciplinary system, including but not limited to the Sexual Misconduct Policy.

269.    Through the documents it publishes and provides to students, Hobart makes express and implied contractual commitments to students involved in the disciplinary process and/or the investigation of potential violations of the Sexual Misconduct Policy.

270.    New York law recognizes that the relationship between a student and a college is contractual in nature, and that the terms of the Student Handbook become part of that contract. *See Vought v. Teachers Coll., Columbia Univ.*, 511 N.Y.S.2d 880, 881 (2d Dep't 1987); *Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 481 (S.D.N.Y. 2015).

271.    Implied in every contract is the covenant of good faith and fair dealing.  *See Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88 (1917).

272.    Based on the aforementioned facts and circumstances, Hobart created express and implied contracts when it offered, and Plaintiff accepted, admission to Hobart, and when Plaintiff paid the required tuition and fees.

273.    On information and belief, Hobart contracted with Chase and/or CSC and Hodge to conduct its investigation and adjudication of Jane Roe's claims in accordance with Hobart's policies.

274.    As such, Plaintiff is a third-party beneficiary of the contracts between Hobart and Chase and/or CSC and Hobart and Hodge, and their violation of Hobart's policies constitutes a breach of contract to Plaintiff.

275.    Hobart, Chase, CSC, and Hodge breached their agreement(s) with Plaintiff throughout the course of the investigation and adjudication of Jane Roe's complaint.  By way of example, and not limitation:

    a.   Defendants failed to provide a process that was fair and impartial;

    b.   Defendants failed to provide a prompt and equitable response to Jane Roe's complaint;

    c.   Defendants failed to apply the presumption of innocence to Plaintiff;

    d.   Defendants failed to properly apply the preponderance of the evidence standard;

    e.   Defendants failed to follow Hobart's definitions and guidelines for affirmative consent and incapacitation;

    f.   Hobart failed to impose any consequences on Roe or Smith for their patently untrue and fabricated and misleading claims;

    g.   Hobart and Hodge permitted Jane Roe's attorney to interrupt the hearing proceedings as well as to feed Roe answers to fact questions posed to her by the Adjudicator;

    h.   Hobart failed to provide the requisite information in the Notice of Investigation issued to Plaintiff;

    i.   Defendants failed to complete the investigation and adjudication within the time period prescribed by the policies, and failed to provide Plaintiff appropriate written notice of the basis for such extensions as required under the policies;

j.   CSC/Investigator Chase failed to gather all relevant evidence;

k.   On information and belief, Hobart failed to provide or ensure the requisite training for investigators and adjudicators;

l.   On information and belief, Hobart permitted Adjudicator Hodge to determine the sanction without consulting with the Dean of Students; and

m.   Hobart improperly denied Plaintiff's appeal without genuine consideration.

276.   Hobart, Chase, CSC, and Hodge further breached the implied covenant of good faith and fair dealing, in that they applied Hobart's policies in a discriminatory way and were improperly motivated by gender bias, political expedience, and institutional self-interest in preserving/repairing Hobart's reputation.

277.   Hobart further violated the covenant of good faith and fair dealing by purporting to provide Plaintiff with a fair process, but in actuality endeavoring to find Plaintiff responsible and punish him to the utmost regardless of the actual facts of the case.

278.   Hobart, Chase, CSC, and Hodge further violated the covenant of good faith and fair dealing by skewing the facts and evidence in Roe's favor and deliberately ignoring, obfuscating, and discounting evidence which tended to show Plaintiff's innocence.

279.   As a proximate and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages, including, but not limited to, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

280.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, Plaintiff John Doe demands judgment against Defendants as follows:

(i)     On the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment awarding John Doe damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Hobart to: (i) reverse the outcome, findings, and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Roe matter; (iii) remove any record of the Title IX finding or Plaintiff's expulsion from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; (v) confer Plaintiff's undergraduate degree (and, as needed, do so retroactively to May 2020); and (vi) any and all further actions required to return Plaintiff to the status quo ante;

(ii)    On the second cause of action for breach of contract, a judgment awarding John Doe damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)   Equitable and injunctive relief directing Hobart to: (i) reverse the outcome, findings, and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Roe matter; (iii) remove any record of the finding or Plaintiff's expulsion from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; (v) confer Plaintiff's undergraduate degree (and, as needed do so retroactively to May 2020); and (vi) any and all further actions required to return Plaintiff to the status quo ante; and

(iv)    Such other and further relief as the Court deems just and proper.

## JURY DEMAND

John Doe herein demands a trial by jury of all triable issues in the present matter.

**Dated:** **New York, New York**
          **February 14, 2022**

                        **Respectfully submitted,**

                        **NESENOFF & MILTENBERG, LLP**
                        *Attorneys for Plaintiff John Doe*

                        By:   /s Andrew Miltenberg
                        Andrew T. Miltenberg, Esq.
                        Stuart Bernstein, Esq.
                        Adrienne Levy, Esq.
                        363 Seventh Avenue, Fifth Floor
                        New York, New York 10001
                        (212) 736-4500
                        amiltenberg@nmllplaw.com
                        sbernstein@nmllplaw.com
                        alevy@nmllplaw.com