UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JOHN DOE,

                     Plaintiff,

          v.

HOBART AND WILLIAM SMITH
COLLEGES and CSC INVESTIGATIONS,
LLC,

                     Defendants.
_____

**DECISION AND ORDER**

6:20-CV-06338 EAW

## INTRODUCTION

Plaintiff John Doe[1] ("Plaintiff") was expelled from defendant Hobart and William

Smith Colleges ("HWS") in April 2020, after having been found responsible for sexually

assaulting a female classmate, Jane Roe ("Roe")[2]. (Dkt. 59 at ¶¶ 1-2). He commenced this

action on May 22, 2020, alleging, in relevant part, violations of Title IX of the Education

Amendments of 1972, 20 U.S.C. § 1681(a), and breach of contract. (Dkt. 1). The two

defendants remaining in the litigation, HWS and CSC Investigations, LLC ("CSC"), now

move for summary judgment.[3] (Dkt. 86, Dkt. 98). For the following reasons, both motions

---

[1]    The Court previously entered a decision and order granting Plaintiff permission to
proceed under a pseudonym. (Dkt. 36).

[2]    Roe and the other HWS students referenced in the materials submitted for summary
judgment are referred to pseudonymously throughout.

[3]    William Boerner, the Title IX Coordinator and Assistant Vice President of HWS,
and Kelley Hodge, an attorney who served as adjudicator for the proceedings at issue here,
were named defendants in this lawsuit. (Dkt. 1). Both brought motions to dismiss pursuant

for summary judgment are granted.  Plaintiff's motion to strike the report of HWS's expert and preclude his testimony (Dkt. 104) is denied as moot.

## FACTUAL BACKGROUND

The following facts are taken from HWS's Statement of Undisputed Facts (Dkt. 86-1), CSC's Statement of Undisputed Facts (Dkt. 98-6), Plaintiff's Statements of Additional Material Facts in Opposition to Summary Judgment (Dkt. 101-2; Dkt. 102-2)[4], and the exhibits submitted by the parties.[5]  Unless otherwise noted, the facts are undisputed.

**I.     Background Information Regarding Sexual Assaults on College Campuses and Investigation Into, and Public Criticism of, HWS**

On April 4, 2011, the Office of Civil Rights ("OCR") of the U.S. Department of Education ("DOE") issued a guidance letter to colleges and universities in receipt of federal funding, known as the "Dear Colleague Letter" (the "DCL")[6].  (Dkt. 101-2 at ¶ 1; Dkt. 113 at ¶ 1; Dkt. 103-1).  The DCL stated that Title IX "prohibit[s] discrimination on the basis

---

to Fed. R. Civ. P. 12(b)(6), which were granted.  (Dkt. 37).  Defendant Tamara Chase and Plaintiff later entered into a stipulation dismissing her from the case.  (Dkt. 95).

[4]     As addressed at oral argument, Plaintiff's Statements of Additional Material Facts in Opposition to Summary Judgment (Dkt. 101-2; Dkt. 102-2) contained commentary and argument inconsistent with the requirements of Local Rule of Civil Procedure 56(a)(2). "This is impermissible, regardless of whether the commentary is intended to assert a related fact, place in context or 'spin' the asserted fact, or deny a perceived implication of the asserted fact."  *Yennard v. Boces*, 353 F. Supp. 3d 194, 196-97 (N.D.N.Y. 2019) (footnotes omitted).  Rather than strike the Statements altogether, as Defendants urged, the Court has considered only the factual assertions contained therein which were supported by record evidence and disregarded any other commentary and argument.

[5]     The Court did not rely on the expert report of Philip Catanzano (Dkt. 86-42) in deciding HWS's motion for summary judgment.

[6]     The DCL was later rescinded by the DOE.  (Dkt. 103-1 at 2).

of sex in education programs or activities operated by recipients of Federal financial assistance," and that "[s]exual harassment of students, which includes acts of sexual violence, is a form of sex discrimination prohibited by Title IX." (Dkt. 103-1 at 2). The DCL supplemented earlier DOE guidance "by providing additional guidance and practical examples regarding the Title IX requirements as they relate to sexual violence." (*Id.* at 3). It noted that "[i]f a school knows or reasonably should know about student-on-student harassment that creates a hostile environment, Title IX requires the school to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects." (*Id.* at 5). The DCL required schools to "publish a notice of nondiscrimination and to adopt and publish grievance procedures." (*Id.*).

On April 19, 2014, the OCR issued another guidance document to colleges and universities, *Questions and Answers on Title IX and Sexual Violence* (the "2014 Q&A")[7]. (Dkt. 101-2 at ¶ 5; Dkt. 113 at ¶ 5; *see also* Dkt. 103-3). The document sought to "further clarify the legal requirements and guidance articulated in the DCL and the *2001 Guidance* and include examples of proactive efforts schools can take to prevent sexual violence and remedies schools may use to end such conduct, prevent its recurrence, and address its effects." (Dkt. 103-3 at 3). It listed "three key procedural requirements" schools "must [] have in place to prevent sexual violence and resolve complaints." (Dkt. 103-3 at 17). The three were: "(1) disseminate a notice of nondiscrimination;" "(2) designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under

---

[7]     The 2014 Q&A was later rescinded by the DOE. (Dkt. 103-3 at 2).

Title IX;" and "(3) adopt and publish grievance procedures providing for the prompt and equitable resolution of student and employee sex discrimination complaints." (*Id.* at 17-18). It also set out the "elements [that] should be included in a school's procedures for responding to complaints of sexual violence." (*Id.* at 20).

In July 2014, The New York Times published a front-page article, *Reporting Rape, and Wishing She Hadn't* ("2014 Times Article") which criticized the way HWS handled a rape case on campus involving three members of the HWS football team. (Dkt. 101-2 at ¶ 15; Dkt. 113 at ¶ 15; Dkt. 103-9). Robert Flowers, then HWS's student affairs administrator, was quoted in the article. (Dkt. 103-9 at 4, 11, 13). In September 2014, an OCR complaint was filed relating to the allegations discussed in the 2014 Times Article. (Dkt. 101-2 at ¶¶ 27-28; Dkt. 113 at ¶¶ 27-28). Six months later, in August 2015, a second OCR complaint was filed against HWS, accusing the school of improperly responding to a female student's report of sexual assault, and retaliating against her by charging her with an alcohol violation after she reported. (Dkt. 101-2 at ¶ 42; Dkt. 113 at ¶ 42). Both OCR complaints were dismissed in September 2018.[8] (Dkt. 103-15; Dkt. 103-22).

At all times relevant, William Boerner was HWS's Title IX coordinator. (Dkt. 86-1 at ¶ 15, Dkt. 101-1 at ¶ 15). He testified that he did not recall being aware of any OCR complaints when he applied and interviewed for the Title IX coordinator position at HWS

---

[8]     To the extent that Plaintiff seeks to challenge HWS's decision not to provide further information regarding the OCR complaints in response to his Rule 34 request, (*see* Dkt. 101-2 at ¶ 49), he should have pursued any such challenge before discovery closed. *See, e.g., In re Vanderveer Estates Holding, LLC*, 328 B.R. 18, 29 (E.D.N.Y. 2005) ("It is inappropriate to bring a discovery dispute to the Court's attention for the first time in opposition to a summary judgment motion.").

in 2019.  (Dkt. 86-13 at 8).  Boerner testified that he was informed that at least one OCR complaint was resolved, but could not recall the timing.  (*Id.* at 9).  Prior to being hired, he came across and read the 2014 Times Article.  (*Id.* at 9).  The article was mentioned during Boerner's interviews, but he did not recall any "discussions of how the Title IX offices at Hobart needed to take a stronger stance against alleged sexual assault."  (*Id.* at 9-10).  Boerner also read a series of articles, published in the student newspaper, that were critical of HWS's handling of campus sexual assault.  (*Id.* at 10).

Boerner testified:

> Q:    Are you familiar with a term trauma-informed approach as it relates to Title IX?
>
> A:    Yes.
>
> Q:    Okay.  And tell me what that term means to you.
>
> A:    Being kind and generous to all parties involved in the process.
>
> Q:    Anything else?
>
> A:    That's how I interpret trauma-informed in my practice and how I understand it for this work.

(*Id.* at 11).  With regard to his training in the trauma-informed approach, Boerner testified he was trained "via the SUNY student conduct institute," (*id.* at 12), and:

> Q:    So I'm trying to understand, you can tell me, were you trained that if a complainant misremembers you're to excuse that because of trauma?
>
> A:    No.

(*Id.* at 12).  He further testified that "I've been informed about information that there might be gaps in someone's memory whether that's the complainant or the respondent or a

witness because of trauma involved in a process of a situation," but when asked if he was "trained to overlook it or not to consider it because of trauma" he answered "no." (*Id.* at 12).

## II.     Encounter Between Plaintiff and Jane Roe

On September 13, 2019, HWS student Jane Roe and her roommate, Sally Smith, made a report to HWS's Title IX office alleging that Plaintiff sexually assaulted Roe almost one year earlier—on October 21, 2018.[9]  (Dkt. 86-1 at ¶ 1; Dkt. 101-1 at ¶ 1; Dkt. 86-5). Roe reported that she was "really drunk" and that Plaintiff had anal sex with her without her consent.  (Dkt. 86-1 at ¶ 2; Dkt. 101-1 at ¶ 2; Dkt. 86-5 at 2).  Smith said she walked in during the encounter and "yelled" at Plaintiff, "asking something like 'What are you doing?'"  (Dkt. 86-1 ¶ 3; Dkt. 101-1 at ¶ 3; Dkt. 86-5 at 3).  Roe reported that she "did not know [Plaintiff's] name at the time and didn't want to know his name," (Dkt. 86-5 at 3), because she "just wanted to forget it happened and moved on," (*id.*).  Roe said she decided to make a formal complaint because a friend told her that "something happened" between Plaintiff and that friend's roommate.  (Dkt. 86-1 at ¶ 4; Dkt. 101-1 at ¶ 4; Dkt. 86-5 at 3).

Complaints of sexual assault at HWS were governed by HWS's Sexual Misconduct Policy (the "Policy").  (Dkt. 86-1 at ¶ 5; Dkt. 101-1 at ¶ 5; Dkt. 86-6).  The Policy provides that students accused of violating the Policy will receive a Notice of Investigation informing them of the complainant's identity, the time, date, location, and nature of the alleged conduct, and information about the respondent's various rights under the policy.

---

[9]      The Court relies on the statements made in the report solely for the purpose of describing the statements, and not for the truth of the matters asserted therein.

(Dkt. 86-1 at ¶ 6; Dkt. 101-1 at ¶ 6; Dkt. 86-6 at 32).   On September 20, 2019, HWS provided Plaintiff with a Notice of Investigation, informing him that Roe had accused him of sexual assault and that the Title IX Office would be investigating her allegations.   (Dkt. 86-1 at ¶ 7; Dkt. 101-1 at ¶ 7; Dkt. 86-7 at 2).   The Notice of Investigation contained information about Plaintiff's rights, an internet link to the Policy, and that Roe "stated that on October 21, 2018, you entered her room in [her dorm] and sexually assaulted her while she was face down and blacked out on her bed."   (Dkt. 86-1 at ¶ 8; Dkt. 101-1 at ¶ 8; Dkt. 86-7 at 2-3).

The Policy also provides that both parties to a sexual misconduct proceeding are entitled to an advisor of their choice who may accompany them to any meetings and provide them with advice, subject to certain limitations.   (Dkt. 86-1 at ¶ 9; Dkt. 101-1 at ¶ 9; Dkt. 86-6 at 28).   Plaintiff retained Stuart Bernstein and the law firm of Nesenoff & Miltenberg, LLP—the same attorneys representing him in this action—to serve as his advisor.   (Dkt. 86-1 at ¶ 10; Dkt. 101-1 at ¶ 10).   Plaintiff chose Bernstein and his law firm because they had significant experience in handling Title IX cases on behalf of respondents and they were highly qualified.   (Dkt. 86-1 at ¶ 11; Dkt. 101-1 at ¶ 11).

The Policy provides that "the Title IX Coordinator will designate one or more Investigators from the Colleges and/or an experienced external investigator to conduct a prompt, thorough, fair, and impartial investigation."   (Dkt. 86-1 at ¶ 17; Dkt. 101-1 at ¶ 17; Dkt. 86-6 at 32).   CSC was hired to conduct the investigation, with Tamara Chase ("Chase") serving as the designated investigator.   (Dkt. 86-1 at ¶ 18; Dkt. 101-1 at ¶ 18).   It was Chase's first investigation for HWS, but for at least four years prior, she conducted

investigations for a number of other colleges and universities. (Dkt. 86-1 at ¶ 19; Dkt. 101-1 at ¶ 19). Chase previously worked with colleges and universities that had sexual misconduct policies and she testified that she felt she adequately understood the Policy. (Dkt. 86-1 at ¶ 23; Dkt. 101-1 at ¶ 23). Plaintiff was provided with written notice of Chase's selection, along with a link to her website containing her background, and was to let Boerner "know as soon as possible if [Plaintiff had] any bias-related concerns or conflicts of interest with Ms. Chase serving in this capacity." (Dkt. 86-1 at ¶ 24; Dkt. 101-1 at ¶ 24). Plaintiff did not object. (Dkt. 86-1 at ¶ 25; Dkt. 101-1 at ¶ 25).

The Policy provides that "[t]he Investigator will notify and seek to interview separately the Complainant, the Respondent, and third-party witnesses, and will gather other relevant and available evidence and information, including, without limitation, electronic or other records of communications between the parties or witnesses . . . photographs . . . and medical records (subject to the consent of the applicable party.)." (Dkt. 86-1 at ¶ 26; Dkt. 101-1 at ¶ 26; *see also* Dkt. 86-6 at 33). Chase interviewed the parties and a number of witnesses, and accumulated electronic communications, photographs, and videos. (Dkt. 86-1 at ¶ 27; Dkt. 101-1 at ¶ 27). Plaintiff disputes whether Chase actively collected evidence, alleging that Chase "generally invited students to provide whatever evidence *they deemed* relevant/supportive of their claims and that the students sent certain, self-selected materials to William Boerner." (Dkt. 101-1 at ¶ 27).

Chase interviewed Roe on September 30, 2019. (Dkt. 86-1 at ¶ 28; Dkt. 101-1 at ¶ 28). Roe told Chase that she was drinking on the night of October 20, 2018, while getting

ready to go to a 90's themed party.[10]  (Dkt. 86-15 at 167).  She "estimate[d] she had a 'good amount' of vodka and Gatorade in Solo cups-approximately six shots mixed with Gatorade as well as additional shots."  (*Id.*).  She told Chase that "she is usually good at handling her alcohol but because she wasn't eating as much, she was more intoxicated."  (*Id.*).  She and her friends "were all drinking a 'good amount' because they can all drink."  (*Id.*).  Roe and her friends went to the party, where she did not stay long, and then went home with her friend Sally Smith "because they were too drunk."  (*Id.*).

Roe told Chase that she did "not recall coming back into her dorm room."  (*Id.* at 168).  She reported that she "was blacked out and was in and out of consciousness and was falling in and out of sleep."  (*Id.*).  At some point, Smith left the room to vomit.  (*Id.*).  Roe was aware that someone entered the room, but thought it was Smith.  (*Id.*).  She told Chase that she later learned the person was Plaintiff, and that "[s]he felt the person touching her and wanted him to get off but was so blackout she couldn't move."  (*Id.*).  Roe stated that Plaintiff took her clothes off and put his penis in her anus without her consent.  (*Id.*).  Plaintiff admits that this is what Roe reported to Chase, but denies that it is true.  (Dkt. 101-1 at ¶ 35).  Roe told Chase that she felt "frozen" and that "if she wasn't as blackout as she was she could've pushed him off."  (Dkt. 86-15 at 168).  After about 10 minutes, Smith returned to the room, saw what was happening, "screamed at [Plaintiff] to get the fuck out

---

[10]    The Court relies on statements made to Chase solely for the purpose of describing the information provided to Chase, not for the truth of the matters asserted, and thus need not address Doe's objection that the statements are inadmissible hearsay.  (*See, e.g.,* Dkt. 101-1 at ¶ 28).

and he got up and left.  [Smith] was also drunk and came over and asked [Roe] if she was

okay but [Roe] was basically blackout drunk and incoherent."  (*Id.* at 169).

Chase also interviewed Roe's roommate, Smith.  (Dkt. 101-1 at ¶ 38).  Smith told

Chase she did not know how much Roe was drinking, but Smith estimated that on a scale

of "1 being completely sober and 10 being blackout [drunk]," Smith "estimated that she

was probably an 8 while they were out at the party and after," and she "thinks that [Roe]

was as intoxicated as she was." (Dkt. 86-15 at 172).  She said she was "Snapchatting" with

Plaintiff, who she had met on Tinder.[11]  (Dkt. 86-1 at ¶ 40; Dkt. 101-1 ¶ 40.).  Screenshots

of Snapchat messages show that shortly before midnight Smith and Plaintiff were

exchanging messages about meeting up.  (Dkt. 86-1 at ¶ 42; Dkt. 101-1 at ¶ 42; Dkt. 86-15

at 148).  The messages showed that Plaintiff came to Smith's dorm, and someone let him

in.  (Dkt. 86-1 at ¶ 44; Dkt. 101-1 at ¶ 44; Dkt. 86-15 at 150).  Smith messaged that "I can't

Gef [sic] up," to which Plaintiff replied, "Well u better."  (Dkt. 86-1 at ¶ 45; Dkt. 101-1 at

¶ 45).

Smith told Chase that she "was really out of it," but recalled walking into her dorm

room and seeing Roe "lying on her stomach, facedown and [Plaintiff] was on top her . . . .

[Roe's] pants were pulled down partially and her rear end was exposed."  (Dkt. 86-1 at

¶ 46; Dkt. 101-1 at ¶ 46; Dkt. 86-15 at 172-73).  She told Chase that Plaintiff's pants and

underwear were down, and that "she screamed and yelled something like, 'Get the fuck

out!'  [Plaintiff] then left.  [Smith] said that [Plaintiff] gazed at [Smith] with a haunting

---

[11]     Snapchat is a messaging app, *see* www.snapchat.com; Tinder is a dating app, *see*
www.Tinder.com.

('weirdest fucking, frazzled') look and didn't say anything.  He 'speed-walked' out." (Dkt. 86-1 at ¶¶ 47, 49; Dkt. 101-1 at ¶¶ 47, 49; Dkt. 86-15 at 173).

The parties dispute whether the photos and videos accumulated by Chase during the investigation show that Roe and Smith were very intoxicated.  (Dkt. 86-1 at ¶ 50; Dkt. 101-1 at ¶ 50).  Plaintiff argues that "the photos and videos speak for themselves and it is up to the finder of fact as to whether Jane Roe appeared to be intoxicated and/or incapacitated therein."  (Dkt. 86-1 at ¶ 50; Dkt. 101-1 at ¶ 50).

Plaintiff, accompanied by Bernstein, was interviewed by Chase on October 17, 2019.  (Dkt. 86-1 at ¶¶ 55-56; Dkt. 101-1 at ¶¶ 55-56).  Plaintiff and his advisor were told that a recording would be made of the interview but would be destroyed after the interview was transcribed and reviewed by Plaintiff.  (Dkt. 86-1 at ¶ 57; Dkt. 101-1 at ¶ 57; Dkt. 86-15 at 176).  Neither Plaintiff nor his counsel objected (Plaintiff notes he was not asked if he objected).  (Dkt. 86-1 at ¶ 58; Dkt. 101-1 at ¶ 58).  Plaintiff told Chase that he and Smith "began to communicate through a string of communication via Tinder for about a week but they did not meet in person," and he thought "it was the intention that they would hook up."  (Dkt. 86-15 at 176).  Plaintiff told Chase that he was not drinking that night.  (Dkt. 86-1 at ¶ 60; Dkt. 101-1 at ¶ 60; Dkt. 86-15 at 176).  He told Chase that Smith was wearing a dark hoodie sweatshirt and grey sweatpants and she "came to the door and let him in."[12] (Dkt. 86-1 at ¶ 62; Dkt. 101-1 at ¶ 62; Dkt. 86-15 at 176).  He told Chase that Smith led him to her room, where Roe was also present, and that Smith "seemed steady on her feet

---

[12]     Plaintiff made this statement before seeing the Snapchat messages described above. (Dkt. 86-1 at ¶ 63; Dkt. 101-1 at ¶ 63).

and did not seem intoxicated." (Dkt. 86-1 at ¶¶ 64-65; Dkt. 101-1 at ¶¶ 64-65; *see also* Dkt. 86-15 at 176). Plaintiff stated that Smith left the room shortly after he entered, and that he and Roe engaged in a conversation about Roe being from England. (Dkt. 86-1 at ¶¶ 66-68; Dkt. 101-1 at ¶¶ 66-68; Dkt. 86-15 at 176-77). He told Chase that Roe seemed "totally fine," as she was "clear and concise" in her speech, "her eyes were wide," and she "was personable and her body language was responsive." (Dkt. 86-1 at ¶ 68; Dkt. 101-1 at ¶ 68; Dkt. 86-15 at 177).

Plaintiff told Chase that Roe approached him, began kissing him, touched his penis over his joggers, and then "reached for the [draw]strings of his joggers to undo them and start pulling them down," so that she could perform oral sex on him. (Dkt. 86-1 at ¶¶ 69-70; Dkt. 101-1 at ¶¶ 69-70; *see also* Dkt. 86-15 at 177). Plaintiff told Chase that Roe asked if they should have sex, that she retrieved a condom, they had consensual vaginal sex, and that the two did not engage in anal sex. (Dkt. 86-1 at ¶ 71; Dkt. 101-1 at ¶ 71; Dkt. 86-15 at 177-78). Plaintiff stated that the sex ended after three to four minutes because he lost his erection and could not continue. (Dkt. 86-1 at ¶ 72; Dkt. 101-1 at ¶ 72; Dkt. 86-15 at 178). He and Roe then got dressed, and he told Roe "I'm just going to head back to my dorm and go to bed," and he left. (Dkt. 86-1 at ¶ 73; Dkt. 101-1 at ¶ 73; Dkt. 86-15 at 178). Plaintiff told Chase that he did not learn Roe's name until he saw it in the investigative notice about a year later, and that he never communicated with Roe or Smith after the encounter. (Dkt. 86-1 at ¶¶ 75-76; Dkt. 101-1 at ¶¶ 75-76; Dkt. 86-15 at 178).

Chase provided Plaintiff with a summary of the interview for his review. (Dkt. 86-1 at ¶ 78; Dkt. 101-1 at ¶ 78). Plaintiff provided a written response to the summary, and

asked for certain clarifications.[13]  (Dkt. 86-1 at ¶ 80; Dkt. 101-1 at ¶ 80).  Chase issued a revised interview summary addressing Plaintiff's points.  (Dkt. 86-1 at ¶ 81; Dkt. 86-1 at ¶ 81).  The original interview summary, Plaintiff's written response, and the revised interview summary were all included in the Final Investigative Report provided to the adjudicator and used at the hearing.  (Dkt. 86-1 at ¶ 82; Dkt. 86-1 at ¶ 82).

On December 19, 2019, Boerner notified Plaintiff that Chase was finalizing a preliminary report, and that Plaintiff would have the opportunity to "make corrections." (Dkt. 86-1 at ¶¶ 84-85; Dkt. 101-1 at ¶¶ 84-85).  The Policy states that both parties "will have an opportunity to review the Preliminary Investigation Report, respond to it in writing, meet with the Investigator, submit additional comments and information to the Investigator, identify any additional witnesses or evidence for the Investigator to consider, and submit any further questions that they believe should be directed by the Investigator to the other party or to any witness."  (Dkt. 86-6 at 33; Dkt. 86-1 at ¶ 86; Dkt. 101-1 at ¶ 86). On January 13, 2019, Boerner shared the preliminary report with both parties, and Plaintiff understood that he was being given the opportunity to respond.  (Dkt. 86-1 at ¶ 87; Dkt. 101-1 at ¶ 87).  Plaintiff asked for a one-week extension, and Boerner granted both parties an additional week to respond.  (Dkt. 86-1 at ¶¶ 88-89; Dkt. 101-1 at ¶¶ 88-89).

On January 27, 2020, Plaintiff submitted a six-page single-spaced document entitled "Response to the Preliminary Investigative Report," created with advice from Bernstein.

---

[13]     Plaintiff objects to the word "clarifications," and states that he "submitted corrections and clarifications where Chase's notes misrepresented his statements and/or were otherwise inaccurate."  (Dkt. 101-1 at ¶ 80).

(Dkt. 86-1 at ¶¶ 90-91; Dkt. 101-1 at ¶¶ 90-91).  Chase made changes to the report based on Plaintiff's response, although Plaintiff "denies that Chase meaningfully or accurately addressed Plaintiff's concerns as set forth in his response." (Dkt. 86-1 at ¶ 96; Dkt. 101-1 at ¶ 96).  Chase did not interview the one witness Plaintiff identified in his response.  (Dkt. 86-1 at ¶ 97; Dkt. 101-1 at ¶ 97).  The witness was identified solely as a character witness. (*Id.*).  Character evidence is not admissible under the Policy.  (Dkt. 86-1 at ¶ 98; Dkt. 101-1 at ¶ 98).  Plaintiff's entire response was included as an appendix to the Final Investigative Report.  (Dkt. 86-1 at ¶ 102; Dkt. 101-1 at ¶ 102).

The Final Investigative Report contained 52 exhibits, which included interview summaries from Roe, Plaintiff and four other witnesses, photos and videos, text messages, reports on use of student access cards, and other evidence.  (Dkt. 86-15).  Chase testified that she controlled the content of the report:

> Q:    . . . did you control what was put in, what wasn't put in, how it was written, what was written?
>
> []
> A:    I drafted the report and shared it with Dr. Boerner, and he, my recollection is, suggested formatting suggestions consistent with how they wanted the, like paragraph numbering.  But I controlled the content, generally, yes.

(Dkt. 86-11 at 16).  Chase testified that no one at HWS encouraged or pressured her to slant the report to favor Roe, and that Plaintiff's gender did not play a role in her work.  (Dkt. 86-11 at 42).  Chase also testified that she was unaware of the 2014 Times Article or the OCR investigations in 2019.  (Dkt. 86-11 at 42-43).

The Policy provides that HWS may appoint an external adjudicator to hear sexual misconduct cases, and HWS chose then-attorney Kelley Hodge to adjudicate this matter.

(Dkt. 86-1 at ¶¶ 113-114; Dkt. 101-1 at ¶¶ 113-114).  Adjudicator Hodge[14] was then an attorney who practiced in the Title IX area and had served as a Title IX coordinator, as well as a criminal defense attorney in Virginia and as the interim district attorney in Philadelphia.  (Dkt. 86-1 at ¶¶ 115-116; Dkt. 101-1 at ¶¶ 115-116).  Adjudicator Hodge testified that she received and reviewed HWS's policy, had conversations with people at HWS about the application of their policies, and had previously adjudicated cases at HWS so she "was very familiar with the policy and had handled matters with or under the auspices of this policy as governing my considerations, actions and applying these definitions.  So I knew this policy, and I knew how the college executed their policy and directed or expected adjudicators to follow their policy."  (Dkt. 86-1 at ¶ 120; Dkt. 101-1 at ¶ 120; Dkt. 86-27 at 54).  Adjudicator Hodge testified that she had no knowledge of the 2014 Times Article, nor did she know that HWS was the subject of OCR complaints.  (Dkt. 86-1 at ¶ 123; Dkt. 101-1 at ¶ 123; Dkt. 86-27 at 55, 64).  She testified that she was unaware of any campus activism regarding Title IX and did not feel any pressure to decide cases in any particular way.  (Dkt. 86-1 at ¶ 124; Dkt. 101-1 at ¶ 124; Dkt. 86-27 at 55).  She testified that Plaintiff's gender played no role in her decision.  (Dkt. 86-1 at ¶ 125; Dkt. 101-1 at ¶ 125; Dkt. 86-27 at 55).

Boerner wrote to Plaintiff on February 7, 2020, informing him that the case would proceed to a hearing and that Hodge was chosen as the adjudicator.  (Dkt. 86-1 at ¶ 127;

---

[14]    The Court refers to Hodge as "Adjudicator Hodge" to reflect her role at the time of the proceedings.  She has since been appointed as a district judge in the United States District Court for the Eastern District of Pennsylvania.

Dkt. 101-1 at ¶ 127; Dkt. 86-29).   He told Plaintiff that "[s]hould you have a concern of bias or conflict of interest in Ms. Hodge serving as the adjudicator of this hearing, please inform me. . . ."   (Dkt. 86-1 at ¶ 129; Dkt. 101-1 at ¶ 129; Dkt. 86-29 at 2).   Plaintiff understood that he had a right to object to Hodge serving as the adjudicator, and consulted with attorney Bernstein—who had participated in one other hearing in which Hodge served as an adjudicator—but did not object.   (Dkt. 86-1 at ¶¶ 131-32; Dkt. 101-1 at ¶¶ 131-32; Dkt. 103 at ¶ 4).   Prior to the hearing, Boerner met with Plaintiff and his advisor to help them prepare.   (Dkt. 86-1 at ¶ 134; Dkt. 101-1 at ¶ 134).

Plaintiff attended the hearing, in person, with Bernstein.   (Dkt. 86-1 at ¶ 136; Dkt. 101-1 at ¶ 136).   Plaintiff was able to take breaks throughout the hearing and to consult with Bernstein.   (Dkt. 86-1 at ¶ 137; Dkt. 101-1 at ¶ 137).   Plaintiff gave an opening statement, and spoke freely, without interruption.   (Dkt. 86-1 at ¶ 138; Dkt. 101-1 at ¶ 138).   Adjudicator Hodge questioned both parties, and both parties were permitted to pose written questions to the other party for the adjudicator to ask.[15]   (Dkt. 86-1 at ¶¶ 140-41; Dkt. 101-

---

[15]   Plaintiff "objects to Hobart's proposed transcript of the hearing as inaccurate and unreliable." (Dkt. 101-1 at ¶ 140).   He argues that the "original, contemporaneous hearing audio is available and serves as the best evidence of what took place during the hearing." (*Id.*).   Plaintiff objects in part because the transcript (*see* Dkt. 90-1, filed under seal) was created from the audiotape, and not created contemporaneously. (*Id.*).   Without more, that does not make it intrinsically inaccurate.   The transcript certification notes just that—that it was prepared from the electronic sound recording.   (Dkt. 90-1 at 46).   Plaintiff also objects because the current transcript was done to replace a transcript that was admittedly inaccurate (Dkt. 101-1 at ¶ 140), but producing a new transcript to replace an admittedly inaccurate one is the correct response.   The only inaccuracy Plaintiff identifies is that Roe's name is consistently misspelled throughout.   (*Id.*).   A repeated typographical error is not enough to call the accuracy of the entire transcript into question.   Absent any identification of specific discrepancies, the Court declines to reject the certified hearing transcript submitted by HWS.

- 16 -

1 at ¶¶ 140-41).  Plaintiff submitted questions for Adjudicator Hodge to ask Roe that were written with assistance from Bernstein.  (Dkt. 86-1 at ¶ 141; Dkt. 101-1 at ¶ 141).  Plaintiff also made a statement prior to being questioned by Adjudicator Hodge.  (Dkt. 86-1 at ¶ 143; Dkt. 101-1 at ¶ 143).  Each party was also able to present questions to Adjudicator Hodge to ask of the witnesses, and Plaintiff submitted questions to ask Smith, one of which Adjudicator Hodge declined to ask.  (Dkt. 86-1 at ¶ 148; Dkt. 101-1 at ¶ 148).  Plaintiff did not "believe [he] wanted or had any witnesses to call."  (Dkt. 86-1 at ¶ 149; Dkt. 101-1 at 149; Dkt. 86-8 at 43).  Each side was permitted to make a closing statement, and Plaintiff agreed he was not limited in any way in his statement, which he wrote with assistance from Bernstein.  (Dkt. 86-1 at ¶¶ 150-51; Dkt. 101-1 at ¶¶ 150-51).

The Policy allows the complainant to provide an impact statement and the respondent to provide a mitigation statement to be used in the event of a finding of responsibility.  (Dkt. 86-1 at ¶ 152; Dkt. 86-1 at ¶ 152).  Plaintiff submitted a mitigation statement in which he represented that he had "no disciplinary history," which was untrue. (Dkt. 86-1 at ¶¶ 153-54; Dkt. 101-1 at ¶¶ 153-54).  Plaintiff "had more than one disciplinary matter at Hobart," although "none of Plaintiff's prior disciplinary matters involved the Sexual Misconduct Policy."  (Dkt. 86-1 at ¶ 155; Dkt. 101-1 at ¶ 155).  Plaintiff was sanctioned and placed on deferred suspension for a year, from September 13, 2018, through September 13, 2019, in relation to an incident where a demeaning term was yelled from the roof of a fraternity at a professor.  (Dkt. 86-1 at ¶¶ 156, 161; Dkt. 101-1 at ¶¶ 156, 161). The letter sent to Plaintiff explained that deferred suspension meant that "if any violation of the Colleges' policy is confirmed, required withdraw/suspension from the Colleges is

the next step." (Dkt. 86-1 at ¶ 162; Dkt. 101-1 at ¶ 162). In addition, Plaintiff was placed on deferred suspension from December 11, 2017, through May 18, 2018, as a result of an underage alcohol violation in December 2017. (Dkt. 86-1 at ¶ 164; Dkt. 101-1 at ¶ 164). Plaintiff also received several alcohol and other infractions between September 2016 and December 2017. (Dkt. 86-1 at ¶ 165; Dkt. 101-1 at ¶ 165).

On March 16, 2020, Adjudicator Hodge issued a 10-page Final Outcome Letter finding Plaintiff responsible for violating HWS's Sexual Misconduct Policy. (Dkt. 86-1 at ¶ 172; Dkt. 101-1 at ¶ 172; Dkt. 86-36). Adjudicator Hodge outlined the relevant charges, stated she was applying the preponderance of evidence standard, noted that a full hearing was held, and wrote that "as the adjudicator, any and all evidence was analyzed to determine if it was more likely than not that you sexually assaulted the Complainant. . . ." (Dkt. 86-1 at ¶ 173; Dkt. 101-1 at ¶ 173; Dkt. 86-36 at 3). She also stated:

> [T]he credibility of each participant was assessed along with determining whether the totality of circumstances supported a finding that it was more likely than not that you committed the offense as alleged in the complaint. In assessing the credibility of you, the Complainant, and any witnesses, consideration was given to each individual's ability to observe the facts they provided, recollect the events, their demeanor (if applicable), any independent corroboration and what, if any, motive they may have to lie or any bias they may have in the outcome of the case.

(Dkt. 86-36 at 4).

Hodge testified that the purpose of the Final Outcome Letter was "to provide a summary of what was provided to me in terms of the information that I received and considered in order to conduct my deliberations . . . how I reached my conclusion." (Dkt. 86-27 at 52). The focus of the Final Outcome Letter then, is "to talk about [] those [factors]

that led you to believe that the respondent was responsible," and that would "generally focus on the reasons why you found the respondent's version of events not credible." (*Id.*). The Final Outcome Letter details several ways Adjudicator Hodge found Plaintiff not credible, including: (1) Roe's account of what happened being supported by Smith's eyewitness testimony (Dkt. 86-36 at 7); (2) Smith's testimony and other documents contradicted Plaintiff's account of how he got into the dorm room, coupled with Plaintiff telling the investigator that Smith let him into the dorm room, and describing her outfit in detail, but changing his account during the hearing to state Smith did not let him into the dorm (*id.* at 6); (3) Plaintiff told the investigator that Roe asked him if they should have sex, but during the hearing instead stated that he asked Roe if she wanted to have sex (*id.* at 7); and (4) photographs and video evidence supported Roe's claim that she was so intoxicated she could not recall large portions of the evening, calling into question Plaintiff's claim that Roe appeared completely sober and he did not smell any alcohol on her (*id.* at 8-9).

Adjudicator Hodge also found that the photographs, videos, and witness accounts supported a finding that Roe was intoxicated on the night in question, and that "the evidence presented does support that [Roe's] behavior was beyond mere drunkenness or intoxication but that she was incapacitated." (*Id.* at 9).

She noted that Roe:

. . . stated she had started "pre-gaming" around 9:55 p.m. with her friends . . . as they prepared to go to a '90s themed party. [Roe] stated she drank "a good amount" of vodka and Gatorade which she estimated to be about six shots mixed with Gatorade. [Roe] stated that she "went a little hard" that night and was drunk before she left to go to the party. [Roe] didn't remember

when she left to go to the party and she could not remember how she got there. She has limited to no recollection of what happened after leaving to go to the party, and only now knows about certain parts of the night from pictures and videos shared by her friends.

(*Id.* at 8).

Because she found Roe incapacitated, Adjudicator Hodge concluded that Roe "was unable to affirmatively consent to sexual activity, even if, hypothetically, I determined that the evidence demonstrated she did initiate, offer, agree or ask to engage in sexual intercourse." (*Id.* at 9). She found the "information provided by the witnesses to be credible," but did not "find that [Plaintiff's] recitation of what took place as more credible than what was stated by the witnesses." (*Id.*). Adjudicator Hodge concluded that "[l]astly, I find that it is not plausible that the Complainant, appearing 'totally fine' would knowingly engage in sexual intercourse, orally and then vaginally, with a person she has never met before, after having a 10-12 minute conversation with that person, never asking for or knowing your name and never giving hers and having no communication with you afterwards." (*Id.*).

As required by the Policy, Adjudicator Hodge consulted with Associate Dean Brandon Barile ("Barile") regarding the sanction to be imposed. (Dkt. 86-1 at ¶ 177; Dkt. 101-1 at ¶ 177). Barile agreed with Adjudicator Hodge's recommendation of permanent separation. (Dkt. 86-37 at 5). In an exchange of text messages with Boerner, Barile stated he agreed with her logic, but thought Plaintiff would "win an appeal since we're remote and only have 6 weeks left." (*Id.*). Boerner replied, "We'll have to wait and see." (*Id.*).

III.    **The Appeal**

The Policy permits a party to file an appeal limited to one of three issues: (1) "previously unavailable relevant evidence that could significantly impact the Final Outcome;" (2) "procedural error(s) that had a material impact on the Final Outcome;" and (3) "the sanction is grossly disproportionate to the conduct committed."  (Dkt. 86-1 at ¶ 182; Dkt. 101-1 at ¶ 182; Dkt. 86-6 at 38).  Plaintiff filed his appeal, written with Bernstein's assistance, on March 25, 2020.  (Dkt. 86-1 at ¶¶ 184-85; Dkt. 101-1 at ¶¶ 184-85).  Plaintiff intended to raise in the appeal all of the procedural errors he identified.  (Dkt. 86-1 at ¶ 186; Dkt. 101-1 at ¶ 186).  The Policy provides that the "Appeal Panel consists of the Vice President for Student Affairs or designee, the Director of Human Resources or designee, and the Provost or a faculty member designee."  (Dkt. 86-6 at 34 n.1).  One of the panel members for Plaintiff's appeal was Flowers.  (Dkt. 101-2 at ¶ 58; Dkt. 113 at ¶ 58).  Plaintiff had the opportunity to object to the participation of any panel members and did not do so.  (Dkt. 86-1 at ¶ 187; Dkt. 101-1 at ¶ 187; Dkt. 113 at ¶ 56; Dkt. 86-40; Dkt. 86-8 at 56).

In his appeal, under the heading "Procedural Errors Exist That Had a Material Impact on the Final Outcome," Plaintiff argued that the investigation and adjudication took longer than the time provided for in the Policy.  (Dkt. 86-1 at ¶ 191; Dkt. 101-1 at ¶ 191; Dkt. 86-39 at 3-4).  The Appeal Panel stated it rejected that argument because the Policy does not set a "hard and fast deadline," rather, it "says 'typically' investigations will be completed within 60 days, but provides many reasons why an investigation might take longer."  (Dkt. 86-41 at 2).  The Appeal Panel noted that "the investigation was complex,"

and school breaks also added to the length of the investigation.  (*Id.*).  "[P]erhaps more importantly," the Appeal Panel held, "you have not established how the timing 'had a material impact on the Final Outcome' of the case."  (*Id.*).  When asked at his deposition if he "believe[d] the length of time it took to complete the investigation somehow effected the outcome," Plaintiff answered "[n]ot necessarily."  (Dkt. 86-1 at ¶ 193; Dkt. 101-1 at ¶ 193; Dkt. 86-8 at 55).

The bulk of Plaintiff's appeal statement appears under the heading "There was a Clear Abuse of Discretion on the Part of the Adjudicator."  (Dkt. 86-39 at 4-10).  The Appeal Panel rejected the arguments set forth in this section:

> You also claim "procedural errors" by arguing the adjudicator was "biased" in how she evaluated certain evidence and resolved certain credibility issues. Most of these arguments simply reargue the facts or how the evidence should have been weighed, which is not within the scope of an appeal.  We find no reason to believe that the adjudicator was biased, and simply because the adjudicator did not weigh the evidence in your favor does not mean she is biased.  For example, while you claim that the adjudicator did not consider a video (Appendix 18), the video was, in fact, presented at the hearing and considered by the adjudicator.  The remainder of your arguments go to weighing of the evidence and the credibility of witnesses.  The adjudicator found [Roe] more credible than you, and offered her reasons why.  There is no reason to infer bias, nor do we see any procedural errors.

(Dkt. 86-41 at 2-3).

Flowers testified that he believes he wrote the Appeal Panel's decision.  (Dkt. 101-2 at ¶ 59; Dkt. 113 at ¶ 59; Dkt. 103-40 at 9).  Flowers testified that after writing a decision, "[u]nder normal circumstances I would have shared it with the other persons that participated in the panel to make sure that we all concurred with the language and the findings and in some cases would have reviewed with the college's counsel as well."  (Dkt.

103-40 at 9).  He did not recall if either of the other panel members had any edits.  (*Id.*).

Dewayne Lucas, who also served on the panel, testified that "one of us wrote the letter,

circulated it amongst the three of us and we all agreed on the language or the final

language."  (Dkt. 103-43 at 9).

## PROCEDURAL BACKGROUND

Plaintiff filed his initial complaint on May 22, 2020.  (Dkt. 1).  He filed his first

amended complaint on August 26, 2020.  (Dkt. 16).  All defendants moved to dismiss.

(Dkt. 20; Dkt. 21; Dkt. 22).  On June 25, 2021, the Court granted the motions to dismiss

by Boerner and Adjudicator Hodge and denied the motions as to the remaining defendants.

(Dkt. 37).

HWS filed an answer on August 5, 2021; Chase filed an answer on August 9, 2021.

(Dkt. 38; Dkt. 41).  Plaintiff filed a second amended complaint on February 14, 2022,

adding CSC as a defendant.  (Dkt. 59).  HWS filed an answer on February 25, 2022 (Dkt.

63); Chase and CSC filed an answer on March 7, 2022.  (Dkt. 64).

On November 17, 2023, HWS filed a motion for summary judgment.  (Dkt. 86).  On

December 1, 2023, the Court entered a stipulation and order dismissing Chase from the

litigation.  (Dkt. 95).  CSC filed a motion for summary judgment on December 12, 2023.

(Dkt. 98).  Plaintiff filed opposition to both motions for summary judgment on February 8,

2024, along with a motion to strike the report of HWS's expert, Philip Catanzano, and

preclude his testimony.  (Dkt. 101; Dkt. 102; Dkt. 104).  HWS and CSC each filed a reply

brief on March 29, 2024.  (Dkt. 112; Dkt. 115).  HWS filed its opposition to Plaintiff's

motion to strike on March 29, 2024.  (Dkt. 114).  Plaintiff filed his reply brief on April 12,

2024.  (Dkt. 118).  The motions were argued July 16, 2024, and the Court reserved decision.[16]  (Dkt. 124).

## DISCUSSION

## I.    Legal Standard for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the Court finds that no rational jury could find in favor of that party.  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact. . . ."  *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014).  "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial."  *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  Once the

---

[16]    At oral argument, the Court ordered CSC to file a corporate disclosure statement identifying the members of its limited liability corporation and their respective citizenship for the purposes of verifying diversity jurisdiction.  (Dkt. 124; Dkt. 126).  The Court is satisfied, based on CSC's corporate disclosure statement filed on July 22, 2024 (Dkt. 127), that it may properly exercise diversity jurisdiction.

moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks and citation omitted). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

## II.   <u>Plaintiff's Title IX Claim</u>

Title IX states in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "This provision, which is enforceable through an implied private right of action, was enacted to supplement the Civil Rights Act of 1964's bans on racial discrimination in the workplace and in universities." *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016). "Because Title IX prohibits (under covered circumstances) subjecting a person to discrimination on account of sex, it is understood to 'bar[] the imposition of university discipline where gender is a motivating factor in the decision to discipline.'" *Id.* (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)).

Plaintiff brings an "erroneous outcome" case, as his "claim is that the plaintiff was innocent and wrongly found to have committed an offense." *Yusuf*, 35 F.3d at 715. "To prevail on an erroneous outcome claim, Plaintiff must 'demonstrate (1) articulable doubt [as to] the accuracy of the outcome of the disciplinary proceeding, and (2) that gender bias was a motivating factor behind the erroneous finding.'" *Doe v. Syracuse Univ.*, 457 F. Supp. 3d 178, 200 (N.D.N.Y. 2020) (citing *Doe v. Colgate Univ. Bd. of Trs.*, 760 F. App'x 22, 30 (2d Cir. 2019)); *see also Yusuf*, 35 F.3d at 715 (plaintiff must demonstrate that the "particular circumstances suggest[] that gender bias was a motivating factor"); *Doe v. Colgate University*, No. 5:15-CV-1069 (LEK/DEP), 2017 WL 4990629, at *11 (N.D.N.Y. Oct. 31, 2017) ("evidence of bias against the accused in sexual misconduct hearings does not equate to bias against men"). Circumstances that would allow an inference of gender bias include "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender. Of course, some allegations, such as statements reflecting bias by members of the tribunal, may suffice both to cast doubt on the accuracy of the disciplinary adjudication and to relate the error to gender bias." *Yusuf*, 35 F.3d at 715.

On this motion HWS does not address the articulable doubt prong, thus conceding, for summary judgment purposes, that Plaintiff can raise a question of material fact on the issue. (Dkt. 86-3 at 28). Instead, HWS argues that it is entitled to summary judgment because "[t]here is absolutely no evidence that sex played any role in any aspect" of the proceedings. (*Id.*).

The Second Circuit recently discussed the role of gender bias in Title IX erroneous outcome cases. *Roe v. St. John's University*, 91 F.4th 643 (2d Cir. 2024). There, St. John's University ("SJU") disciplined male plaintiff Richard Roe for allegedly sexually assaulting two women, Jane Doe and Mary Smith. Roe sued under Title IX, arguing that anti-male bias influenced SJU's handling of the accusations against him, and also lodged state law contract claims. *Id.* at 647. SJU moved to dismiss on the ground, as relevant here, that Roe failed to adequately plead gender bias. *Id.* at 652. Roe alleged several procedural errors in SJU's handling of the disciplinary proceedings,[17] and the majority opinion noted that "[a]ccepting Roe's version of events as true, as we must at this stage of the litigation, SJU erroneously concluded that Roe violated SJU's Student Code of Conduct by engaging in non-consensual sexual contact with Doe." *Id.* at 653. "[T]he allegation that a university conducted its disciplinary proceedings in a less-than-flawless manner does not automatically permit a factfinder to reasonably infer that a university has committed sex discrimination." *Id.* at 654. Thus, "[a] university's failure to comply with its internal Title IX policies may similarly be insufficient to support a minimal plausible inference of sex discrimination." *Id.* "Finally, even allegations of 'potentially serious flaws' in a Title IX

---

[17]   Specifically, Roe alleged that "SJU engaged in sex-based discrimination against Plaintiff by (1) finding him in violation of SJU's prohibition on non-consensual sexual contact even though it was Doe who had initiated the contact by placing his hand on her breast, (2) asserting that Plaintiff should have *expected* a sanction of some kind for admitting that Doe, the female student, had initiated physical contact of a sexual nature, (3) denying his appeal in disregard of Policy 703, and (4) denying his appeal on January 8, 2019, because SJU was being publicly scrutinized in light of the #SurvivingSJU hashtag." *Roe v. St. John's Univ.*, No. 19-CV-4694 (PKC) (RER), 2021 WL 1224895, at *16 (E.D.N.Y. Mar. 31, 2021) (internal quotation marks and brackets omitted).

plaintiff's disciplinary proceedings may fail to allege 'sufficient facts to support a plausible inference that the irregularities are attributable to sex bias.'" *Id.* (quoting *Doe v. Stonehill Coll., Inc.*, 55 F.4th 302, 334 (1st Cir. 2022)).

The majority affirmed the dismissal of Roe's complaint, finding that the procedural irregularities Roe complained of, standing alone, did not "automatically permit a factfinder to reasonably infer that a university has committed sex discrimination," as "procedural errors are not inevitably a sign of sex bias." *Id.* "[W]hile it may be true that in some cases an erroneous decision is sufficiently 'inexplicable' to warrant inferring that the university reached its decision due to sex-based bias . . . this is not such a case." *Id.* at 655-56 (quoting *Doe v. Oberlin Coll.*, 963 F.3d 580, 588 (6th Cir. 2020)); *see also Doe v. Rochester Inst. of Tech.*, No. 21-CV-6761-FPG, 2024 WL 1051953, at *12 (W.D.N.Y. Mar. 11, 2024) (granting defendant summary judgment on plaintiff's erroneous-outcome claim after finding that the plaintiff "identifie[d] a number of procedural irregularities—which are, in fact, sufficient to support a breach-of-contract claim against RIT" but "he does not provide the 'minimal evidence' necessary to establish that any potential bias underlying those irregularities was 'on account of sex'" (quoting *Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 n.48 (2d Cir. 2019)).

Plaintiff relies on *Doe v. Trs. of Hamilton Coll.*, No. 6:22-CV-214, 2024 WL 1675130 (N.D.N.Y. Apr. 18, 2024). There, the court found Plaintiff raised a question of material fact on the issue of gender bias because "[a] rational jury could credit plaintiff's evidence of procedural flaws coupled with evidence of a pattern of anti-male gender bias and external pressure on Hamilton and infer that defendant's decision to expel plaintiff was

motivated in part by gender bias." *Id.* at *8.  Unlike here, however, the plaintiff in *Doe v. Trs. of Hamilton Coll.* could point to record evidence that would support an inference that the hearing officer was biased, given that she "previously served as an investigator in a separate sexual misconduct case in which plaintiff was a witness." *Id.* at *7.  The district court also found that record evidence that Hamilton was the subject of an OCR complaint "based on complaints of alleged discrimination including sexual harassment, sexual violence, and retaliation," and there had been a campus rally "promoting solidarity with survivors of sexual violence" raised a question of fact as to whether external pressure influenced the proceedings. *Id.*  The Court is unpersuaded by the court's analysis in this regard, which fails to discuss how the *individuals* involved in the proceedings exhibited gender bias.

Here, Plaintiff alleges that gender bias may be found in:  (1) Adjudicator Hodge's "personally held gender-biased views of women as disinterested in sex without a relationship;" (2) her treatment of identical conduct between Plaintiff and the female students as damaging only to Plaintiff's credibility; (3) giving women more preferential treatment during the hearing; (4) "conducting Plaintiff's questioning as a cross-examination designed to create a pretext to find him responsible;" (5) ignoring exculpatory evidence; and (6) quoting from the investigative report, "implying that the decision letter was pre-written before the hearing even took place." (Dkt. 101 at 18-19).  Taken together, he argues, "[a]ll of this is indicative of a predetermined outcome motivated by gender bias." (*Id.* at 19).

Plaintiff also argues that Chase: (1) "skewed her entire Investigative Report in favor of the female students and against Plaintiff;" (2) failed to interview a witness who could have described Roe's intoxication level on the night in question; (3) "made no effort to collect relevant texts, communications, and social media posts that could have supported Plaintiff's claims and/or hurt Jane Roe's or Sally Smith's credibility;" and (4) refused to interview a character witness suggested by Plaintiff, but included negative character remarks about Plaintiff in the report and helpful character claims about Jane Roe.  (*Id.* at 19-20).

In other words, Plaintiff contends that gender bias can be proven through these alleged procedural errors.  But Plaintiff's allegations of procedural error do not rise to the level contemplated by *Roe*.  The dissent in *Roe* pointed out that the complaint alleged that SJU's decision was simply wrong: "the complaint [] alleged that the [university] [b]oard accepted [the plaintiff's] admitted version of events, that those events involved no wrongdoing, and that the [board] disciplined him anyway."  91 F.4th at 670 (Menashi, J., dissenting).  The majority found that was not enough to demonstrate gender bias on a motion to dismiss because even if SJU "erroneously concluded that [the plaintiff] violated [its] Student Code of Conduct," it "[did] not follow that [the university] reached this allegedly erroneous outcome due to gender bias."  *Id.* at 653.  Here, even drawing the inferences in Plaintiff's favor, the procedural errors he identifies did not create a process so egregiously unfair as to support an inference of gender bias, especially at the summary judgment stage.  *See, e.g., Roe*, 91 F.4th at 653 n.10 ("It may bear re-emphasis here that the issue before us is not whether SJU's determinations respecting Roe's behavior were

incorrect, but if so, whether they were incorrect *as a result of* gender bias on the part of

SJU.").   Plaintiff was given a meaningful opportunity to present his version of what

occurred, and the fact that Adjudicator Hodge found his testimony materially inconsistent,

calling his credibility into question, was not an irrational conclusion to draw from the

record before her.   "[F]actfinders are permitted to make decisions on the basis of unstated

credibility assessments in settings such as criminal proceedings that are more formal than

school disciplinary hearings."   *Id.* at 654 n.11; *see also Doe v. Samford Univ.*, 29 F.4th

675, 691 (11th Cir. 2022) ("We regularly permit factfinders to make unstated but implicit

credibility determinations in more formal settings than school disciplinary hearings, such

as in criminal proceedings.  We cannot hold the hearing panel to a higher standard than we

hold district courts.") (internal citation omitted).

Indeed, the best evidence that the crux of Plaintiff's complaints are that he simply

disagrees with Adjudicator Hodge's conclusions can be found in his responses to HWS's

Statement of Material Facts, wherein he disagrees that photos and videos taken of Roe on

the night in question show that she was extremely intoxicated.  (Dkt. 101-1 at ¶¶ 50, 53).

Plaintiff asserts that "the photos and videos speak for themselves and it is up to the finder

of fact as to whether Jane Roe appeared to be intoxicated and/or incapacitated therein."

(*Id.* at ¶ 50).  But that is exactly what already occurred: Adjudicator Hodge, as the fact

finder, found that the "totality of the evidence," which necessarily includes the videos and

photos, supported a finding that Roe was incapacitated and incapable of affirmatively

consenting to sex.  (Dkt. 86-36 at 9).

Nor does Plaintiff raise a material question of fact as to whether public pressure led those involved here to discriminate on the basis of gender, as he cites to nothing in the record indicating that either Chase or Adjudicator Hodge was aware of any outside pressures.  Chase testified that she neither read nor heard of the 2014 Times Article, and did not know of the OCR investigations.  (Dkt. 86-11 at 42-43).  She also testified that Plaintiff's gender played no role in her work, and:

> Q:    Did anyone from HWS encourage you to slant the report
>       in a certain way to favor the complainant?
>
> A:    No.
>
> Q:    Did anyone at HWS pressure you to design the report in
>       any particular way?
>
> A:    No.

(*Id.* at 42).

Similarly, Adjudicator Hodge testified that she did not read, and was unaware of, the 2014 Times Article, was unaware of the OCR complaints, and did not know of any campus activism regarding Title IX issues.  (Dkt. 86-27 at 55, 64).  She also testified that she did not feel pressured to decide Plaintiff's case in a particular way.  (*Id.* at 55).  When asked "[w]hat role did [Plaintiff's] gender play in your decision in this case," Adjudicator Hodge responded: "None."  (*Id.* at 55).

Plaintiff also relies on Adjudicator Hodge's statement in the Final Outcome Letter stating: "Lastly, I find that it is not plausible that the Complainant, appearing 'totally fine' would knowingly engage in sexual intercourse, orally and then vaginally, with a person she has never met before, after having a 10-12 minute conversation with that person, never

asking for or knowing your name and never giving hers and having no communication with your afterwards." (Dkt. 86-36 at 9). Plaintiff argues that this statement indicates Adjudicator Hodge "personally held gender-biased views of women as disinterested in sex without a relationship." (Dkt. 101 at 18). That is not a reasonable inference to draw from that sentence, which is the culmination of Adjudicator Hodge's explanation as to why she did not find Plaintiff's version of events credible.[18] There are no generalizations about women or men. Adjudicator Hodge testified that she "considered everything in my evaluation and analysis and when determining what was or was not plausible or believable in this instance," (Dkt. 86-27 at 30), "[s]o it wasn't just people hooking up can't happen. People can meet and hook up, but I looked at the totality of all these circumstances, and that led me to that sentence. . . ." (*Id.* at 31).

HWS notes that in the six cases Adjudicator Hodge adjudicated for HWS involving male respondents, she found the respondent responsible in three cases and not responsible in three cases. (Dkt. 86-28 at 6). Plaintiff argues that the data are suspect because Adjudicator Hodge did not corroborate the numbers at her deposition. (Dkt. 101 at 26).[19]

---

[18]    According to Plaintiff's own version of events, he arrived at a stranger's dorm room completely sober with the express purpose of hooking up with Roe's roommate. Roe, on the other hand, stated she had consumed alcohol and was in her own dorm room, falling in and out of sleep. Adjudicator Hodge's conclusion that it was not plausible that Roe would want to have sex under the circumstances is perfectly reasonable and in no way depends on the gender of the individuals involved.

[19]    Hodge did not repudiate HWS's statistics regarding the results in cases she adjudicated. Rather, she testified that she did not recall how many cases she found a male respondent not responsible. (Dkt. 86-27 at 55, 63-64).

The data are included in a verified interrogatory, and thus are admissible without corroboration by Adjudicator Hodge. Plaintiff also argues that "[HWS] repeatedly cited to statistics that just over half of all respondents were found responsible," so that "if Hodge did indeed have an even record of adjudications before Plaintiff's case, a rational juror could conclude that Boerner skewed the process against Plaintiff in order to keep the ratio of responsibility findings for male respondents at over 50%." (*Id.*). That is completely speculative and not a rational inference. Plaintiff cites to nothing in the record that would support an inference that the outcome in his case would skew HWS's numbers one way or the other. The evidence Plaintiff relies on to establish that HWS "repeatedly cited to statistics that just over half of all respondents were found responsible" reflect the numbers for all cases adjudicated at HWS over a period of years *predating* the proceedings at issue here. (Dkt. 101 at 26; *see* Dkt. 103-9 at 13; Dkt. 103-12 at 2 (both stating, in 2014, that in the past two years, HWS adjudicated seven cases of sexual misconduct, with four students being expelled)). Plaintiff's case—adjudicated in 2020—would have no bearing on those numbers.

For the academic years 2018, 2019 and 2020, HWS reported 13 cases of sexual assault involving male respondents that moved to resolution. (Dkt. 86-28 at 6). Of those, three respondents were found responsible, six were found not responsible, and four resulted in other outcomes. (*Id.*). The results of Plaintiff's case would not bring or keep the numbers at 50%. Manipulating the proceedings here to find Plaintiff responsible would only affect the numbers for the six cases *in which Adjudicator Hodge served as an*

*adjudicator*, not HWS's numbers overall.[20]   And even then, the numbers would shift from finding three men responsible and three men not responsible to finding four men responsible—not a mathematically significant shift.

Plaintiff also argues that he raised a question of material fact as to whether Boerner, to offset external pressures on HWS to do better in its handling of sexual abuse cases, acted with anti-male bias.[21]   Again, Plaintiff fails to cite to record evidence that would support such an inference.   Boerner did not start work at HWS until several years after the 2014 Times Article was published, and was not at the school when the OCR complaints were filed.   (Dkt. 86-13 at 51).   Boerner testified that he read the 2014 Times Article, and that it came up during his interview, but he did not recall any discussion during his interview of the need for the Title IX office "to take a stronger stance against alleged sexual assault." (*Id.* at 9-10).   Nor does Plaintiff identify record evidence indicating that Boerner had any substantive involvement in Adjudicator Hodge's decision.   While Boerner was provided with a copy of the Final Outcome Letter before it was distributed, Plaintiff points to nothing in the record demonstrating Boerner provided any input into the decision, and Adjudicator Hodge testified that he did not.   (Dkt. 86-27 at 61).   As to the appeal, the record establishes

---

[20]   Plaintiff also argues that the statistics HWS produced in its interrogatory response did not adequately respond to the question propounded.   If Plaintiff was unsatisfied with HWS's response to a discovery demand, he needed to take the appropriate steps to resolve the issue before discovery closed.

[21]    Plaintiff credibly contests the extent of Boerner's involvement in preparation of the Investigative Report.   (*See, e.g.,* Dkt. 101-1 at ¶¶ 107, 108, 110).   Because the Court finds that Plaintiff cannot raise a question of material fact as to whether Boerner exhibited gender-based bias in Plaintiff's disciplinary proceedings, the dispute regarding the extent of Boerner's involvement in the investigation and hearing is not material.

only that Boerner provided the panel with materials, including a timeline and a template, and does not suggest Boerner oversaw or participated in the panel's decision. (Dkt. 103-38). At summary judgment, Plaintiff must come forward with actual evidence showing more than Boerner's general awareness that HWS had been the subject of negative publicity in the past in order for the Court to conclude that a jury could plausibly infer Boerner acted with discriminatory animus in how he handled the allegations against Plaintiff.

Plaintiff also argues that Flowers' participation in Plaintiff's appeal is further evidence of outside pressure leading to gender discrimination. He argues that Flowers was identified in the 2014 Times Article, and authored the decision, such that a rational jury could conclude that HWS, "and specifically, Robert Flowers, were determined to ensure that Plaintiff's responsibility finding was upheld on appeal and that he was punished to the utmost, no matter what." (Dkt. 101 at 21-22). The difficulty with that argument is that Flowers was part of an appeal *panel*. Plaintiff does not identify any evidence that would support his theory that Flowers alone controlled the outcome of his case. Indeed, the other member of the Appeal Panel who was deposed—Dewayne Lucas—testified that the panel reviewed the record separately, then "came together and discussed the appeal and our decision. And one of us wrote the letter, circulated it amongst the three of us and we all agreed on the language or the final language." (Dkt. 103-43 at 9). On this record, a reasonable jury could not draw an inference that Flowers single-handedly railroaded Plaintiff's appeal.

The cases Plaintiff cites for the proposition that procedural errors coupled with external pressure are sufficient to establish discriminatory bias were primarily decided on motions to dismiss. *See, e.g., Vengalattore v. Cornell Univ.*, 36 F.4th 87, 107, 108-09 (2d Cir. 2022) (allegations that "the procedures followed by Cornell in dealing with Roe's allegations were fundamentally skewed" coupled with evidence of public pressure sufficient to survive motion to dismiss); *Noakes v. Syracuse Univ.*, 369 F. Supp. 3d 397, 415 (N.D.N.Y. 2019) (allegations of public pressure plus allegations of "flaws in the investigation, assumptions made by investigators, and an unwillingness by investigators to consider evidence" sufficient to survive motion to dismiss); *Rolph v. Hobart & William Smith Colls.*, 271 F. Supp. 3d 386, 402 (W.D.N.Y. 2017) (allegations of favorable treatment given to female complainant plus allegations of public pressure sufficient to survive motion to dismiss).

A motion to dismiss requires only that a Title IX complaint "plead[] specific facts that support a minimal plausible inference of such discrimination," an admittedly "low" standard. *Doe v. Columbia Univ.*, 831 F.3d at 48, 56. But when a motion for summary judgment is made, "we go beyond the paper allegations of the pleadings, which were enough to survive the common law demurrer. The time has come, as James and Hazard put it, 'to put up or shut up.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citing Fleming James, Jr. & Geoffrey C. Hazard, Jr., *Civil Procedure* 150 (2d ed. 1977)). "Accordingly, unsupported allegations do not create a material issue of fact." *Id.*

Plaintiff's reliance on *Doe v. Siena Coll.* is misplaced. No. 1:22-CV-1115 (BKS/TWD), 2023 WL 197461 (N.D.N.Y. Jan. 17, 2023). There, Plaintiff sought a

preliminary injunction to block his two-year suspension following a finding that he was responsible for sexual assault. *Id.* at *1. In finding that plaintiff "raised serious questions on the merits as to whether *gender* bias was a motivating factor behind the alleged erroneous outcome," the court noted that the record contained statements by the Title IX coordinator that would allow an inference that the coordinator "exhibited gender bias." *Id.* at *16. For example, during a meeting, the coordinator "was dismissive of the idea that Plaintiff, a male student, could have been assaulted by Roe, a female student," and that the Title IX coordinator "also had previously expressed her lack of support for the new Title IX regulations and the opportunity for cross-examination, which she was concerned could deter reports of assaults, in Title IX proceedings." *Id.* The court found those statements, taken together with "the totality of Plaintiff's allegations regarding pressure on the College," along with plaintiff's evidence regarding several serious procedural errors, sufficient to raise serious questions on plaintiff's Title IX claim. *Id.* The record here lacks similar evidence.

At bottom, a plaintiff "cannot survive summary judgment by simply arguing that policy changes from the federal government and pressure from student groups created gender bias in an individual disciplinary decision." *Doe v. Hamilton College*, No. 6:21-CV-0436 (GTS/CFH), 2023 WL 8782020, at *23 (N.D.N.Y. Dec. 19, 2023) (collecting cases). Plaintiff must come forward with evidence to support the claimed gender bias. He has failed to meet that burden. Instead, he relies on a speculative narrative about gender bias, but he lacks evidence to back up those claims. Even considering the evidence in the light most favorable to Plaintiff, no rational jury could conclude that gender bias was a

motivating factor behind the allegedly erroneous outcome.  Thus, the Court grants HWS's motion for summary judgment on Plaintiff's Title IX claim.

## III.   Breach of Contract Claims Against HWS

"Under New York law, an implied contract is formed when a university accepts a student for enrollment: if the student complies with the terms prescribed by the university and completes the required courses, the university must award him a degree." *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011).  "The terms of the implied contract are 'contained in the university's bulletins, circulars and regulations made available to the student.'  Implicit in the contract is the requirement that the institution 'act in good faith in its dealing with its students.'"  *Id.* (first quoting *Vought v. Teachers Coll., Columbia Univ.*, 127 A.D.2d 654, 654 (2d Dep't 1987), then quoting *Olsson v. Bd. of Higher Educ.*, 49 N.Y.2d 408, 413-14 (1980)); *see also Goldberg v. Pace Univ.*, 88 F.4th 204, 210 (2d Cir. 2023) ("Under New York law, a student and the college or university in which the student enrolls enter into an implied contract, the essence of which is that the academic institution must act in good faith in its dealings with the student.") (internal quotation marks and brackets omitted).

"To state a valid claim for breach of contract in that unique context, the student must first identify an express promise for 'certain specified services' in the university's relevant materials."  *Goldberg*, 88 F.4th at 210  (quoting *Baldridge v. State*, 293 A.D.2d 941, 943 (3d Dep't 2002)).  To assert a breach of contract claim, a plaintiff must identify the specific terms of the implied contract that were allegedly violated by the college.  *Rolph*, 271 F. Supp. 3d at 405-06.  "General statements of policy or broad pronouncements of a

University's compliance with existing anti-discrimination laws [or] promising equitable treatment of all students cannot provide the basis for a breach of contract claim." *Id.* (internal quotation marks and brackets omitted).

### A.    Substantial Compliance

While a student may sue a college for breach of implied contract, analyzing such claims under a "[c]ontract theory is not wholly satisfactory . . . because the essentially fictional nature of the contract results in its generally being assumed rather than proved, because of the difficulty of its application, and because it forecloses inquiry into, and a balancing of, the countervailing interests of the student on the one hand and the institution on the other." *Tedeschi v. Wagner Coll.*, 49 N.Y.2d 652, 658 (1980).  To account for these difficulties, courts should look to see if the "university has adopted a rule or guideline establishing the procedure to be followed in relation to suspension or expulsion," and, if so, "that procedure must be substantially observed."  *Id.* at 660; *see also Matter of Doe v. Skidmore Coll.*, 152 A.D.3d 932, 935 (3d Dep't 2017) ("The determination must be annulled only where there has been a lack of substantial compliance, or where the determination lacks a rational basis.").  "Perfect adherence to every procedural requirement is not necessary to demonstrate substantial compliance." *Skidmore Coll.*, 152 A.D.3d at 935.

In his responsive papers, Plaintiff recites the "substantial compliance" standard, but his analysis goes on to equate "substantial compliance" with the doctrine of "substantial performance."  (Dkt. 101 at 29-30).  However, as Plaintiff's counsel agreed during oral argument, the two are not the same.  "The substantial performance doctrine provides that

where a contract is made for an agreed exchange of two performances, one of which is to be rendered first, substantial performance rather than exact, strict or literal performance by the first party of the terms of the contract is adequate to entitle the party to recover on it." *Bernard v. Las Americas Comm., Inc.*, 84 F.3d 103, 108 (2d Cir. 1996) (quoting *Brown-Marx Assocs., Ltd. v. Emigrant Sav. Bank*, 703 F.2d 1361, 1367 (11th Cir. 1983)).  The doctrine is primarily used to determine if a party seeking to recover substantially performed under the contract.  *See, e.g., Optima Media Grp. Ltd. v. Bloomberg L.P.*, No. 17-CV-1898 (AJN), 2021 WL 1941878, at *8 (S.D.N.Y. May 14, 2021) ("In order to recover for breach of contract, a party must first show it substantially performed under that contract.").  The "substantial performance" standard fails to account for the unique relationship between student and college.  *See Tedeschi*, 49 N.Y.2d at 658.  The Court declines to apply the doctrine of substantial performance here, and instead applies the substantial compliance standard set out in *Tedeschi*.

### B.    Preserving Procedural Error for Review

HWS argues that Plaintiff cannot pursue breach of contract claims based on procedural errors he did not raise during his disciplinary proceeding.  (Dkt. 86-3 at 35).  It relies on a series of decisions in state court Article 78 proceedings that stand for the proposition that petitioners waived procedural claims that were not raised during the school's disciplinary proceedings.  *See, e.g., Bilicki v. Syracuse Univ.*, 67 Misc.3d 1230(A), 127 N.Y.S.3d 228, at *6 (N.Y. Sup. Ct. 2019) (unpublished table decision) (no claim for procedural error where petitioner "did not make a specific claim of procedural error" during the school's administrative appeal process); *Haug v. State Univ. of N.Y. at Potsdam*, 166

A.D.3d 1404, 1405 (3d Dep't 2018) (procedural arguments unpreserved when not first raised "at the administrative hearing when they could have been corrected or failing to raise them altogether"); *Lampert v. State Univ. of N.Y. at Albany*, 116 A.D.3d 1292, 1294 (3d Dep't 2014) ("Petitioner's claimed procedural errors . . . are unpreserved due to his failure to raise them at the hearing or in his administrative appeal. . . ."). As Plaintiff correctly points out, these cases were litigated pursuant to New York's Article 78 procedure. *See, e.g., Boyle v. N.Y.S. Dep't of Motor Vehicles*, 200 A.D.3d 1375, 161 N.Y.S.3d 346, 348-49 (3d Dep't 2021) (noting that petitioners wishing to challenge determinations under Article 78 may not do so until they have exhausted their administrative remedies).

HWS has not cited any breach of contract case where a court found the failure to raise a procedural issue during the underlying disciplinary proceedings barred a later suit for breach of the implied contract.[22] Nor did the Court's research reveal such a case. The Court declines to apply such a standard here.

HWS also argues that in considering its motion to dismiss, the Court discussed just three of Plaintiff's alleged breaches of contract, such that Plaintiff may now only proceed on those three claims. (Dkt. 37 at 31-34; Dkt. 112 at 13-14). The earlier opinion did not limit Plaintiff's claims: the Court simply discussed the claims Plaintiff discussed in his opposition. (Dkt. 37 at 31-34). The remaining breach of contract claims were not

---

[22]     HWS relies on *Doe v. Case Western Univ.* for the proposition that "[i]ndividuals subject to administrative proceedings are free to waive rights they may otherwise be entitled to in that forum." 809 F. App'x 276, 281 (6th Cir. 2020). But that is not the same as waiving the ability to sue for breach of contract for failure to substantially comply with the terms of the implied contract.

dismissed with prejudice, and Plaintiff alleged those same claims in his second amended complaint filed after the Court's ruling on the motion to dismiss (Dkt. 59 at ¶ 275), which was filed by stipulation (Dkt. 57). The Court declines to limit Plaintiff's claims to those discussed at the motion to dismiss stage.

### C.    Lack of Required Training

The Policy provides that investigators "will receive annual training on issues related to Prohibited Conduct and on how to conduct an investigation that is trauma-informed, fair and impartial, provides parties with notice and a meaningful opportunity to be heard, and protects the safety of Complainants and the HWS community while promoting accountability." (Dkt. 86-6 at 32). In addition, "[a]ll adjudicators are trained at least annually on non-discrimination; the dynamics of sexual misconduct; the factors relevant to a determination of credibility; the appropriate trauma-informed manner in which to receive and evaluate sensitive information; the manner of deliberation; evaluation of consent and incapacitation; the application of the preponderance of the evidence standard; sanctioning; and the Colleges' Sexual Misconduct Policy and these Procedures." (*Id.* at 34). Finally, "Appeal panel members are trained at least annually on non-discrimination; the dynamics of sexual misconduct; the factors relevant to a determination of credibility; the appropriate trauma-informed manner in which to receive and evaluate sensitive information; the manner of deliberation; evaluation of consent and incapacitation; the application of the preponderance of the evidence standard; sanctioning; and the College's Sexual Misconduct Policy and these Procedures." (*Id.* at 34 n.1).

Chase testified that she received regular training in Title IX. (Dkt. 86-11 at 41).
Adjudicator Hodge also testified that she both received regular training on Title IX issues
and provided such training to others. (Dkt. 86-27 at 52-54). Both testified that they were
given a copy of the Policy and discussed with Boerner how the Policy worked. (Dkt. 86-
11 at 41-42; Dkt. 86-27 at 54). In response to an interrogatory, Chase stated that she "did
not receive any training from Hobart concerning Hobart's Sexual Misconduct Policy and/or
Handbook of Community Standards," (Dkt. 103-46 at 5-6), but expanded on that answer
during her deposition:

> Q: What did you mean when you answered this question by the
> word "training"?
>
> A: I meant a school-facilitated, either in person or, some are on
> Zoom, but a training, an actual hours-long presentation about
> investigation processes. It's not what, you know, however
> long a conversation was with Dr. Boerner about what the
> policy entailed. You know, certainly under a half hour.
>
> So that's what I meant by training. It was an extensive kind of
> more comprehensive.
>
> Q: If you use "training" to mean giving an orientation to
> understand the nature of policy, did you receive that?
>
> A: Sure.

(Dkt. 86-11 at 42). Chase testified that in 2019, she attended annual trainings. (*Id.* at 40).
The Appeal Panel also received training directly from HWS. (Dkt. 103-44).

Plaintiff argues that Boerner "admitted that he did nothing to ensure that Chase had
the proper training under the Policy," (Dkt. 101 at 31), but that is not a fair representation
of Boerner's testimony:

- 44 -

Q:    Okay.  Did Miss Chase receive annual training?

A:    My understanding is yes.

Q:    And when you say your understanding, what is your understanding?

A:    She's a trained investigator working for a firm that does this for a living, she's an expert in her field, it's my understanding that she received annual training and, yes.

Q:    Okay.  Did you receive copies of any certificates or any documentation of the annual training that Miss Chase underwent?

A:    No.

(Dkt. 86-13 at 15).

Plaintiff argues that HWS "has not submitted any proof that Chase, Hodge, or the members of Plaintiff's Appeal Panel received the *specific* training laid out in the Policy, on an *annual* basis relevant to when they were involved in Plaintiff's case, as required under the Policy."  (Dkt. 101 at 31).  But the Policy is silent as to what form the training would take, meaning the training could be formal or informal and still substantially comply with the Policy.  Nor does Plaintiff demonstrate how the failure to provide the specific training in the Policy prejudiced his case.  *See, e.g., Zartoshti v. Columbia Univ.*, 79 A.D.3d 470, 471 (1st Dep't 2010) ("While the initiation of the proceedings and the makeup of the committee were not in literal compliance with the Student Handbook, the record supports" finding substantial compliance, and petitioner "demonstrated no prejudice resulting from the deviation from literal compliance with the Student Handbook procedures.").  In sum,

- 45 -

no rational jury could conclude on this record that the training provided—or not provided—

constituted a breach of contract.

### D.  Failure to Timely Resolve the Investigation and Adjudication

With respect to the timing of the investigation, the Policy provides:

> The investigation typically will be completed within thirty (30) calendar days.  This period may be extended to account for a previous attempt, if any, at Informal Resolution, or for other good cause, as described in the section on Timeframe for Completion of Investigation and Adjudication; Extension for Good Cause.  Any extension, other than for Informal Resolution, and the reason for the extension, will be shared with the parties in writing.

(Dkt. 86-6 at 33).  With respect to the timing of adjudication, the Policy provides:

> Typically, the period from commencement of an investigation through resolution (finding and sanction, if any) will not exceed sixty (60) calendar days.  This timeframe may be extended for good cause, which may exist if additional time is necessary to ensure the integrity and completeness of the investigation, to comply with a request by an external law enforcement for temporary delay to gather evidence for a criminal investigation, to accommodate the availability of witnesses, to account for breaks or vacations in the HWS calendar, to account for complexities of a case, including the number of witnesses and volume of information provided by the parties, or for other legitimate reasons.  The Title IX coordinator will notify the parties in writing of any extension of this timeframe and the reason for such extension.

(*Id.* at 39).

There is no question that both the investigation and the adjudication took longer

than the Policy anticipates.  The investigation began in September 2019 and ended in

February 2020.  (Dkt. 102-2 at ¶ 10; Dkt. 113 at ¶ 104).  In all, investigation through

adjudication took 178 days.  (Dkt. 113 at ¶ 126).  HWS argues that the Policy "specifically

allows for delays for school breaks, the complexity of a case and other factors that may

require more time."  (Dkt. 119 at 14).  It also argues that Plaintiff's "claim that he was not

provided 'written notice of extensions as per the Policy' does not amount to a material breach when Plaintiff was consistently updated throughout the course of the proceeding as to the timing." (*Id.*).

In *Doe v. Colgate Univ.*, the investigation at issue spanned four years, despite the university's policy that "[t]he University aims to complete all investigations within a 60-day calendar period." 2017 WL 4990629, at *19. The court there found that "the words 'aim to' indicate that the goal of completing investigations within sixty calendar days is an 'aspirational' statement that 'is not enforceable' as a contractual obligation." *Id.* (collecting cases). Similarly, here the Policy provides that the timeframes for investigation and adjudication are how long such processes "typically" take. As in *Colgate*, the word "typically" is "aspirational" and not a binding promise as to when investigations may be completed.

Plaintiff also argues that HWS breached the Policy by not keeping him notified in writing as to the reasons for the delay. HWS does not point to any evidence in the record that it notified Plaintiff, in writing, of any reason for the delay in decision, with the exception of a few extensions requested by Plaintiff, who can be charged with knowing why such extensions were granted. (Dkt. 86-1 at ¶¶ 54, 79, 88, 130, 183; Dkt. 101-1 at ¶¶ 54, 79, 88, 130, 183). But HWS persuasively argues it substantially complied with the Policy by updating Plaintiff throughout the course of the proceeding. (Dkt. 119 at 14; Dkt. 86-1 at ¶¶ 24, 83, 87, 89, 127; Dkt. 101 at ¶¶ 24, 83, 87, 89, 127). Moreover, Plaintiff cannot demonstrate that the delay prejudiced the outcome. (Dkt. 86-8 at 55 (Q: "Do you believe that the length of time it took to complete the investigation somehow effected the

outcome?" A: "Not necessarily.")).  As a result, no rational jury could conclude the lack of compliance with the time frames set forth in the Policy rose to the level of a breach of contract.

### E.    Failure to Interview a Witness and Failure to Gather Relevant Information

The Policy provides:

> During the investigation, the parties will have an equal opportunity to be heard, to submit information and corroborating evidence, to recommend witnesses who may have relevant information, and to submit questions that they believe should be directed by the Investigator to each other or to any witness.  The Investigator will notify and seek to interview separately the Complainant, the Respondent, and third-party witnesses, and will gather other relevant and available evidence and information, including, without limitation, electronic or other records of communications between the parties or witnesses (via voice-mail, text message, email and social media sites), photographs (including those stored on computers and smartphones), and medical records (subject to the consent of the applicable party).

(Dkt. 86-6 at 33).  Plaintiff argues that Chase: (1) failed to interview a witness, "E," who was with Roe and Smith shortly after the encounter with Plaintiff; (2) failed to gather exculpatory information, including Facebook postings; and (3) failed to gather any communications between Roe and any other student on the night in question.  (Dkt. 101 at 33-35).

Substantial compliance does not require that Chase cover every possible base in her investigation.  In an argument apparently raised for the first time in response to HWS's motion for summary judgment, Plaintiff argues Chase should have interviewed "E," a student seen in a video taken shortly after Plaintiff's encounter with Roe.  (*Id.* at 33-34). Plaintiff also argues that Chase failed to collect text messages sent by Roe after the incident,

despite Smith indicating Roe was texting shortly after the encounter, which he argues would go to her incapacitation after the encounter.  (*Id.* at 34-35).  But Smith did not say Roe was texting; she stated she "thinks [Roe] got a text" from a friend.  (Dkt. 86-15 at 173). It cannot be said that failure to interview "E" or collect text messages, if any, was "critical" to the case, because there is no way of knowing what such evidence would show.  Perhaps such evidence would support Plaintiff's claims, and perhaps not.  Chase interviewed both Plaintiff and Roe, as well as four other witnesses, collected text messages, videos, photographs, and other evidence.  (Dkt. 86-15).  The Final Investigative Report included 50 exhibits.  The Policy allowed Plaintiff to "identify any additional witnesses or evidence for the Investigator to consider" during the proceedings.  (Dkt. 86-6 at 33).  Combined with the voluminous record compiled by Chase, Plaintiff's failure to suggest additional avenues for investigation at a time when they could be implemented and integrated into the investigation severely undercuts his argument that such evidence was critical.  That is particularly true where, as here, Plaintiff was able to consult with his advisor—an attorney who specializes in these types of cases—at every step of the process.

Plaintiff also argues that Chase failed to track down certain Facebook postings made by Roe.  Plaintiff told Chase that he spoke with Roe, noticed she had an English accent, and that the two spoke about her mother being from England.  (Dkt. 86-15 at 177).  This contradicted Roe's statement to Chase that she and Plaintiff did not speak.  (*Id.* at 168).  In a follow-up interview Roe told Chase she "has no idea how [Plaintiff] knew she was British because she's certain she did not talk to him that night.  [Roe] said that maybe [Plaintiff] followed her on Instagram and Facebook where there are photos with her Mom in England

and there is a British flag in the background." (*Id.* at 195).  HWS argues that the Facebook postings were not material to the investigation because Roe was "speculating."  (Dkt. 86-3 at 37 n.8).  The Court agrees.  Plaintiff also argues that "Hodge testified that she relied on Jane Roe's (unsubstantiated) claim about her social media in making credibility decisions."  (Dkt. 101 at 34).  The deposition testimony does indicate that Adjudicator Hodge was aware of Roe's theory that Plaintiff may have seen her social media posts, but Adjudicator Hodge stated she did not rely on that theory in making her decision:

> Q:     . . . how did he – would he have known on the night in question that [Roe] had a British accent?
> []
> A:     He states he knew because she spoke.  She states she doesn't recall saying anything or having any conversation and then she provides information that she believes maybe there was another way.  I don't know.  I wasn't in the room.
>
> Q:     . . . *You credited her statement that I don't recall as compared to crediting [Plaintiff's] that they had a conversation, correct?*
> []
> A:     *No.*

(Dkt. 86-27 at 15) (emphasis added).  The Final Outcome Letter makes no mention of a Facebook post.  (Dkt. 86-36).

Substantial compliance does not require that HWS undertake its obligations with perfect performance.  Chase's authority was limited to her role under the Policy—she did not have the authority to compel participation in the investigation, or to issue subpoenas to procure evidence.  *See, e.g.*, Dkt. 86-6 at 32 ("Neither party is required to participate in the investigation or any form of resolution under these Procedures. . . .").  Plaintiff fails to

point to record evidence to raise a question of material fact as to whether failures in the investigative process rise to the level of breach of implied contract.

### F. Failure to Properly Apply the Standards for Incapacitation and Intoxication

The Policy provides:

Affirmative Consent cannot be obtained by taking advantage of the incapacitation of another individual where the person initiating sexual activity knew or reasonably should have known that the other was incapacitated.  Incapacitation is a state where an individual cannot make an informed and rational decision to engage in sexual activity.  An individual is incapacitated if the individual lacks conscious knowledge of the nature of the act or is physically helpless, asleep, unconscious, or otherwise unaware that sexual activity is occurring.
. . .
In evaluating Affirmative Consent in cases of alleged incapacitation, the Colleges ask two questions: (1) Did the person initiating sexual activity know that the other party was incapacitated?  And if not, (2) should a sober, reasonable person in the same situation have known that the other party was incapacitated?  If the answer to either of these questions is "yes," Affirmative Consent was absent.

(Dkt. 86-6 at 10).

Plaintiff argues in a conclusory fashion that (1) "Chase's Final Investigative Report centered the inquiry on whether Jane Roe 'was/appeared' to be 'intoxicated,' combining two separate inquiries and improperly implying a lower standard (intoxication, rather than incapacitation) to make a finding of sexual assault."  (Dkt. 101 at 35); and (2) that Adjudicator Hodge focused on Roe's failure to give verbal consent—which was not required under the Policy—and "skipped straight from intoxication to incapacitation without addressing the factors or evidence that showed Jane Roe did not lack capacity on the night in question."  (*Id.*).

Assuming without deciding that definitions in the Policy rise to the level of an enforceable contractual promise, the Court finds HWS substantially complied with the Policy.  The Final Investigative Report sets out the correct definition of "incapacitation" under the Policy.  (Dkt. 86-15 at 6).  It discusses Roe's intoxication in the section discussing "contested information," but in a footnote Chase acknowledged that intoxication was "not directly relevant to the allegations," but was "relevant with regards to credibility assessments."  (Dkt. 86-15 at 14, 14 n.17).  Most importantly, and contrary to Plaintiff's argument, the Final Investigative Report does not make a finding of sexual assault.  (Dkt. 101 at 35).  The report explicitly states that it is "disputed as to whether [Roe] was able to, or did, affirmatively consent to engage in sexual activity with [Plaintiff]."  (Dkt. 86-15 at 14).

The allegations against Adjudicator Hodge are similarly unfounded.  It is true that Adjudicator Hodge remarked on the fact that in Plaintiff's recitation of events during the hearing, he stated he asked Roe if she wanted to have sex and Roe "did not respond verbally."  (Dkt. 86-36 at 7).  Adjudicator Hodge went on to note that "[d]uring the investigation, you stated to the investigator that the Complainant asked you 'Should we have sex?'" (*Id.*).  Adjudicator Hodge stated that "[t]his is an inconsistency in an important aspect of what took place that night."  (*Id.*).  There is nothing in the record to suggest Adjudicator Hodge considered the lack of verbal consent for anything other than the inconsistency in Plaintiff's testimony at the hearing versus what he told Chase.  Moreover, Adjudicator Hodge specifically found that the evidence supported finding Roe was incapacitated at the time when she and Plaintiff were in her dorm room.  (*Id.* at 9).  The

record would not allow a reasonable jury to find Adjudicator Hodge failed to apply the appropriate standard.

### G.    Failure to Redact Character Evidence

Under the Policy, character evidence is not admissible, and the Title IX coordinator "may redact . . . statements as to any party's general reputation for any character trait." (Dkt. 86-6 at 33; *see also* Dkt. 86-1 at ¶ 98; Dkt. 101-1 at ¶ 98).  Plaintiff argues that HWS allowed "negative character claims" about Plaintiff and "helpful character claims about Roe and Smith" to appear in the Final Investigative Report, and "permitted Jane Roe to slander Plaintiff's character at the hearing."  (Dkt. 101 at 35).

Plaintiff identifies three "statements of character evidence that were flattering or helpful to Jane Roe and damaging to Plaintiff."  (Dkt. 113 at ¶ 102).  The first is contained in Roe's initial complaint, included in the Final Investigative Report, where Roe stated that after she confided to a friend about the encounter, the friend told her that "[s]omething happened with him and my roommate," which is when Roe "decided she wanted to do something."  (Dkt. 86-15 at 51).  Next are statements by Roe's friend that Roe got "'pretty incapacitated' pretty often," and "even though [Roe] and [Smith] got drunk often, she personally would believe them because they are good people."  (*Id.* at 180).  The third is a statement by Plaintiff that "[h]e knows he was not drinking or intoxicated (or any other drug use) that night because he was on social probation for prior drinking sanctions."  (*Id.* at 176).  There is no indication that Adjudicator Hodge relied on any of the statements in adjudicating the case, and Plaintiff offers no argument as to how the three statements were material or affected the outcome.

As for Plaintiff's "slander" claim, he alleges that Adjudicator Hodge agreed to consider information presented by Roe at the hearing regarding alleged violations by Plaintiff of a no-contact order, which Roe stated she offered "to show [] his disregard with the rules." (Dkt. 86-32 at 10). Both Adjudicator Hodge and Boerner told Roe that the issue of whether the no-contact order had been violated was not part of the adjudication. (*Id.* at 9-10). Adjudicator Hodge told Roe that "I understand and I hear you with that and I'll give the weight to any statements given by you, as well as by [blank], and any weight that I appropriate to any of the information contained in the report." (*Id.* at 10). Nothing in the Final Outcome Letter indicates Adjudicator Hodge considered the alleged violation of the no-contact order. As a result, Plaintiff's arguments in this regard do not justify denying summary judgment in favor of HWS.

### H.   Allowing Roe's Advisor to Feed her Answers at the Hearing

Pursuant to the Policy, "[e]ach party has the right to choose and consult with an Advisor of their choice." (Dkt. 86-6 at 28). "While the Advisors may provide support and advice to the parties at any meeting and/or proceeding, they may not speak on behalf of the parties or otherwise participate in, or in any manner disrupt, such meetings and/or proceedings." (*Id.*).

Plaintiff alleges that Roe's advisor "[fed] her answers throughout the hearing." (Dkt. 113 at ¶ 113).[23] He gives three specific examples:

---

[23]   The Court notes that Plaintiff primarily sets out this argument in his Statement of Additional Material Facts in Opposition to Summary Judgment (Dkt. 113 at ¶ 113), addressing the issue in his brief with just a few sentences. (Dkt. 101 at 36). The Court

[Dkt. 103-36][24], at timestamp 51:40-52:00 (Jane Roe was asked to explain the context of a photo; her advisor feeds her responses that she repeats verbatim, and after Jane Roe describes herself as "drunk", the advisor whispers something, and then Jane Roe corrects to "blackout"); [Dkt. 103-36], at timestamp 1:27:35-1:28:55 (Jane Roe was asked to confirm her initial claim that she remembered falling asleep after the incident without pulling up her pants. Jane Roe responds "yes." Roe's advisor then whispers "[unintelligible] didn't understand that", after which Roe suddenly claims she "didn't understand" the question. Roe then changes her testimony and states she did *not* recall falling asleep with her pants still down. Hodge then asked Roe if she recalled making the video [in Tab 18 to the investigative report]. Roe's advisor whispers "I didn't make the video," which Roe then repeats verbatim); [Dkt. 103-36], at timestamp 1:43:00-1:45:15 (Hodge asked Jane Roe whether it was true that she told Chase that she stayed in bed after the incident and fell asleep without pulling her pants back up; Jane Roe responds emphatically "yes", then Roe's attorney whispers to her, Jane Roe asks for a minute, they continue whispering, and then Jane Roe changes her testimony again and claims she has no recollection of saying that to Chase in her interview.).

(Dkt. 113 at ¶ 113).[25]

HWS denies that the audio reflects Roe's advisor providing her with answers. (*Id.*).

Adjudicator Hodge was asked if she recalled Roe's attorney providing her with answers, and she testified "[i]ndependently, I can't recollect that. No. I don't remember." (Dkt. 86-27 at 57). Adjudicator Hodge did recall that "at one point during the hearing . . . the advisor for [Roe] was maybe trying to speak for her, and I noted to both Mr. Bernstein and the advisor for [Roe] that I am expecting to hear from the parties and not from them." (*Id.*).

---

includes his specific examples from his Statement for thoroughness, but declines to consider arguments made in the Statement rather than in the brief.

[24]   The recording of the disciplinary hearing, conducted on March 9, 2020, is filed under seal. (Dkt. 103-36).

[25]   The Court listened to the audio recording, but cannot clearly identify any specific words in the whispering.

Plaintiff's scant one-sentence argument on this issue fails to address how, even fully crediting his interpretation of the whispering, three incidents over the course of a roughly three-hour hearing amounts to a material breach of the rule against advisors not speaking on behalf of the parties. (Dkt. 101 at 36). The record makes clear that both Roe and Plaintiff received advice from their advisors throughout the proceedings, and without more, Plaintiff cannot raise a question of material fact as to whether Roe's advisor was speaking on her behalf, or simply advising her during the hearing.

## I.    Failure to Properly Apply the Preponderance of the Evidence Standard

The Policy provides that a preponderance of evidence standard governs any finding of responsibility, which "means that it is more likely than not that a Policy violation occurred." (Dkt. 86-6 at 6). Plaintiff argues that Adjudicator Hodge failed to apply the proper standard, because "the substantial weight of the evidence supported Plaintiff's testimony, proved that Jane Roe did not lack capacity to consent, and revealed Roe and Smith to be entirely unreliable and inconsistent." (Dkt. 101 at 36). He acknowledges that the Final Outcome Letter sets out the correct standard, but argues that Adjudicator Hodge failed to apply that standard in deciding the case. (*Id.* at 36-37).

Adjudicator Hodge both acknowledges that the standard to be applied is the preponderance of the evidence, and then, as set out fully above, explains why she found the preponderance of the evidence weighed in favor of finding Plaintiff responsible. (Dkt. 86-36 at 3, 6-7). Plaintiff is correct that there is some evidence in the record that supports his version of events—particularly his knowledge that Roe's mother is British. But the

exculpatory evidence he identifies is not so overwhelming as to call into question Adjudicator Hodge's application of the preponderance of the evidence standard, particularly since it rests on credibility findings the factfinder is best positioned to make. Adjudicator Hodge stated that she considered "the credibility of each participant," with "consideration [] given to each individual's ability to observe the facts they provided, recollect the events, their demeanor (if applicable), any independent corroboration and what, if any, motive they have to lie or any bias they may have in the outcome of the case." (*Id.* at 4). Further, Adjudicator Hodge specifically found that Roe had "limited to no recollection of what happened after leaving to go to the party, and only now knows about certain parts of the night from pictures and videos shared by her friends." (*Id.* at 8). In contrast, Plaintiff was sober on the night in question. Inconsistent recollections are consistent with intoxication and incapacitation, less so with being sober. At bottom, Plaintiff simply disagrees with Adjudicator Hodge's assessment of the evidence, particularly the videos and pictures that she found persuasive on the issue of Roe's intoxication and incapacitation. It is not this Court's job to relitigate the underlying claims—the Court's role is limited to determining whether Plaintiff raised a question of material fact as to whether Adjudicator Hodge properly applied the preponderance of the evidence standard. *See, e.g., Roe*, 91 F.4th at 661 ("While Roe has alleged a few significant facts that do indeed weigh in favor of his claims, his allegations as a whole are not sufficient to plausibly support a minimal inference of sex-based discrimination.").

Nor do the cases Plaintiff relies on support his contention—each was decided on a motion to dismiss, and as discussed above a plaintiff's burden on a motion to dismiss is far

lower than at the summary judgment stage.  *See Doe v. Princeton Univ.*, 30 F.4th 335 (3d

Cir. 2022) (motion to dismiss); *Doe v. Syracuse Univ.*, 440 F. Supp. 3d 158 (N.D.N.Y.

2020) (motion to dismiss); *Feibleman v. Trs. of Columbia Univ. in City of N.Y.*, No. 19-

CV-4327 (VEC), 2020 WL 882429 (S.D.N.Y. Feb. 24, 2020) (motion to dismiss).

Plaintiff's one case not involving a motion to dismiss, *Siena College*, is distinguishable.

As discussed above, the plaintiff in that case sought a preliminary injunction to avoid being

suspended after being found responsible for sexual misconduct.  2023 WL 197461, at *1.

Among her other allegations, the complainant claimed to have suffered bruising and a lip

injury during the alleged assault.  *Id.* at *5.  The district court found that there was question

as to whether the hearing office ignored evidence and applied the wrong standard because

there was videotape, medical records, and sworn testimony that directly contradicted the

complainant's claim of injury.  *Id.* at *15.  In contrast, here, Plaintiff relies on perceived

inconsistencies and how Adjudicator Hodge viewed certain evidence, such as the photos

and videos, in determining that Roe was incapacitated and unable to give affirmative

consent.  *See, e.g., Colgate Univ.*, 2017 WL 4990629, at *23 ("The Court cannot engage

in a granular examination of the record to find fault in the Panel's decision-making.")

(collecting cases).  Thus, summary judgment in favor of HWS is warranted on this claimed

breach of contract.

### J.      Failure to Provide Plaintiff with Proper Notice

The Policy provides that when an investigation begins, the parties will receive notice

that identifies the complainant and respondent, "specif[ies] the date, time (if known),

location, and nature of the alleged Prohibited Conduct," and "identif[ies] potential Policy

violation(s)."  (Dkt. 86-6 at 32).  The Notice of Investigation provided to Plaintiff noted that Roe "stated that on October 21, 2018, you entered her room in [her dorm] and sexually assaulted her while she was face down and blacked out on her bed."  (Dkt. 86-7 at 2). Plaintiff argues that "sexual assault" is "an extremely broad definition," and that when he asked for more information before his interview with Chase, Boerner refused to provide it. (Dkt. 101 at 37).  Boerner did decline to provide Plaintiff a copy of the complaint.  (Dkt. 103-29 at 2).  However, Plaintiff and his advisor met with Boerner regarding the charges prior to Plaintiff's meeting with Chase, and Boerner provided him with additional information.  (Dkt. 86-8 at 24).  Plaintiff testified that Boerner answered his "questions regarding the nature of the charges."  (*Id.*).

The Policy does not require that the details of the "Prohibited Conduct" be provided in the Notice of Investigation—it requires only that the violation be identified.  (Dkt. 86-6 at 32).  Even assuming the Policy does require more disclosure, Plaintiff admitted he received additional—and sufficient—information from Boerner before being interviewed by Chase.  Plaintiff's cursory argument does not explain how receiving the underlying details from Boerner, rather than in the Notice of Investigation, in any way affected the outcome of the disciplinary proceedings.  Given that Plaintiff did receive notice of the relevant facts prior to his interview with Chase, the Court finds the undisputed facts establish that HWS substantially complied with the notice requirements set forth in its Policy.

K.      **Failures of the Appeal Panel**

The Policy provides three grounds for appeal: (1) "previously unavailable relevant evidence that could significantly impact the Final Outcome;" (2) "procedural error(s) that had a material impact on the Final Outcome; and" (3) "the sanction is grossly disproportionate to the conduct committed." (Dkt. 86-6 at 38).

Plaintiff's appeal set out a variety of arguments under the heading "Procedural Errors Exist That Had a Material Impact on the Final Outcome," but only one was argued in more than a sentence or two: that the investigation and adjudication took far longer than the time provided for in the policy. (Dkt. 86-39 at 3-4). The Appeal Panel rejected that argument, finding the Policy only states how long an investigation "typically" takes. (Dkt. 86-41 at 2). The Appeal Panel noted that "the investigation was complex, there were school breaks involved, and we do not believe that the length of time it took to investigate and adjudicate the claim was unreasonable." (*Id.*). In addition, and "perhaps more importantly, you have not established how the timing 'had a material impact on the Final Outcome' of the case." (*Id.*). As to the remainder of Plaintiff's arguments, the Appeal Panel found:

> You also claim "procedural errors" by arguing the adjudicator was "biased" in how she evaluated certain evidence and resolved certain credibility issues. Most of these arguments simply reargue the facts or how the evidence should have been weighed, which is not within the scope of an appeal. We find no reason to believe that the adjudicator was biased, and simply because the adjudicator did not weigh the evidence in your favor does not mean she is biased. For example, while you claim that the adjudicator did not consider a video (Appendix 18), the video was, in fact, presented at the hearing and considered by the adjudicator. The remainder of your arguments go to weighing of the evidence and the credibility of witnesses. The adjudicator found [Roe] more credible than you, and offered her reasons why. There is no reason to infer bias, nor do we see any procedural errors.

(*Id.* at 2-3).

Plaintiff perfunctorily argues that the Appeal Panel failed to address his procedural arguments.  (Dkt. 101 at 38).  He does not explain how the arguments he considers unaddressed by the Appeal Panel are procedural within the meaning of the Policy, and also does not argue how he was prejudiced by any such errors.  He also argues that the Appeal Panel failed to review the record.  (*Id.*).  Plaintiff notes that Boerner created a OneHub folder that members of the Appeal Panel could use to access materials relevant to the appeal.  (Dkt. 86-13 at 38).  Based on digital access records that he argues show the panel members did not access all or part of the record—and relying on arguments set out in his Statement of Facts rather than his memorandum of law—Plaintiff draws the inference that members of the Appeal Panel failed to properly review the records.  (Dkt. 101 at 38; Dkt. 113 at ¶¶ 156-161).  HWS argues that the access records do not support such an inference because the record lacks any evidence that the access records accurately reflect each time a party accessed OneHub, and because there is no evidence that the Panel members did not have other access to the appeal materials.  The two panel members who were deposed, Lucas and Flowers, both testified that they reviewed at least part of the record, although neither could recall exactly what was reviewed.  (Dkt. 103-43 at 11, 48; Dkt. 103-40 at 11-12, 14).  Without more, Plaintiff's speculation that "the Appeal Panel did not review or consider key parts of the underlying record, and some of them did not even review Plaintiff's appeal itself" is simply that—speculation.  (Dkt. 101 at 38).

Plaintiff next argues that the evidence "strongly suggests" Flowers "controlled the Appeal decision, the other Panel members merely went along with Flowers' decision, and

Flowers was personally motivated to ensure that Plaintiff's responsibility finding was upheld and that he was punished to the utmost." (*Id.*). Plaintiff notes that "[w]hile Flowers testified that his standard practice would have been to circulate the draft decision to the other Appeal Panel members for their review and approval, no such emails/communications have been produced by Hobart in this litigation, indicating that Flowers alone controlled the decision." (Dkt. 101-2 at ¶ 60). A reasonable jury cannot draw such an inference given that Lucas testified that the panel "came together and discussed the appeal and our decision," and "one of us wrote the [appeal decision], circulated it amongst the three of us and we all agreed on the language or the final language," and that the decision was unanimous. (Dkt. 103-43 at 9). Thus, summary judgment is warranted in favor of HWS on this claimed breach of contract.

### L.     Failure to Properly Preserve Evidence

The Policy states that "[t]he Title IX Coordinator will retain all records relating to reports of Sexual Misconduct for no fewer than eight years." (Dkt. 86-6 at 39). However, it is undisputed that Plaintiff "and his advisor were told that a recording would be made of the interview but would be destroyed after the interview was transcribed and reviewed by" Plaintiff, and neither one objected. (Dkt. 101-1 at ¶¶ 57-58). Plaintiff cannot now argue that the records were improperly destroyed. No rational jury could conclude that this constituted a breach of contract.

### M.     Breach of the Implied Covenant of Good Faith and Fair Dealing

To the extent that Plaintiff attempts to ground a breach of contract claim in the Policy's use of the terms "thorough," "fair" and "impartial" (Dkt. 101 at 38-39), it is well

settled that "general statements of policy" or "broad pronouncements of [a] University's compliance with existing anti-discrimination laws, promising equitable treatment of all students," cannot provide the basis for a breach of contract claim. *Ward v. N.Y. Univ.*, No. 99 CIV. 8733(RCC), 2000 WL 1448641, at *4 (S.D.N.Y. Sept. 28, 2000); *see also Rolph*, 271 F. Supp. 3d at 405-06 ("[A] student asserting a breach of contract claim must identify the specific terms of the implied contract that were allegedly violated by the college (such as an internal rule, regulation, or code), and failure to do so is fatal to the claim."); *Faiaz v. Colgate Univ.*, 64 F. Supp. 3d 336, 359-60 (N.D.N.Y. 2014) (alleged violation of the requirement that "standards of consistency and equity [in disciplinary proceedings] are maintained" does not form basis of breach for contract claim).

Plaintiff argues in the alternative that HWS's action violated the covenant of good faith and fair dealing because it "deliberately skewed the entire process against him in order to support a predetermined outcome of guilt based on Plaintiff's status as a male accused of sexual assault." (Dkt. 101 at 39). "Under New York law, a covenant of good faith and fair dealing is implicit in all contracts." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007). The covenant encompasses a pledge that "neither party to a contract shall do anything that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract, or to violate the party's presumed intentions or reasonable expectations." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 205 (2d Cir. 2018) (alterations adopted and quotation marks and citation omitted). "Where the contract contemplates the exercise of discretion, [the duty of good faith and fair dealing] includes a promise not to act arbitrarily or irrationally in exercising that discretion."

*Cordero v. Transamerica Annuity Serv. Corp.*, 39 N.Y.3d 399, 409 (2023) (citation omitted). "The duty of good faith and fair dealing, however, is not without limits, and no obligation can be implied that 'would be inconsistent with other terms of the contractual relationship.'" *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) (quoting *Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 304 (1983)).

Having found that HWS substantially complied with the terms of the implied contract between itself and Plaintiff, the Court also finds Plaintiff has failed to raise a question of material fact as to whether HWS breached the covenant of good faith and fair dealing. Substantial compliance, by its very nature, allows for a party to make some errors without being held liable for breach of contract. Plaintiff does not point to any record evidence, other than his own spin on the facts, to support his contention that all involved in the proceedings "deliberately skewed the entire process against him in order to support a predetermined outcome of guilt based on Plaintiff's status as a male accused of sexual assault." (Dkt. 101 at 39). The record would not allow a reasonable jury to conclude that HWS acted in an arbitrary manner, or in bad faith.

HWS's motion for summary judgment on Plaintiff's breach of contract claim is, for the reasons given above, granted.[26]

---

[26]   As aptly stated in *Roe*:

We note that, accepting Roe's claims as true, SJU's treatment of him and the complaints against him may well not have been up to the standards that would apply if the issues that the university officials decided were adjudicated in a federal court proceeding. But Doe's and Smith's complaints against Roe were not decided by Article III judges in a federal court—they were decided by school officials in a school setting. Hence, even if we accept

IV.     **CSC's Motion for Summary Judgment**

A.     **Background**

HWS's Policy provides in relevant part:

> Whenever Formal Resolution is commenced, the Title IX Coordinator will designate one or more Investigators from the Colleges and/or an experienced external investigator to conduct a prompt, thorough, fair, and impartial investigation.  All Investigators will receive annual training on issues related to Prohibited Conduct and on how to conduct an investigation that is trauma-informed, fair and impartial, provides parties with notice and a meaningful opportunity to be heard, and protects the safety of Complainants and the HWS community while promoting accountability.

(Dkt. 86-6 at 32).

HWS and CSC entered into an agreement for CSC to "conduct investigations into allegations of violations of HWS's Sexual Misconduct Policy and related policies" (the "Agreement").  (Dkt. 98-2 at 2).  The Agreement does not name either Plaintiff or Roe, and it contemplates CSC conducting more than one investigation on HWS's behalf:

> This Agreement is a Master Agreement between the parties.  HWS may propose that Investigator conduct investigations from time to time.  Investigator may accept such proposed Investigations in its sole discretion.  Any such investigations that Investigator agrees to perform for HWS shall be performed pursuant to the terms of this Agreement.

(*Id.* at 2).  The Agreement further provides:

> If Investigator agrees to undertake the investigation, it shall provide the services described in the Policy with such care and skill as are customarily exercised by a professional investigator, which may generally include but are

---

Roe's claimed innocence and agree that SJU's conduct of Roe's disciplinary proceedings was not flawless, we conclude that, on the record before us, Roe has not alleged facts that could reasonably support a minimal plausible inference of sex discrimination.  And *that* is the issue before us.

91 F.4th at 661.

not limited to: familiarizing itself with the Policy, reviewing the complaint and other documents already gathered by HWS concerning the complaint; interviewing the complainant, the respondent, and other individuals with relevant knowledge; gathering other evidence that may be relevant to the complaint; and preparing a written report concerning the complaint and the investigation, including a summary of the facts, recommended findings of fact, and recommended findings with respect to responsibility, all in accordance with the Policy and the procedures referenced and/or incorporated therein.

(*Id.* at 2-3).

The Agreement required CSC to maintain professional liability insurance "to cover claims or potential claims that might arise in the rendering of services under this Agreement." (*Id.* at 3).  It also provided:

If any Claims are asserted against Investigator connected in any way with matters covered by or connected with this Agreement, Investigator shall promptly notify HWS Title IX Coordinator.

(*Id.* at 4).

## B.    Third-party Beneficiary

CSC moves for summary judgment on the ground that Plaintiff lacks standing to enforce the contract between HWS and CSC because Plaintiff is neither a party to, nor a third-party beneficiary of, the Agreement.[27]  (Dkt. 98-5 at 12-18).

---

[27]    The Agreement provides that it "shall be governed by and construed in accordance with Vermont law." (Dkt. 98-2 at 7).  Despite this, both parties analyzed their claims under New York law, and at oral argument agreed it appropriate to apply New York law.  *See Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 52 (2d Cir. 1984) (even where there is a choice-of-law provision in the underlying contract, the parties may agree as to the law to be applied through their conduct).  The Court therefore applies New York law in its analysis.

"Under New York law, a third party is an intended (as opposed to incidental) beneficiary of a contract 'if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.'"  *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 248 (2d Cir. 2002) (quoting Restatement (Second) Contracts § 302).  "A party asserting rights as a third-party beneficiary must establish '(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost.'"  *State of Cal. Pub. Emps. Ret. Sys. v. Shearman & Sterling*, 95 N.Y.2d 427, 434-435 (2000) (quoting *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 336 (1983)).

"[A]n intent to benefit the third party must be shown, and, absent such intent, the third party is merely an incidental beneficiary with no right to enforce the particular contracts."  *Port Chester Elec. Constr. Corp. v. Atlas*, 40 N.Y.2d 652, 655 (1976) (internal citation omitted).  New York courts generally recognize "a third party's right to enforce a contract in two situations: when the third party is the only one who could recover for the breach of contract or when it is otherwise clear from the language of the contract that there was 'an intent to permit enforcement by the third party.'"  *Dormitory Auth. of the State of N.Y. v. Samson Constr. Co.*, 30 N.Y.3d 704, 710 (2018) (quoting *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38, 45 (1985)).

"[D]ismissal of a third-party-beneficiary claim is appropriate where the contract rules out any intent to benefit the claimant, or where the complaint relies on language in the contract or other circumstances that will not support the inference that the parties intended to confer a benefit on the claimant." *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 124 (2d Cir. 2005) (internal citations omitted). Conversely, "a contractual requirement that the promisor render performance directly to the third party shows an intent to benefit the third party." *Id.*; *see also Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt.*, 692 F.3d 42, 52 (2d Cir. 2012) (analysis focuses on "whether the parties intended to benefit the third party"). A court "should consider the circumstances surrounding the transaction as well as the actual language of the contract." *Subaru Distribs.*, 425 F.3d at 124. The benefit to the third party must be "sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate [the third party] if the benefit [was] lost." *Bayerische Landesbank*, 692 F.3d at 52 (quoting *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 251 (2d Cir. 2006)).

Here, the language of the Agreement does not indicate an intent to make the parties involved in a HWS disciplinary proceeding third-party beneficiaries. Only HWS and CSC are defined as the contracting parties to the Agreement. (Dkt. 98-2 at 2). The Agreement's preamble states that the purpose of the Agreement is for HWS "to retain the services of Investigator to conduct investigations into allegations of violations of HWS's Sexual Misconduct Policy and related policies" and makes no mention of the parties involved in

such allegations.  (*Id.*).  The Agreement provides that CSC agrees to perform investigations "for HWS," without mention of any other parties.  (*Id.*).

Nor does the Policy indicate an intent to provide a direct benefit to the parties of a disciplinary proceeding.  Rather, the language of the Policy makes clear that the investigations are intended to benefit HWS by providing a record for its disciplinary process.  The Policy provides in pertinent part that the "Title IX coordinator will designate one or more Investigators from the Colleges and/or an experienced external investigator to conduct a prompt, thorough, fair, and impartial investigation."  (Dkt. 86-6 at 32).  It specifies that "[t]he investigation is a neutral fact-gathering process."  (*Id.*).  Under the Policy, the parties are provided with an opportunity to review and comment on both the preliminary and final investigative report, but there is no mention of the parties using or relying on the reports.  Rather, the Final Investigative Report is first used by the Title IX coordinator to determine whether to take the proceedings to the next step.  (*Id.* at 34).  If the parties proceed to an administrative conference, then "[t]he Final Investigative Report will serve as the primary evidence in making a determination of responsibility."  (*Id.* at 35).  If the parties proceed to a hearing before an adjudicator, then the parties may "address any information in the Final Investigation Report and the supplemental statements submitted in response to the Final Investigation Report."  (*Id.*).

The Policy provisions make clear that the primary purposes of the investigative services rendered by CSC is to create an evidentiary record for HWS (1) to use in deciding how to proceed after a complaint is filed, and (2) to assist the adjudicator appointed by HWS in making a finding of responsibility.  Any benefit that flows to a party to a

disciplinary proceeding is incidental, not direct.  *See McPheeters v. McGinn, Smith and Co.*, 953 F.2d 771, 774 (2d Cir. 1992) ("A third-party beneficiary exists, however, 'only if the parties to that contract intended to confer a benefit on him when contracting; it is not enough that some benefit incidental to the performance of the contract may accrue to him.'") (quoting *Kyung Sup Ahn v. Rooney Pace, Inc.*, 624 F. Supp. 368, 371 (S.D.N.Y. 1985)).

While not binding, *Velastequi v. Exchange Insurance Co.*, 132 Misc.2d 896 (N.Y. City Civ. Ct. 1986), is persuasive.  There, plaintiff was an insured whose insurance was cancelled because of a motor vehicle accident.  *Id.* at 897.  Plaintiff sued both his insurance company and the claims investigator hired by his insurance company to investigate and report on the plaintiff's accident.  *Id.*  Plaintiff argued that he was a third-party beneficiary of the contract between his insurance company and the claims investigator.  *Id.*  He alleged that the investigator "did not make a meaningful investigation; did not comply with its obligation towards the codefendant, and submitted wrong and malicious reports which caused the codefendant to cancel the insurance policy."  *Id.*  The court concluded that "no privity of contract existed between the plaintiff and defendant," and that "[a]t best, a contract exists between the plaintiff and the defendant" insurer.[28]  *Id.*  The investigator, the court concluded, "was retained to obtain a statement of facts from the plaintiff."  *Id.*  "A statement of facts is a detailed accounting made by the assured to its assurer, of an

---

[28]      While Plaintiff notes, correctly, that *Velastequi* also addresses a novel issue of tort law (Dkt. 102 at 18), the court also analyzed plaintiff's claim that he was a third-party beneficiary to the agreement between the insurer and the adjuster.  132 Misc.2d at 897-98.

occurrence, based upon which the insurance company is obligated, by contract, to defend the assured against any claims arising therefrom." *Id.*  The court found that "all services rendered" by the investigator "were performed for the benefit" of the insurer, but "[t]his does not make the plaintiff a beneficiary of the purpose for which the person procuring the statements was so retained." *Id.*  The court relied on Restatement of Contracts § 147, which states that "[a]n incidental beneficiary acquires by virtue of the promise no right against the promisor or promisee." *Id.* at 898.  Just as the investigator's report was made for the benefit of the insurer, even though plaintiff may receive some incidental benefit from it, so too here the investigations undertaken pursuant to the Agreement were for the benefit of HWS, and any benefit to Plaintiff was incidental.

Plaintiff's reliance on *Finch, Pruyn & Co. v. M. Wilson Control Servs. Inc.*, 239 A.D.2d 814 (3d Dept. 1997), is misplaced.  There, plaintiff hired an electrician to replace a transformer.  *Id.* at 814-15.  The electrician hired a subcontractor to perform the work. *Id.* at 815.  While doing the work, the subcontractor made a mistake that forced plaintiff's factory to close for a period of time.  *Id.*  Plaintiff sued both the electrician and the subcontractor.  *Id.*  The Appellate Division found that plaintiff was a third-party beneficiary to the contract because the subcontractor was hired to do the work necessary to the completion of the contract between the plaintiff and the electrician.  *Id.* at 815-16.  Plaintiff argues that HWS specifically hired CSC to perform HWS's obligations under the Policy to provide an investigation, making him the third-party beneficiary of the Agreement.  (Dkt. 102 at 15).

Plaintiff's argument, however, ignores a key part of the Appellate Division's analysis: that the work to be performed "necessarily required [the subcontractor] to directly perform services at plaintiff's facility." *Finch, Pruyn*, 239 A.D.2d at 816. "Such circumstances evidence a clear intent by [the electrician], as promisee, 'to give [plaintiff] the benefit of the promised performance.'" *Id.*; *see also Jones v. County of Chenango*, 180 A.D.3d 1199, 1199-1200 (3d Dep't 2020) ("Defendants were "necessarily required . . . to directly perform services at plaintiff's" home to satisfy their contractual obligations, provided those services under a program intended to benefit plaintiff and were required by that program to repair any damage they caused to the home, all of which evinces the clear intent of defendants and the County to make plaintiff the intended third-party beneficiary of their contract.").  In other words, it is not enough that CSC was hired to fulfill HWS's obligation to provide an investigation—there must be other indicia that the contract was intended to benefit the third party.

Also unpersuasive is Plaintiff's reliance on § 3.2 of the Agreement, which states that "[i]f any Claims are asserted against Investigator connected in any way with matters covered by or connected with this Agreement, Investigator shall promptly notify HWS Title IX coordinator."  (Dkt. 98-2 at 4).  Plaintiff argues that "[i]f the parties intended that *only* Hobart could sue CSC under the contract, it would be nonsensical to require CSC to notify Hobart of any claims made against it." (Dkt. 102 at 13).  This argument lacks merit. The fact that the parties contemplated CSC may be sued by others in relation to work undertaken pursuant to the Agreement—a claim for defamation, for example—does not evidence a specific intent to allow Plaintiff to enforce the Agreement.

Plaintiff also relies on the "express" incorporation of the Policy into the Agreement, arguing that since the Policy promises HWS will undertake an investigation, and he is the direct beneficiary of that promise in the Policy, the Agreement is plainly intended to provide a benefit to him.  (Dkt. 102 at 12).  As set out above, the language of the Policy does not evidence an intent that investigations are intended to provide parties to the disciplinary proceeding with a direct benefit.  To the extent that Plaintiff is arguing that the entirety of the Policy is incorporated by reference into the Agreement, that position is not consistent with New York law.  When "a document 'incorporates by reference certain provisions of another [document], that reference does not alone demonstrate the parties' intent to incorporate other terms not expressly referenced.'"  *Mindspirit, LLC v. Evalueserve Ltd.*, 346 F. Supp. 3d 552, 585 (S.D.N.Y. 2018) (quoting *Norcast S.ar.l. v. Castle Harlan, Inc.*, No. 12 CIV. 4973 PAC, 2014 WL 43492, at *5 (S.D.N.Y. Jan. 6, 2014)).

In other words, the only terms of the Policy that are incorporated by reference into the Agreement are those specified in the Agreement.  The Agreement provides that "[i]f Investigator agrees to undertake the investigation, it shall provide the services described in the Policy with such care and skill as are customarily exercised by a professional investigator . . . all in accordance with the Policy and the procedures referenced and/or incorporated therein."  (Dkt. 98-2 at 2-3).  The Agreement thus incorporates only the procedures set out in the Policy for how an investigation is to be performed, not every provision of the Policy.  Plaintiff cannot enforce the terms of his implied contract with HWS by asserting third-party beneficiary status under the Agreement between HWS and

CSC.  *See, e.g., Debary v. Harrah's Operating Co.*, 465 F. Supp. 2d 250, 268 (S.D.N.Y. 2006) (existence of separate contracts indicated that agreement "most certainly did not intend to confer third-party beneficiary rights" because those rights "were clearly defined elsewhere"); *4 Hour Wireless v. Smith*, No. 01 Civ. 9133 (RO), 2002 WL 31654963, at *5 (S.D.N.Y. Nov. 22, 2002) ("conclusion that Calypso was not an intended third-party beneficiary of the AT&T/4 Hour contract is buttressed by Calypso's own agreement with 4 Hour").

The Court finds no reasonable jury could find Plaintiff an intended third-party beneficiary of the Agreement between HWS and CSC, and grants CSC's motion for summary judgment.

## CONCLUSION

For the reasons set forth above, HWS's motion for summary judgment (Dkt. 86) and CSC's motion for summary judgment (Dkt. 98) are granted.  The motion to strike the expert report and preclude the expert's testimony (Dkt. 104) is denied as moot.  The Clerk of Court is directed to enter judgment and to close the case.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:        September 24, 2024
              Rochester, New York